FILED

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

MAY 1 3 2011

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
              DEPUTY CLERK

| | | |
|---|---|---|
| RAMON TORRES HERNANDEZ, | § | |
| TDCJ No. 999431, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| V. | § | CIVIL NO. SA-08-CA-827-OG |
| | § | |
| RICK THALER, Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional | § | |
| Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER DENYING RELIEF

Petitioner Ramon Torres Hernandez filed this federal habeas corpus action pursuant to Title 28 U.S.C. Section 2254 challenging his October, 2002 Bexar County conviction for capital murder and sentence of death. For the reasons set forth hereinafter, petitioner is entitled to neither federal habeas relief nor a Certificate of Appealability from this Court.

## I. Background

A.   The Cold Case

On the evening of December 16, 1994, a pair of middle school girls, cousins Sarah Gonzales and Priscilla Almares, disappeared while walking together not far from Sarah's residence in the Timber Creek area of San Antonio.[1] On December 17, 1994, a group

_____

[1] At petitioner's trial, an acquaintance of Sarah Gonzales testified (1) December 16, 1994 was the last day of school before Christmas break that year, (2) he attended Anson Jones Middle School with Sarah Gonzales, (3) that day, Sarah asked him for his

of employees from an automobile dealership and their families out

delivering Christmas baskets to needy families discovered the

lifeless bodies of Sarah and Priscilla lying in the high brush

along side a road.[2]  The medical examiner testified both girls'

---

phone number, (4) when he gave her his phone number, Sarah wrote
it down on her hand, and (5) he never saw Sarah thereafter.
Statement of Facts from Petitioner's Trial (henceforth "S.F.
Trial"), Volume 21, testimony of Damon Bailey, at pp. 18-23.
     Another of Sarah Gonzales' classmates at Anson Jones Middle
School testified (1) she and Sarah were both in the seventh grade
in December, 1994, (2) she invited Sarah to attend a Christmas
party at her home on the evening of December 16, 1994, (3) Sarah
asked her if Sarah could bring her cousin Priscilla to the party,
(4) after school that afternoon, she saw Sarah get off the bus at
the corner of Meadow Way and Timber Creek, (5) around five or six
p.m., she saw Sarah and Priscilla walking down Meadow Way toward
the corner of Meadow Way and Marbach, where a Church's fried
chicken restaurant was located, (6) she gave Sarah a flyer
announcing the Christmas party, (7) neither Sarah nor Priscilla
ever arrived at her party, and (8) she never saw either of them
thereafter. S.F. Trial, Volume 21, testimony of Julia Miera, at
pp. 27-37, 46.
     The aunt of both Sarah and Priscilla testified (1) she
picked up Priscilla from Peas Middle School on December 16, 1994
and dropped Priscilla off at Sarah's home on Timber Creek, (2)
Sarah and Priscilla were close friends in addition to being
cousins, (3) after watching Priscilla enter Sarah's home, she
never saw either girl again, and (9) in December, 1994, Priscilla
was twelve years old and Sarah was thirteen. S.F. Trial, Volume
21, testimony of Nelda Charles, at pp. 50-63.


     [2] S.F. Trial, Volume 21, testimony of Robert Allen Strom,
II, at pp. 64-68; testimony of Mary Lou Phillips, at pp. 72-76;
testimony of Robert Neaves, at pp. 78-81; testimony of Harold
Sipple, at pp. 91-94.
     The San Antonio Police officer who processed the crime scene
testified (1) the girls' bodies were found in the 6500 block of
Keitha Road, lying in the grass along the asphalt and gravel
shoulder of a roadway in a trashy area not far from a cul-de-sac,
(2) one girl was missing a shoe, and (3) it appeared the girls
had been brought there from another location and dumped there.
S.F. Trial, Volume 21, testimony of Mark Witherell, at pp. 98-

bodies showed signs of severe sexual assault and asphyxiation by strangulation, possibly either manual or ligature.[3]  Sarah's sexual assault kit revealed no sperm.[4]  Priscilla's vaginal slide did not reveal any sperm but her anal slide did show the presence of sperm.[5]  DNA testing employing the techniques available in 1995 managed only to exclude two gang members whom law enforcement officers were investigating at that time.[6]  The trail

---

124.

[3] More specifically, the medical examiner who performed the autopsies on both girls' bodies testified (1) Priscilla was missing one boot and her shirt was pulled up to reveal her bra, (2) both girls had freshly masticated chicken and french fries in their stomachs, (3) both girls' torsos were exposed and showed contusions thereon, (4) both girls showed signs of severe sexual assault, i.e., significant injuries to their vaginal areas consistent with trauma that would have necessitated medical evaluation, including vaginal bruising, injuries to the hymen, and blood in their vaginal vaults, (5) the sexual assaults occurred in both girls while they were alive, (6) Priscilla had tearing of her vaginal walls, (7) both girls died as a result of strangulation, (8) it was not possible to determine the method of strangulation employed to kill either girl, (9) the method used to strangle the girls would have been either manual, an irregular ligature such as a towel, or even the crook of the elbow, and (10) neither of the girls' bodies were very dirty. S.F. Trial, Volume 21, testimony of Steven A, Erickson, at pp. 128-66.

[4] S,.F. Trial, Volume 21, testimony of Lonnie Ginsburg, at pp. 175-76.

[5] Id., at pp. 177, 180, 183, 186-87.

[6] A San Antonio Police Sergeant testified police forwarded DNA samples from two gang members murdered after the discovery of the girls' bodies to the Texas DPS Lab in Austin for comparison against the DNA found in Priscilla's anal swab. S.F. Trial, Volume 22, testimony of Martin J. Landgraf, at pp. 17-19.
A Texas Department of Public Safety DNA Supervisor and a former employee of the DPS Lab testified DQ Alpha and D1S80 tests

of Sarah and Priscilla's killer quickly grew cold until DNA

testing performed in 2001 showed petitioner's DNA to be a match

for the sperm fraction of Priscilla's anal swab.[7]

B.  The Disappearance of Rosa Rosado

On the evening of March 31, 2001, Rosa Maria Rosado

disappeared while en route to work.[8]

C.  The Confession of Asel Abdygapparova

On April 5, 2011, Asel Abdygapparova met with a San Antonio

Police Homicide Detective and gave a five-page written statement

detailing her knowledge of Rosado's abduction, robbery, sexual

assault, and murder by petitioner Ramon Hernandez and Santos

Minjarez.[9]  On April 6, 2011, Abdygapparova led police to a

_____

conducted in 1995 excluded each of those two suspects as possible
donors of the sperm fraction of the mixed sample found in
Priscilla's anal swab. S.F. Trial, Volume 21, testimony of Irma
Rios, at pp. 215-31; testimony of Kathleen Zeller, at pp. 244-48.

[7] S.F. Trial, Volume 24, testimony of Garon Foster, at pp.
50-54; testimony of Meghan Clement, at pp. 92-94.

[8] S.F. Trial, Volume 22, testimony of Patricia Hernandez, at
pp. 40-49.

[9] A copy of Asel Abdygapparova's written statement appears
at pages 299-303 of petitioner's State Habeas Transcript.
    Asel's statement described Rosado's abduction and robbery by
Minjarez and petitioner before petitioner drove them to a hotel,
where Abdygapparova rented a room and Minjarez sexually assaulted
Rosado multiple times:
        I drove back to the hotel and knocked on the door.
    It took about ten minutes to get back.  The door
    opened, but I don't know who opened it.  I saw Santos
    and Ramon standing there, and they had their clothes
    on.  I saw the girl on the bed.  She was just laying
    down.  She had a top on, but nothing from the waist

4

down.  She was still alive, but still had her mouth
covered.  I went to use the bathroom.  While I was in
there Ramon walked in.  I don't remember if he said
anything, but I was asking him what they were going to
do.  He wouldn't answer.  I walked out of the bathroom
and I saw Santos.  He was raping the girl.  He was
sitting in a chair and he was holding her in his lap
and was raping her.  She was facing away from him and
her hands were tied.  She still had the top on, and she
wasn't saying anything because her mouth and face were
still covered.  Santos still had his boots on.  His
pants were still on him, but were down by his boots.  I
knew he was raping her and she didn't want to do that.
I don't think she would have done that herself.  I felt
bad for her because what Santos and Ramon were doing to
the girl wasn't right.  It was upsetting me very much.
     Ramon called me back into the restroom.  He said
something, but I don't remember what he said.  We
waited in there, then Santos came in.  I walked out of
the restroom and sat on a chair.  The girl was laying
on the bed.  She had a blanket from my car covering
her.  It was a red and blue blanket.  She was still
alive.  Santos or Ramon, I don't remember which one,
called me back to the restroom.  One of them told me to
go buy a shovel.  I'm not sure which told me.  Then
Santos walked out.  After he walked out I asked Ramon
what they were going to do.  Ramon told me to just go
get the shovel.  When I walked out I saw Santos raping
her again.  He was standing by the bed, and she was
still on the bed.  She was still alive, on her knees,
and facing away from him.  I went back into the
bathroom, but Ramon was telling me to leave and go get
the shovel.  I was asking him to go with me because I
was scared and didn't know what they were going to do,
but he walked me out of the hotel room to the car.  As
I was walking by I guess Santos finished his thing
because he pushed the girl on the bed.  I wasn't
looking at him, but I could see him pull his pants up
through the side of my vision.  I would not look at the
girl because I was scared.  I felt very bad for her
because nobody deserves that.  She hasn't done anything
to them to be treated like that.
     I was still asking Ramon to go with me, but he
said no, he had to stay there with Santos.  I left and
went to the Walmart on 410 and Evers.  I went in and
bought a shovel.  It was long with a straight wooden

5

clearing near the University of Texas at San Antonio campus off 1604 and Chase Hill Boulevard where police found Rosado's body buried in a shallow grave.[10]   Abdygapparova also led police to the motel where she informed police petitioner and Minjarez had held Rosado during her final hours.[11]

---

handle and a curved edge for the blade.  That was sometime around 11:00pm I think.  That time just sticks in my head for some reason.
        After I bought the shovel I went back to the motel room.  I parked the car and knocked.  Santos opened the door.  He wouldn't let me in, but walked me back to the car.  He was telling me not to go in there.  I asked him why, what did they do in there.  He said she is gone.  I said what do you mean, you killed her?  He said "yes, she is gone."  He told me to wait outside. I was waiting by the car.  Santos came back out and called me to the room.  I went into the room and saw her laying down on the floor.  She didn't have a towel on her head anymore and she had no clothes on.  That is when I saw her body.  She was dead.  She wasn't moving, and she didn't have the towel on her head or the tape on her wrists.  Her eyes were closed, and there was some blood on the right side of her face.  I couldn't tell where it was coming from.  They told me they have to bury her.

Statement of Asel Abdygapparova, Transcript of pleadings, motions, and other documents filed in petitioner's state habeas corpus proceeding (henceforth "State Habeas Transcript"), Volume I, at pp. 300-01.
        Abdygapparova's statement then detailed how the trio transported Rosado's body to a location near the UTSA campus along Loop 1604 and buried her in a shallow grave.

[10] S.F. Trial, Volume 22, testimony of John Kellogg, at pp. 50-55, 57, 65-67, 75; testimony of Doug Ryan, at pp. 76-84, 93-99; testimony of Katie Allen, at pp. 99-112.  S.F. Trial, Volume 23, testimony of Andrew Carian, at pp. 29-30.

[11] S.F. Trial, Volume 22, testimony of John Kellogg, at pp. 56-57; testimony of Harold Bellamy, at pp. 129-33; testimony of Michael Garcia, at pp. 150-54, 157-88.  S.F. Trial, Volume 23, testimony of Andrew Carian, at pp. 31-32.

D. <u>Petitioner's Arrest and First Interrogation (April 6, 2001)</u>

San Antonio Police arrested petitioner during the early morning hours of April 6, 2001.[12]  From approximately 2:25 to 5:00 a.m. on April 6, 2011, San Antonio Police Detectives John Kellogg and Andrew Carian interviewed petitioner after giving petitioner his *Miranda* warnings.[13]  Initially, petitioner denied

---

The owner of the motel to which Abdygapparova led police testified at trial (1) he rented a room to Abdygapparova on March 31, 2001 at approximately 8:50 p.m., (2) Abdygapparova registered under the name "Asel Lee," (3) he did not see others in the room in question on that night, (4) but when he checked the room later, a bed spread was missing, and (5) police later searched the room in question and removed carpeting and chair cushions. S.F. Trial, Volume 22, testimony of Ansuya Bhagat, at pp. 114-26.

An employee of the WalMart where Abdygapparova purchased the shovel used to bury Rosado's body identified a surveillance video tape recording that appeared to depict Abdygapparova purchasing a shovel at approximately 10:45 p.m. on March 31, 2001. S.F. Trial, Volume 22, testimony of John Hernandez, at pp. 135-44.

[12] S.F. Trial, Volume 23, testimony of Kenneth Tollett, at pp. 13-15.

During the evidentiary hearing held in October, 2007 in petitioner's state habeas corpus proceeding, both petitioner and his mother testified petitioner was arrested at approximate two a.m. on April 6, 2001. Statement of Facts from State Habeas Hearing (henceforth "S.F. State Habeas Hearing"), Volume 3 of 10, testimony of Ramon Hernandez, at p. 194; testimony of Gloria Torres Hernandez, at p. 304.

[13] S.F. Trial, Volume 2, testimony of Andrew Carian, at pp. 27-38; S.F. State Habeas Hearing, Volume 5 of 10, testimony of John Kellogg, at pp. 50-55; Volume 5 of 10, testimony of Andrew Carian, at pp. 87-95.

Detective Kellogg testified he was not present throughout the entirety of petitioner's April 6, 2011 interview but, rather, was present for approximately 45 minutes beginning shortly after Detective Carian began interviewing petitioner and then for a second, shorter, period before Kellogg left the Police homicide office around 3:30 a.m. S.F. State Habeas Hearing, Volume 5 of 10, testimony of John Kellogg, at pp. 49-55, 70-71.

7

knowing either Minjarez or Abdygapparova.[14]  Petitioner

eventually admitted he knew Minjarez but then asked for an

attorney and his interview promptly halted.[15]

E. Petitioner's Second Interrogation (April 7, 2001)

Around 11:45 a.m. on April 7, 2001, petitioner met with

Bexar County Adult Detention Center social worker Kim Robinson

and, shortly thereafter, with BCADC intake and release supervisor

Rogelio Contreras.[16]  Deputy Contreras notified the San Antonio

Police Department's homicide office that petitioner wished to

speak with detective Carian.[17]  Later that same date, detectives

Carian and Kellogg met with petitioner at the BCADC and, after

again being given his *Miranda* warnings, petitioner agreed to be

transported to the San Antonio Police for the purpose of giving a

formal written statement.[18]  Petitioner thereafter gave a nine-

---

[14] S.F. Trial, Volume 2, testimony of Andrew Carian, at pp.
27-37; S.F. State Habeas Hearing, Volume 5 of 10, testimony of
Andrew Carian, at pp. 88-91, 122-28, 131-32.

[15] *Id.*

[16] S.F. Trial, Volume 2, testimony of Kim Robinson, at pp.
4-17; S.F. State Habeas Hearing, Volume 4, of 10, testimony of
Rogelio M. Contreras, at pp. 238-53; Volume 5 of 10, testimony of
Kim Robinson, at pp. 3-46.

[17] S.F. State Habeas Hearing, Volume 4 of 10, testimony of
Rogelio M. Contreras, at pp. 240-52; Volume 5 of 10, testimony of
Andrew Carian, at pp. 96-97.

[18] S.F. Trial, Volume 2, testimony of Andrew Carian, at pp.
38-44; S.F. State Habeas Hearing, Volume 3, testimony of Ramon
Hernandez, at p. 251; Volume 5 of 10, testimony of John Kellogg,
at pp. 61-66; testimony of Andrew Carian, at pp. 97-107

page, written statement which petitioner reviewed and edited very carefully.[19]  In his written statement executed April 7, 2001, petitioner stated (1) he and Minjarez decided to rob Rosado when they spotted her near a bus stop, (2) he drove the vehicle during Rosado's abduction, but (3) Minjarez was the person who actually sexually assaulted and murdered Rosado.[20]  Petitioner does not claim there was any factually inaccurate information contained in his written statement.[21]

F. Indictment

On March 12, 2003, a Bexar County grand jury indicted petitioner in cause no. 2002-CR-1613 on a single Count of capital murder, alleging four different theories of that offense.[22]  More specifically, petitioner was charged with (1) having

---

[19] S.F. Trial, Volume 2, testimony of Andrew Carian, at pp. 38-43; Volume 23, testimony of Andrew Carian, at pp. 37-39, 63-64. S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 221, 223, 225-26, 230, 233-34, 251, 287-88. Petitioner's nine-page written statement was admitted into evidence during petitioner's trial as State Exhibit no. 195 and read in open court. S.F. Trial, Volume 23, testimony of Andrew Carian, at pp. 37-62.  Copies of petitioner's written statement also appear at S.F. Trial, Volume 29 (State Exhibit 5 from the hearing on petitioner's motion to suppress) and Volume 30 (State Exhibit 195 from trial).

[20] S.F. Trial, Volume 23, testimony of Andrew Carian, at pp. 49-55.

[21] S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 237-38.

[22] Transcript of pleadings, motions, and other documents filed in petitioner's state trial court proceeding (henceforth "Trial Transcript"), at pp. 4-6.

9

intentionally and knowingly murdered Rosado while in the course

of committing and attempting to commit the predicate felonies of

aggravated sexual assault, kidnaping, and robbery upon Rosado and

(2) having committed more than one murder (i.e., the murders of

Rosa Rosado, Sarah Gonzales, and Priscilla Almares) during

different criminal transactions but pursuant to the same scheme

and course of conduct.[23]

G. <u>Petitioner's Motion to Suppress His Statement</u>

On March 20, 2002, the state trial court held an evidentiary

hearing on petitioner's motion to suppress, as involuntary, his

written statement.  Petitioner did not testify during the hearing

on his motion to suppress.

The social worker with whom petitioner spoke on the morning

of April 7, 2001 testified (1) petitioner appeared anxious when

she spoke with him, (2) when petitioner indicated he wanted to

get something off his chest, she halted her interview of

petitioner and had the booking sergeant take petitioner away, (3)

while petitioner was anxious and upset, she did not consider him

suicidal, and (4) petitioner's exact words to her were that he

would feel better if he got something off his chest.[24]

---

[23] *Id.*

[24] S.F. Trial, Volume 2, testimony of Kim Robinson, at pp.
4-17.

A San Antonio Police detective testified (1) on April 7, 2001, he received a call from the jail around 11:40 a.m. saying that a person arrested in a homicide wished to talk regarding the case, (2) he paged Detective Carian, and (3) the day before, i.e., on April 6, 2011, petitioner's interview with Detective Carian had terminated as soon as petitioner asked for an attorney.[25]

The detective who took petitioner's written statement on April 7, 2001 testified (1) he had contact with Asel Abdygapparova on April 6, 2001 and Abdygapparova furnished information which led to the discovery of Rosado's body and the arrests of petitioner and Minjarez, (2) Abdygapparova identified petitioner as her boyfriend and identified a motel from which evidence was recovered, (3) after petitioner's arrest on April 6, 2001, he personally read petitioner his rights off a printed card, (4) petitioner claimed initially that he didn't know Minjarez or Abdygapparova, (5) petitioner later admitted he knew Minjarez but denied any knowledge of the offense and then requested a lawyer, (6) the following date, April 7, 2001, while in Austin, he received a page shortly before noon indicating the petitioner wanted to speak with him, (7) when he arrived at the BCADC, he once more read petitioner his rights, (8) petitioner

---

[25] S.F. Trial, Volume 2, testimony of Barney Dale Whitson, at pp. 18-26.

11

indicated he was willing to talk with police and to go to the police homicide office, (9) petitioner claimed Minjarez actually committed the offense, (10) petitioner carefully edited the first and final drafts of the written statement, making many changes thereto, (11) no promises or threats were made to petitioner to induce petitioner's statement, (12) petitioner indicated he understood his rights, (13) petitioner was furnished with drinks and snacks and given restroom breaks during his interview, (14) the detective was unaware petitioner was taking any prescribed medications for depression or that petitioner had been in contact with the BCADC's mental health department, (15) petitioner's demeanor during his April 7, 2001 interview was "serious," not emotional, (16) he did confront petitioner with the statements of both Abdygapparova and Minjarez, and (17) petitioner appeared to have a rational understanding of the facts of the case, made sense, and did not appear to be "out of it" or to be unaware of what was going on.[26]

At the conclusion of the hearing, the state trial judge denied petitioner's motion to suppress petitioner's written statement.[27]

H. Additional DNA Testing

---

[26] S.F. Trial, Volume 2, testimony of Andrew Carian, at pp. 26-59.

[27] S.F. Trial, Volume 2, at p. 63.

12

More sophisticated DNA testing revealed that (1) petitioner could not be excluded as a possible donor of the sperm fraction of the anal swab from Priscilla Almares' rape kit[28] and (2) Minjarez could not be excluded as a possible source of semen found on a carpet stain in the motel room to which Abdygapparova led police.[29]

I. Guilt-Innocence Phase of Trial

The guilt-innocence phase of petitioner's capital murder trial commenced on October 1, 2002.

1. The Prosecution's Case

In addition to the evidence summarized above, including petitioner's written statement which was read in open court, the jury also heard testimony from the Bexar County medical examiner who testified (1) Rosado died as a result of asphyxiation, (2) Roasado's body showed indications that pressure had been applied to the back of her neck, causing hemorrhaging into the whites of her eyes, (3) he was unable to determine the precise manner in which Rosado had been asphyxiated, (4) both Sarah Gonzales and Priscilla Almares were strangled but he was unable to determine

---

[28] S.F. Trial, Volume 24, testimony of Garon Foster, at pp. 50-54; testimony of Meghan Clement, at pp. 92-94. One DNA expert testified that a small amount of foreign genetic material was found in Priscilla's vaginal area but the material was insufficient for DNA testing. *Id.*, Volume 24, testimony of Garon Foster, at p. 84.

[29] S.F. Trial, Volume 24, testimony of Garon Foster, at pp. 45-48, 71.

if the precise method of strangulation was manual or a ligature,
(5) to cause death by strangulation, it would be necessary to
apply pressure for somewhere between ninety seconds to two and a
half minutes, (6) unconsciousness can be achieved in the average
adult by applying pressure to the neck for ten to fifteen
seconds, (7) Rosado suffered reddish and greenish bruises on her
face, forehead, chin, the bridge of her nose, and cheeks, as well
as multiples bruises on her arms and legs (8) Rosado suffered
chemical burns on her right cheek as a result of application of
an alkaline compound such as lye bleach, (9) Rosado also suffered
bleaching stains on her upper torso, (10) Rosado suffered
multiple hemorrhages, contusions, and abrasions to her vaginal
area, (11) Rosado's head injuries were consistent with her having
been beaten about the head, i.e., with blunt force trauma to the
head, (12) Rosado's leg injuries were consistent with her leg
having been caught in a closing car door, as petitioner indicated
in his written statement, (13) Sarah Gonzales suffered multiple
bruises to her forehead and the left side of her face, as well as
the back of her neck, (14) internal bleeding was observed in both
of Sarah's eyes, (15) Sarah suffered a laceration, a contusion,
and multiple abrasions to her vaginal area, as well as trauma to
her hymen and bruising and hemorrhaging of her vaginal walls
consistent with vaginal penetration, (16) Priscilla Almares also
suffered facial injuries, Petechiae in the her facial skin and

14

the whites of both her eyes, (17) Priscilla suffered scrapes to the left side of her chest, (18) Priscilla suffered multiple vaginal lacerations consistent with vaginal penetration, (19) while both Sarah and Priscilla suffered post-mortem ant bites, their bodies were unusually clean for a sexual assault case, (20) all three case showed similarities, to wit, all were young females who were abducted, sexually assaulted, beaten about the head, killed by asphyxiation in a manner he could not definitively determine but which indicated they had not offered much resistance, (21) all three victims had pressure applied to their necks, and (22) Rosado's body had been cleaned with bleach and the two girls' bodies appeared unusually clean.[30]

  2. <u>The Defense's Evidence</u>

  An acquaintance of Sarah and Priscilla testified (1) she saw Sarah and Priscilla at Westlakes Mall on the evening of December 16, 1994 in the company of a young man, possibly around age 19 or 20, whom she had not met before and who did not appear to want to look at her, (2) she later saw the two girls riding in a minivan driven by an unidentified male, and (3) a person she did not know later showed her a Polaroid photograph of Priscilla naked with three guys who were throwing gang signs.[31]  On cross-examination,

---

[30] S.F. Trial, Volume 24, testimony of Vincent DiMaio, at pp. 131-40, 151-79.

[31] S.F. Trial, Volume 25, testimony of Tina Marie Garcia, at pp. 10-31.

however, she admitted her statement to police indicated the date she had seen the two girls was December 12, 1994 and she had not gone to the police when she learned of the girls' deaths on December 17, 1994.[32]

A resident of the area from which the girls disappeared testified that, on December 16, 1994, he observed Sarah and Priscilla walking down the street and being followed by three young, teenage guys who appeared to be harassing the girls.[33]

Another witness testified (1) he saw two girls walking during the early morning hours of December 17, 1994 near the access road to Loop 410 near Marbach Road, (2) the girls appeared to be having trouble with a group of guys in a pickup truck with whom the girls were arguing, (3) petitioner was not among the men in the pickup truck, (4) he was not certain the two petite girls he had seen were Sarah and Priscilla, and (5) the guys in the pickup truck were wearing gang attire.[34]

A psychiatrist employed at the BCADC reviewed for the jury's benefit the petitioner's history of medications on April 7, 2001, pointing out petitioner's BCADC medical records indicated (1) petitioner received 20 mg of Prozac at approximately 11:05 a.m.

---

[32] *Id.*, at pp. 36-37.

[33] S.F. Trial, Volume 25, testimony of Kelvin Payne, at pp. 39-55.

[34] S.F. Trial, Volume 25, testimony of Russell Gutierrez, at pp. 66-86.

on that date, or the equivalent of "a couple cups of coffee," and (2) petitioner appeared anxious but coherent and said he would feel better if he got something off his chest.[35]

### 3. The Verdict

On October 9, 2001, the jury returned its verdict at the guilt-innocence phase of petitioner's trial, finding petitioner guilty of capital murder, as charged in the indictment.[36]

## J. Punishment Phase of Trial

The punishment phase of petitioner's capital murder trial commenced on October 10, 2002.

### 1. The Prosecution's Evidence

A former neighbor of the petitioner's family testified about an incident in April, 1986 in which he and his wife returned home to find their home had been "turned upside down" and law enforcement officers later found his television in the kids' bedroom next door, his wife's jewelry box in an ice chest in

---

[35] S.F. Trial, Volume 25, testimony of Dr. Ceasar Garcia, at pp. 111-16.

[36] S.F. Trial, Volume 26, at pp. 124-25; Trial Transcript, at p. 263; State Habeas Transcript, Volume II, at p. 336. Petitioner's co-defendants, Santos Minjarez and Asel Abdygapparova, were separately convicted and sentenced in connection with the same offense. Like petitioner, Minjarez was convicted in large part based upon a written statement Minjarez gave to police in which Minjarez attempted to down-play his role in Roasado's murder and to portray Hernandez and Abdygapparova as the real instigators of the offense. *Minjarez v. State*, AP-74,592, 2005 WL 3061981, *2-*3 (Tex. Crim. App. November 16, 2005).

their backyard, and his wallet on top the roof (minus all credit cards).[37]

An eyewitness and several law enforcement officers testified about an incident in April, 1990 in which petitioner and another man broke down the door of a home, burglarized the residence, and fled on foot when police arrived.[38]

A trio of San Antonio Police Officers testified about an incident in June, 1990 in which petitioner was arrested for auto theft and possession of an illegal knife.[39]

A pair of witnesses who were once neighbors of petitioner testified about an incident in January, 1991 in which (1) petitioner invited a male neighbor to petitioner's apartment to watch a porn video, (2) petitioner left his apartment on a pretext and locked the male neighbor inside petitioner's apartment, and (3) petitioner then went to the neighbor's apartment and raped his neighbor's wife.[40]

---

[37] S.F. Trial, Volume 27, testimony of Hiram J. Crowder, at pp. 53-60.

[38] S.F. Trial, Volume 27, testimony of Vincent Mosqueda, at pp. 60-64; testimony of Andres Ortiz, at pp. 64-71; testimony of Johnny Teran, at pp. 72-74; testimony of Robert Anthony Rosales, at pp. 110-13; testimony of Abel Rodriguez, at pp. 113-17.

[39] S.F. Trial, Volume 27, testimony of Antonio Zayas, at pp. 78-87; testimony of Tamara Ford, at pp. 89-94; testimony of Daryl Volkman, at pp. 95-99.

[40] S.F. Trial, Volume 27, testimony of Danny G. Zapata, at pp. 22-29; testimony of Anna Diaz, at pp. 105-09.
A San Antonio Police officer who responded to that rape call

The victim of a residential burglary testified about having her home burglarized in April, 1991 and, later, obtaining the return of all her stolen property.[41]

A quintet of law enforcement officers testified about an incident in March, 1994 in which petitioner and Minjarez burglarized a house, led police on a high speed chase (at least briefly driving the wrong way on a major highway), wrecked their vehicle, and then fled on foot across a busy thoroughfare.[42]

A quartet of BCADC employees testified about an incident in August, 2002, in which the petitioner was caught late at night hiding in a cell other than his own in the midst of an attempted escape that involved cutting through cinder block walls and concealing the resulting holes with a home-made, stucco-like, substance.[43]

---------------

and arrested petitioner on January 12, 1991 testified Santos Minjarez was also present at the time of petitioner's arrest and Minjarez gave the name "Ernest Perez" and left the scene. S.F. Trial, Volume 27, testimony of James David McDonald, at pp. 189-90.

[41] S.F. Trial, Volume 27, testimony of Joan Anderson, at pp. 99-103.

[42] S.F. Trial, Volume 27, testimony of Russell Lucas, at pp. 136-39; testimony of Enrique Cantu, at pp. 135-57; testimony of Steve Amerson, at pp. 158-63; testimony of Dennis Robert Casillas, at pp. 164-71; testimony of Abel V. Rodriguez, at pp. 172-81.

[43] S.F. Trial, Volume 27, testimony of Arthur Poole, at pp. 190-232; testimony of Paul Tom Powers, at pp. 45; testimony of Mark Flores, at pp. 245-48; testimony of Charles Campbell, at pp. 249-54.

The prosecution also introduced documents establishing petitioner had previously been convicted of (1) multiple counts of burglary of a habitation with intent to commit theft and one count of carrying an illegal knife[44] and (2) burglary with intent to commit sexual assault.[45]

## 2. The Defense's Evidence

Petitioner's trial counsel presented evidence showing that all charges against petitioner arising from the incident in June, 1990 were subsequently dismissed for insufficient evidence.[46]

A psychiatrist who had interviewed petitioner testified (1) petitioner possessed normal intelligence, (2) petitioner had a normal family development until age 15 (i.e., in 1986), when petitioner's father was murdered, (3) petitioner felt guilt and experienced depression and mental health problems thereafter, (4) petitioner was diagnosed with post traumatic stress disorder ("PTSD"), anxiety disorder, and major depressive disorder and subsequently developed significant symptoms, entered treatment, and remained intermittently on medication for the next fifteen

---

[44] S.F. Trial, Volume 27, testimony of David Dunbar, at pp. 10-19.

[45] S.F. Trial, Volume 27, testimony of Michael Gonzalez, at pp. 33-44.

[46] S.F. Trial, Volume 27, testimony of Michael Gonzales, at pp. 9-25. Petitioner's records did show petitioner was sentenced to serve a 17-year term of imprisonment in cause no. 1994-CR-2000B on March 10, 1997. *Id.*, at p. 25.

20

years, (5) among the medications prescribed for petitioner were
Prozac, Klonopin (described by the witness as a mild
tranquilizer), Thorazine, and Trazadone, (6) petitioner was
admitted to the hospital at least twice for his depression and
PTSD relating to his father's death, (7) petitioner has a
documented mental illness stemming from the traumatic murder of
petitioner's father that petitioner observed at a young age, (8)
petitioner has been chronically depressed for many years, (9) the
physician found no indications petitioner was malingering, and
(10) it was unusual for a person with an antisocial personality
to be clinically depressed because such persons typically lack a
conscience.[47]

On cross-examination, however, the same physician testified
(1) petitioner got a girlfriend pregnant at age fifteen, a
different girlfriend pregnant at age 16, and Asel Abdygapparova
was pregnant with petitioner's child at the time of Rosado's
murder, (2) petitioner is not retarded, (3) petitioner was
diagnosed in both 1994 and 1996 with anti-social personality
disorder, which features recurrent violations of social norms, an
inability to learn from past experience, disregard for the rights
and property of others, and a lack of social conscience, (4)
petitioner had been through the juvenile justice system and was

---

[47] S.F. Trial, Volume 28, testimony of Edward Brown Gripon,
at pp. 39-68, 98-106.

21

on probation prior to his father's murder, (5) petitioner's mental health indicate petitioner tends to blame others for his own conduct, (6) petitioner told one of his treating doctors that he liked to fight, (7) petitioner was found by one interviewer to be manipulative and head strong, (8) petitioner used marijuana, LSD, and alcohol all before the age of 16, (9) petitioner tends to be aggressive toward others and deceitful, (10) impulsiveness is high among antisocial personalities, (11) petitioner has a long history of not caring for his children and not paying child support, (12) petitioner has experienced significant periods of unemployment and was frequently absent from work when employed, and (13) petitioner's antisocial personality means petitioner lacks empathy for others and tends to engage in exploitive and irresponsible sexual relations.[48]

Petitioner's aunt testified petitioner was a good man, a hard worker, very intelligent, on the Dean's List at college, good with children, very respectful and polite, had problems as a juvenile arising from his father's murder which were noticeable as early as his father's funeral, and deserved to live.[49]

---

[48] *Id.*, at pp. 68-98.

[49] S.F. Trial, Volume 28, testimony of Andrea Torres, at pp. 110-17.

Several of petitioner's friends and other family members
testified to petitioner's good character and good personality
traits.[50]

---

[50] More specifically, a friend of petitioner testified
petitioner (1) was a "great individual," who cared for his
family, (2) helped his family and friends, (3) inspired others to
get their education, (4) taught him "family values," and (5) was
not a threat to society. S.F. Trial, Volume 28, testimony of Joe
Vargas, at pp. 119-24.
    Petitioner's sister-in-law testified petitioner (a/k/a
"Casper") was a good person, close to his family, a very good
father, and felt responsible and guilty about his father's death.
S.F. Trial, Volume 28, testimony of Elizabeth Hernandez, at pp.
126-30.
    One of petitioner's younger brothers testified that (1)
prior to their father's murder, petitioner had been a good
brother, (2) after their father's murder, petitioner dropped out
of school and started using drugs and alcohol, (3) petitioner
thereafter became "detached" from the rest of their family and
began staying out late, (4) petitioner went to prison at age 18
and was worse after his release, (5) in the late-1990's
petitioner began getting his life back together, attending Palo
Alto College, (6) petitioner and Eloise stayed with petitioner's
mother for a couple years and had a place of their own at one
time, (7) petitioner encouraged him not to drop out of school,
and (8) petitioner was a "real caring, real loving" person who
cried when re-living their father's death. S.F. Trial, Volume 28,
testimony of Mario Hernandez, at pp. 131-37.
    Petitioner's younger sister testified (1) before their
father's murder, petitioner was close to her, (2) after their
father's murder, petitioner lived with other relatives and just
couldn't cope, (3) petitioner was outside calling to his father
to come inside when she heard a gunshot and their father fell on
the floor, (4) petitioner held his father in his arms as their
father breathed his last, (5) petitioner went to prison at age 18
for burglaries and was depressed upon his release, (6) petitioner
was hospitalized after their father's death and has received drug
and alcohol treatment, and (7) petitioner went back to school and
attended Palo Alto College. S.F. Trial, Volume 28, testimony of
Melissa Arnold, at pp. 138-45.
    Petitioner's mother testified (1) petitioner was the oldest
of four sons and a daughter, (2) she has been widowed since 1986,
(3) petitioner was close to his father, (4) petitioner was always
very smart, (5) petitioner was inside urging his father to come

3. <u>The Verdict</u>

On October 11, 2002, the jury returned its verdict at the

punishment phase of petitioner's capital murder trial, finding

(1) beyond a reasonable doubt there was a probability the

---

inside when a crowd approached the house and one person shot
petitioner's father, (6) when petitioner's father died, he lost
his role model, (7) thereafter, petitioner lost interest in
school and was admitted to Santa Rosa after attempting suicide,
(8) petitioner was readmitted to Santa Rosa in 1987 for suicide,
(9) petitioner went to prison for burglaries, (10) petitioner did
not abuse alcohol after his release from prison, (11) she
furnished a home to petitioner, Eloise, and their kids in the
early-1990's, (12) Eloise had petitioner's first child when he
was fifteen and Eloise was seventeen, (13) petitioner and Eloise
divorced, (14) petitioner also had a child by Asel, and (15)
petitioner is not an animal or a cruel, cold-hearted, person but,
rather, is a "very loving, caring" person who could not kill
anyone. S.F. Trial, Volume 28, testimony of Gloria Hernandez, at
pp. 146-58.
      Petitioner's male cousin testified (1) he has known
petitioner his entire life, (2) petitioner loves his mother very
much and has been there for his mother since his father's death,
(3) petitioner's family lived with his family following the
murder of petitioner's father, (4) petitioner's brothers Mario
and Danny both dropped out of school after their father's murder,
(5) petitioner felt guilty over his father's murder, (6) gang
members who lived across the street from petitioner's family were
responsible for the murder of petitioner's father, (7) petitioner
became depressed after his father's murder, withdrew, and began
hanging around with Santos Minjarez in high school, (8) when he
dropped out of college in 1994, petitioner helped him find a job
in construction, (9) petitioner got his GED and enrolled at Palo
Alto College, and (10) petitioner was affectionate toward his
children even after the divorce. S.F. Trial, Volume 28, testimony
of Richard Torres Jimenez, Jr., at pp. 158-68.
      Another of petitioner's younger brothers, a Marine Corps
recruiter, testified (1) petitioner advised him to stay on the
straight road, (2) petitioner wrote him from prison encouraging
him to go back to school, (3) petitioner took a lot of blame for
their father's death, (4) "it just really tore us apart for a
long time," and (5) after their father's death, petitioner
distanced himself from their family. S.F. Trial, Volume 28,
testimony of Danny Hernandez, at pp. 168-78.

defendant would commit criminal acts of violence that would

constitute a continuing threat to society, (2) beyond a

reasonable doubt the defendant actually caused the death of Rosa

Rosado or did not actually cause the death of Rosa Rosado but

intended to kill Rosa Rosado or another or he anticipated that a

human life would be taken, and (3) taking into consideration all

of the evidence, including the circumstances of the offense, the

defendant's character and background, and the defendant's

personal moral culpability, there was insufficient mitigating

circumstance to warrant a sentence of life imprisonment rather

than a sentence of death.[51]   The state trial court imposed

sentence.[52]

K. <u>Direct Appeal</u>

Petitioner appealed his conviction and sentence.   In a brief

filed December 19, 2003, petitioner asserted five points of

error.[53]   In an unpublished opinion issued March 23, 2005, the

---

[51] S.F. Trial, Volume 28, at pp. 231-32; Trial Transcript,
at pp. 277-80; State Habeas Transcript, Volume II, at pp. 350-54.

[52] S.F. Trial, Volume 28, at pp. 232-33.   The Judgment
entered October 15, 2002 in petitioner's trial court proceeding
appears at several places in petitioner's state court records,
including at Trial Transcript, at pp. 284-85; State Habeas
Transcript, Volume I, at pp. 90-91; and State Habeas Transcript,
Volume II, at pp. 358-59.

[53] As points of error on direct appeal, petitioner argued
(1) the evidence was legally and factually insufficient to
sustain the jury's guilty verdict, (2) the trial court erred when
it failed to set aside the indictment because the indictment
failed to give sufficient notice of the manner and means of the

Texas Court of Criminal Appeals affirmed petitioner's conviction

and sentence. *Hernandez v. State,* AP-74,451 (Tex. Crim. App.

March 23, 2005).[54]  Petitioner did not thereafter seek certiorari

review of his conviction or sentence by the United States Supreme

Court.

L. Underline(State Habeas Corpus Proceeding)

L. State Habeas Corpus Proceeding

     On October 6, 2004, petitioner filed an application for

state habeas corpus relief in which he asserted a dozen grounds

for relief.[55]

---

offense charged, (3) the trial court erred when it failed to
grant defendant's motion to suppress the defendant's oral
statement because of a lack of voluntariness, (4) the trial court
erred when it allowed the prosecution to admit repetitious
exhibits which were more prejudicial than probative, and (5)
defendant was denied his constitutional right to the effective
assistance of counsel by virtue of his trial counsel's failure to
obtain assistance from the trial court in locating potential
witnesses and failing to object to evidence offered by the
prosecution.

     [54] The Texas Court of Criminal Appeals (1) found the
evidence, particularly petitioner's written statement, sufficient
under the Texas law of parties to support petitioner's conviction
for capital murder, (2) rejected on the merits petitioner's
argument that his indictment failed to give proper notice of the
charge against petitioner, (3) declared petitioner's third point
of error "multifarious and inadequately briefed," (4) held
petitioner had failed to explain why the photographs petitioner
complained should not have been admitted were more prejudicial
than probative, and (5) held petitioner had failed to demonstrate
his trial counsel's performance in failing to locate certain
witnesses was objectively unreasonable under the circumstances
and held petitioner had failed to identify the exhibits to which
his trial counsel should have objected.

     [55] As grounds for relief, petitioner argued (1) there was
insufficient evidence showing the murders of Sarah Gonzales and
Priscilla Almares were committed in the course of the same scheme

October 25-26 and 30-31, 2007, the state habeas trial court held an evidentiary hearing on petitioner's grounds for state habeas corpus relief.[56]  The primary focus of the evidentiary hearing was the voluntariness of petitioner's written statement executed April 7, 2001.

---

or course of conduct as the murder of Rosa Rosado, (2) his trial counsel rendered ineffective assistance by failing to prevent the state from pleading and proving the murder of Gonzales and Almares were part of the same scheme or course of conduct as Rosado's murder, (3) the trial court erroneously admitted petitioner's involuntary written statement, (4) petitioner's waiver of his right to refrain from self-incrimination was involuntary, (5) the state violated petitioner's rights to remain silent and to the assistance of counsel, (6) his trial counsel rendered ineffective assistance by failing to present available evidence showing petitioner's written statement was involuntary, (7) petitioner's conviction and sentence of death violate the principle announced in *Apprendi* because the jury was not required to find beyond a reasonable doubt the absence of all mitigating evidence warranting a life sentence, (8) his trial counsel rendered ineffective assistance by failing to object to the absence of a "beyond reasonable doubt" burden of proof in the mitigating evidence special issue, (9) his appellate counsel rendered ineffective assistance by failing to raise this same *Apprendi* argument as a point of error on direct appeal, (10) his trial counsel rendered ineffective assistance by failing to object to prosecutorial closing argument at the punishment phase of trial inviting the jury to speculate on how the victim's families' felt about the appropriate punishment, (11) his appellate counsel rendered ineffective assistance by failing to raise points of error challenging the trial court's failure to quash the indictment based upon *Apprendi*, and (12) his appellate counsel rendered ineffective assistance by failing to raise points of error regarding the trial court's denial of petitioner's requests to have detective Carian testify regarding the contents of Asel Abdygapparova's written statement that Minjarez actually raped and murdered Rosado.

[56] The verbatim transcription of those four days of evidentiary hearing appear at S.F. State Habeas Hearing, Volumes 2-5.

1. <u>Petitioner's Testimony</u>

After introducing voluminous copies of petitioner's medical and mental health records from the BCADC, the Center for Health Care Services (where petitioner was treated for PTSD, depression, and anxiety disorder following his release on parole from prison), and other facilities, petitioner took the stand at the

state habeas hearing, offered his own six-page affidavit,[57] and

---

[57] Petitioner's six-page affidavit was admitted into evidence during the evidentiary hearing held in petitioner's state habeas corpus proceeding and is found at S.F. State Habeas Hearing, Volume 10, at pp. 1051-56.

In his affidavit, petitioner asserted (1) his trial counsel never advised him of his right o testify during the hearing on petitioner's motion to suppress his statement, (2) Dr. Wilson prescribed Klonopin for many years to help petitioner sleep, (3) in October, 2000, a new physician, Dr. Stowe, began reducing petitioner's Klonopin prescription over several months from four milligrams a day to a single milligram daily, (4) petitioner continued to take four milligrams of Klonopin daily, supplementing his own supply of Klonopin by obtaining additional pills from his uncle, (5) during this time frame, petitioner nonetheless often ran out of Klonopin half way through his 30-day prescription, (6) by March 29, 2011, petitioner was no longer able to supplement his Klonopin and attempted unsuccessfully to get Dr. Stowe to reconsider his decision to take petitioner off Klonopin, (7) at the time of petitioner's arrest he had not taken Klonopin in three days and was going "cold turkey" from Klonopin withdrawal, (8) petitioner had experienced klonopin withdrawal symptoms before, which he described as including feeling blood flowing through his head, extreme nervousness, his body convulsing involuntarily, his arms and legs jerking, loss of balance, hyperventilation, insomnia, and panic attacks, (9) he began experiencing panic attacks as soon as detective Carian began interrogating petitioner on April 6, (10) he told Carian what was wrong and that he needed medications but Carian just laughed and accused petitioner of faking these episodes, (11) petitioner began trembling and shaking uncontrollably, (12) during the ensuing five-hour interrogation, Carian repeatedly threatened petitioner with the death penalty unless petitioner cooperated, (13) Carian refused to arrange for petitioner to receive medications unless petitioner gave a statement, (14) when petitioner invoked his right to counsel within five minutes of the start of interrogation on April 6, Carian just smiled, (15) Carian wanted petitioner to confirm Abdygapparova's statement, (16) after five hours, Carian finally honored petitioner's requests for an attorney and to terminate the interview, (17) petitioner was taken to the BCADC, where he received 20 mg of Prozac after petitioner's mother delivered said medication to the jail, (18) "I wanted to see a doctor who could prescribe Klonopin. I knew from experience that the jail doctors will issue practically any drug as long as it will keep you from being a disruption.", (19) petitioner was finally booked into the BCADC

then submitted to cross-examination by the State.

The thrust of petitioner's testimony before the state habeas court was his assertion that he had been suffering from severe withdrawal symptoms, relating to his abuse of the prescription medication Klonopin, at the time of his arrest and during both of his interviews by detective Carian on April 6 and 7, 2001, during which interviews petitioner claimed he begged for medication while Carian mocked petitioner's obvious signs of withdrawal and threatened to withhold any medication from petitioner until

---

at 2 a.m. on April 7, 2001, (20) he began to grow suicidal and couldn't sleep, (21) sometime around noon, he told a POD officer he wanted to kill himself, (22) when he was taken to see Kim Robinson, he became panicky and told her about his need for medication and that he was going crazy, (23) he told Robinson he needed to see a doctor because he needed to get "all these things off my chest," (24) he told Robinson he hadn't slept in days and had been experiencing panic attacks, (25) when Robinson informed him she could not furnish him with medications, petitioner became hysterical and demanded that she call a doctor, (26) Robinson left and brought a floor sergeant named Contreras, who informed petitioner that he needed to talk to an investigator, not a doctor, (27) when petitioner was later taken down to an interrogation room and saw detective Carian, petitioner became frightened and told Carian "she wasn't supposed to be killed and that it was only supposed to be a robbery," (28) petitioner did not want to give a statement but wound up at the homicide office, (29) petitioner was tired and sick and only gave a statement because he feared to refuse to do so would result in him not getting to see a doctor or any medication for his panic attacks, (30) neither Carian, Robinson, nor Contreras would get petitioner a doctor, and (31) neither of his trial counsel ever asked petitioner about the circumstances surrounding the taking of petitioner's statement and never discussed with petitioner whether he should testify at the hearing on the motion to suppress. S.F. State Habeas Hearing, Volume 10, affidavit of Ramon Hernandez, at pp. 1051-56.

petitioner furnished a statement that was consistent with the written statement given previously by Abdygapparova.[58]

More specifically, petitioner testified in pertinent part that (1) Dr, Wilson had prescribed Klonopin for years to help petitioner sleep, (2) Klonopin is highly addictive, (3) in October, 2000, Dr. Stowe began to reduce petitioner's Klonopin prescription, (4) nonetheless, petitioner continued to take the same dosage of Klonopin by supplementing his own prescription with additional Klonopin he obtained from his uncle Joe Torres, (5) he had only one and a half milligrams of Klonopin in his possession on March 29, 2001 and was unable to obtain any additional supply thereafter, (6) he experienced severe symptoms of Klonopin withdrawal during both his interviews with detective Carian, including the sensation of blood rushing through his head, feelings of tenseness and nervousness, the involuntary shaking of his arms and legs, hyperventilation, a racing heartbeat, and uncontrollable shaking and trembling, (7) Carian repeatedly threatened petitioner with the death penalty unless petitioner gave a statement and refused to honor petitioner's requests for an attorney and to terminate their interview on April 6 until detective Barney Whitson arrived, (8) petitioner told the booking nurse he was going through withdrawal, (9) his

---

[58] S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 18-76, 173-302.

mother subsequently brought petitioner's medications to the jail
but he was given only Prozac on April 7, (10) he was unable to
sleep and was suicidal following his arrest, (11) when he told
the POD officer he was suicidal, he was taken to see Kim
Robinson, (12) he told Robinson about his interrogation and the
threats Carian had made, informed Robinson he was withdrawing
from Klonopin, and said he needed to see a doctor because he
"needed to get these things off my chest," (13) when Robinson
informed him there was no doctor available, petitioner became
hysterical and demanded to see a doctor, (14) Robinson then got
officer Contreras, whom petitioner also informed he needed
medications, (15) when he was taken to see Carian on April, 7,
petitioner was tired, disoriented, and his body was jerking
uncontrollably, (16) it took eight hours for petitioner to give
and correct his statement on April 7, (17) the panic attack
petitioner experienced during his interview on April 7 did not
affect his memory or his ability to edit his written statement,
(18) Carian told petitioner his statement should conform to
Abdygapparova's statement, (19) when petitioner told Robinson and
Conteras he wanted to "get things off his chest," he had not
intended to suggest he wanted to talk to a detective about his
case but, rather, meant he wanted to talk to a doctor about his
medication, (20) he told officer Contreras he was suicidal and
needed to see a doctor, (21) he drank beer and liquor the first

week in April, 2001 to ameliorate the effects of his Klonopin withdrawal, (22) the only reason petitioner gave his written statement on April 7 was his belief, based on Carian's statements on April 6, that petitioner would continue to be denied Klonopin unless petitioner gave a statement, and (23) he did not discuss with his trial counsel either the circumstances surrounding the giving of his written confession, his mental condition, or the fact he was going through Klonopin withdrawal at the time he gave his written statement.[59]

### 2. Petitioner's Experts

Dr. Paula Kathleen Lundberg-Love, a professor of psychology and expert psycho-pharmacologist, testified in pertinent part that (1) based upon her review of petitioner's medical and mental health records, as well as her clinical interview of petitioner, petitioner had clearly experienced a traumatic event, i.e., the fatal shooting of petitioner's father, which caused petitioner to suffer from post traumatic stress disorder ("PTSD"), (2) the petitioner also suffered from panic disorder, a condition characterized by overwhelming anxiety, (3) petitioner also suffered from major depression, including suicidal ideation, (4) Klonopin is a Benzodiazepine drug designed to reduce anxiety and is no longer a drug of choice to treat panic disorder because

---

[59] S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 18-41, 46-76, 181-206, 210-60, 265-302.

patients tend to develop tolerance and dependance on same, (5)
persons coming off Benzodiazepine drugs may experience enhanced
anxiety, (6) after his release from prison, petitioner's anxiety
disorder had been treated initially with Ativan and Paxil, (7)
later Buzbar was added and, even later, petitioner was treated
with Ativan, Inderal, and Paxil, (8) eventually, petitioner was
prescribed Prozac in lieu of Paxil, in part because of the
negative sexual side-effects of Paxil on petitioner, (9) in June,
1998, Dr. Wilson switched petitioner from Ativan to Klonopin,
which is a longer-acting medication, (10) petitioner took 4 mg of
Klonopin daily from June, 1998 until August, 2000, when Dr. Stowe
began reducing petitioner's dosage of Klonopin, (11) by the late-
1990's Benzodiazepine drugs were contraindicated for anxiety
disorder and PTSD because of the tendency of patients to develop
iatratenic drug dependence, i.e., physician-induced dependence,
(12) she questioned whether petitioner's reduction in Klonopin
dosage from 4 mg to 1 mg daily was too rapid, (13) a person who
had taken Klonopin for a sustained period of time and experienced
a reduction of dosage from 4 mg to 1 mg daily would likely
experience "breakthrough symptoms of anxiety," (14) petitioner's
testimony regarding his symptoms during his interviews with
Carian was consistent with what she believed a person
experiencing rapid withdrawal from Klonopin, (15) Klonopin
withdrawal causes significant anxiety symptoms and is exacerbated

by alcohol use, (16) maximum symptoms may be delayed as much as a
week but, in as little half a week, symptoms would be disruptive
and would contravene a patient's ability to function normally,
(17) withdrawal from Klonopin is also exacerbated by simultaneous
withdrawal from alcohol, (18) petitioner reported to her that he
experienced hyperventilation and trembling shortly after his
arrest, (19) Klonopin withdrawal could cause elevated heart rate
and pulse, shallow respiration, and trembling, (20) petitioner's
vital signs taken on April were all in or near the normal range
but that fact did not rule out the possibility of Klonopin
withdrawal, (21) while Prozac would ameliorate the symptoms of
depression and help PTSD, it would not help with Klonopin
withdrawal, (22) she was unable to say whether petitioner's
written statement on April 7, 2001 was voluntary, and (23)
nothing in petitioner's clinical interview or testimony was
inconsistent with Klonopin withdrawal.[60]

The psychiatrist who treated petitioner from August, 2000 to
March, 2001, Dr. Robert H. Stowe, testified in pertinent part
that (1) Dr. Wilson had prescribed Prozac and Klonopin for
petitioner, (2) he decided to taper down petitioner's dosage of
Klonopin, in part because of petitioner's diagnosis of poly-
substance abuse/dependence, (3) Dr. Wilson had prescribed up to 6

---

[60] S.F. State Habeas Hearing, Volume 3 of 10, testimony of
Dr. Paula Kathleen Lundberg-Love, at pp. 78-166.

mg of Klonopin daily and Dr. Stowe was concerned about the possibility of cross-addiction, (4) it would have been easy for petitioner to become addicted to a Benzodiazepine drug like Klonopin, (5) he did not intend to substitute another drug for Klonopin because he believed Prozac would be sufficient to treat petitioner's symptoms, (6) the typical symptoms of Klonopin withdrawal include anxiety, convulsions, tremors, increased blood pressure, increased heart rate, sweating, agitation, increased motor restlessness, and seizures, (7) over a period of several months he weaned petitioner off Klonopin and in February, 2011, he discontinued any Klonopin for petitioner, (8) he believed petitioner successfully adjusted to the gradual reductions in dosage of Klonopin, (9) in early 2001, petitioner indicated to Dr. Stowe that he was only taking 20 mg of Prozac daily, instead of the prescribed 30 mg daily and he was only taking Klonopin on an "as needed" basis rather than as prescribed, (10) psycho-tropic medications are only effective when taken as prescribed, (11) a sudden stop of Klonopin after taking high doses would result in extreme agitation, (12) Klonopin withdrawal would normally include anxiety, insomnia, restlessness, high blood pressure, and rapid heart rate, (13) nonetheless, he would not expect Klonopin withdrawal to affect a person's judgment, (14) he was never contacted by petitioner's trial counsel, (15) he never saw any signs of Klonopin withdrawal while treating petitioner

36

but did see increased anxiety, (16) he prescribed Trazodone to
help with petitioner's insomnia, not as a substitute for
Klonopin, (17) he was satisfied with petitioner's anxiety
symptoms until petitioner's last visit on March 29, 2001, when he
became concerned about petitioner's symptoms, (18) he had no
knowledge that petitioner was ever taking more than the
prescribed dosage of Klonopin, (19) it is possible, if
petitioner's account of his over-self-medication is true, the
petitioner was experiencing Klonopin withdrawal on April 6, 2001,
(20) petitioner never appeared to resist his efforts to reduce
petitioner's Klonopin dosage, (21) a person who had been on
Klonopin for five years would have a riskier withdrawal than a
patient who had been the medication less time, (22) reducing the
dosage of petitioner's Klonopin would not have done any good if
petitioner had been supplementing from other sources, (23)
withdrawal from Benzodiazepine drugs like Klonopin is much more
medically significant than withdrawal from heroin or cocaine and
can cause life-threatening seizures and extreme elevations in
blood pressure and heart rate, which can lead to stroke or heart
attack, (24) petitioner's anxiety level in 2001 was consistent
with petitioner supplementing his Klonopin to maintain the prior
dosage before Dr. Stowe began tapering down petitioner's dosage,
(25) petitioner's "normal" vital signs taken at 11:58 a.m. on
April 7, 2001 were not indicative of Klonopin withdrawal, (26)

37

Klonopin withdrawal symptoms are not necessarily apparent to an observer, (27) a person withdrawing from Klonopin might have difficulty focusing on details, (28) petitioner typically manifested panic symptoms intermittently, and (29) by March 29, 2001, petitioner knew the name of the medication Klonopin.[61]

### 3. Petitioner's Trial Counsel

Attorney Michael Ugarte testified (1) he had petitioner's medical records and BCADC classification records prior to the hearing on petitioner's motion to suppress, (2) petitioner's trial counsel had petitioner evaluated by a court-appointed mental health expert, Dr. Gripon, (3) Ugarte became aware that petitioner was receiving mental health services, (4) he was aware petitioner had been diagnosed with PTSD and major depression, (5) he was aware petitioner had been prescribed Klonopin, (6) he spoke with petitioner regarding petitioner's dealings with Dr. Wilson, (7) both of petitioner's trial counsel and Dr. Gripon had discussions with petitioner regarding the circumstances surrounding petitioner's giving of his written statement, (8) had petitioner's trial counsel been aware of petitioner's alleged Klonopin withdrawal at the time petitioner gave his statement, they would have explored that subject further, (9) petitioner was aware of his constitutional rights, including his right to

---

[61] S.F. State Habeas Hearing, Volume 4 of 10, testimony of Dr. Robert H. Stowe, at p. 9-46.

testify at the hearing on petitioner's motion to suppress, (10)
petitioner was "quite talkative," "very intelligent," experienced
in the criminal justice system, and understood how the system
worked, (11) petitioner never mentioned to Ugarte that petitioner
was undergoing withdrawal from Klonopin or any other drug at the
time of petitioner's interrogations by detective Carian, (12) the
petitioner never told Ugarte that, on April 6, detective Carian
ignored petitioner's repeated requests to terminate petitioner's
interview and for an attorney, (13) petitioner did not tell
Ugarte that petitioner began experiencing panic attacks as soon
as Carian began interviewing petitioner, (14) petitioner never
told Ugarte that petitioner began to tremble and shake during his
first interview with Carian, (15) petitioner never told Ugarte
that Carian laughed at petitioner, accused petitioner of faking
illness, or threatened petitioner with the death penalty during
petitioner's interviews, (16) petitioner never told Ugarte that
Carian directed petitioner to conform petitioner's statement to
Abdygapparova's statement or that Carian refused to arrange for
petitioner to receive medical attention during the petitioner's
interviews, (17) petitioner never told Ugarte that petitioner was
suicidal during his interviews or that petitioner had gone
without sleep for 72 hours prior to giving his statement, (18)
Ugarte would have expected petitioner to convey such information
to Ugarte if, in fact, it had happened because petitioner had

attended college and was very good about furnishing trial counsel
with information, (19) Ugarte would have objected if the
prosecutor had gestured toward the victims' families during jury
argument, and (20) had petitioner informed trial counsel that
petitioner was withdrawing from Klonopin while giving his written
statement, the whole strategy of petitioner's trial counsel at
the hearing on the motion to suppress petitioner's statement
would have been different.[62]

Attorney Patrick Hancock, petitioner's other trial counsel,
testified in pertinent part that (1) petitioner's trial counsel
obtained petitioner's medical records from the BCADC and the
Center for Health Care Services, (2) Hancock asked petitioner
about medications prior to the suppression hearing, (3) he did
not object to prosecutorial argument concerning the wishes of the
victims' families because he did not wish to make a big deal out
of same, (4) Hancock spoke with petitioner regarding the
circumstances surrounding petitioner giving his written statement
and used that information in their motion to suppress, (5)
petitioner is a very intelligent man whom Hancock believes would
have been unlikely to hold anything back from trial counsel, (6)
petitioner understood every aspect of trial and a lot of the
nuances of court work, (7) petitioner never told Hancock that

---

[62] S.F. State Habeas Hearing, Volume 4 of 10, testimony of
Michael Ugarte, at pp. 47-138.

petitioner waw withdrawing from Klonopin at the time petitioner gave his statement, (8) petitioner never told Hancock that petitioner was denied any medication while giving his statement, (9) petitioner never said he was experiencing a panic attack during his interrogation, (10) petitioner was "very proactive in his defense and he wasn't shy about communicating" with his trial counsel, in writing or whispering or talking during the breaks, (11) if petitioner had told Hancock that Carian had laughed at, mocked, or threatened petitioner during the interrogation, Hancock would have questioned Carian about same, (12) petitioner never indicated there was anything factually inaccurate in petitioner's written statement, (13) Hancock was aware petitioner was being treated and medicated for mental illness at the time of petitioner's arrest, (14) Hancock was unaware that petitioner was not receiving his prescribed medications at the time of petitioner's interrogation, (15) petitioner's trial counsel had their own mental health expert independently evaluate petitioner's medical records, (16) any evidence petitioner was withdrawing from drugs at the time petitioner gave his statement would have been relevant to the issue of the voluntariness of petitioner's statement and would have been helpful to the defense, and (17) petitioner never told Hancock that petitioner

41

was suffering withdrawal symptoms or needed medication during petitioner's interrogation.[63]

### 4. <u>Petitioner's State Appellate Counsel</u>

The attorney who filed petitioner's appellant's brief on direct appeal testified in pertinent part that (1) he focused his review of the trial record on claims that were properly preserved, (2) he did not raise a point of error complaining about the state trial court's failure to admit Abdygapparova's written statement under the "rule of optional completeness," in part, because petitioner's trial counsel never argued for admission of her statement on that basis, (3) he also believed such a point of error lacked substantial likelihood of success because of the state harmless error rule, and (4) he believed petitioner's trial counsel had opened the door to the questions by prosecutors directed to detective Carian which resulted in Carian explaining that petitioner refused to cooperate with investigators until Carian informed petitioner that Abdygapparova had implicated petitioner in Rosado's rape and murder.[64]

### 5. <u>BCADC Staff</u>

Caroline Mkubwa, a social worker at the BCADC who interviewed petitioner during the intake process, testified in

---

[63] S.F. State Habeas Hearing, Volume 4 of 10, testimony of Patrick Hancock, at pp. 139-78.

[64] S.F. State Habeas Hearing, Volume 4 of 10, testimony of Rocky Glass, at pp. 179-213.

pertinent part that (1) she interviewed petitioner on April 7,
2001, (2) petitioner gave a history of PTSD and anxiety and
indicated he was then taking Prozac 15 mg every morning and
Trazodone 50 mg, (3) petitioner denied suicidal ideation and
denied a history of substance abuse, (4) petitioner was coherent,
alert, oriented to time, place, and person, and displayed logical
thinking with a normal neurological affect, (5) she is familiar
with drug withdrawal and routinely asks inmates about their drug
use and drug withdrawal, (6) petitioner did not tell her he was
going through withdrawal from Klonopin, (7) she checked off a
form indicating petitioner's demeanor was "normal" and "calm,"
and (8) had petitioner been showing signs of withdrawal distress,
he would have been assigned to the detox unit but, instead,
petitioner was assigned to the general population.[65]

The social worker who saw petitioner just before noon on
April 7, 2001 testified in pertinent part that (1) she
interviewed petitioner around 11:15 a.m. on April 7, 2001, (2)
petitioner wanted medications and appeared anxious, (3)
petitioner appeared to be anxious but coherent and oriented to
time, place, and situation, (3) she checked with the nurse and
learned petitioner had received Prozac or Trazodone that morning,
(4) petitioner said he had been interrogated by the police for a

_____

[65] S.F. State Habeas Hearing, Volume 4 of 10, testimony of
Caroline Mkubwa, at pp. 217-37.

long time, he had been silent during his interrogation, and he
believed he would feel better if he got something off his chest,
(5) at that point, she halted her interview and referred
petitioner to the booking sergeant, (6) petitioner did not appear
to be in need of immediate medical attention, (7) petitioner did
not tell her he had gone without sleep for several days, (8)
petitioner did not tell her he had been threatened with the death
penalty and had been having panic attacks all night long, (9)
petitioner did not appear suicidal, (10) petitioner did not tell
her he wanted to see a doctor, (11) she is generally familiar
with Klonopin, as an anti-depressant, (12) she cannot recognize
Klonopin withdrawal, (13) sergeant Contreras came and took
petitioner away, (14) petitioner did not become hysterical and
did not demand to see a doctor, (15) petitioner was not having
seizures, was not shaking or jerking uncontrollably, and was not
sweating profusely, and (16) when petitioner said he wanted to
get something off his chest, he did so in the context of
describing his lengthy interrogation by police and she did not
understand that comment to mean petitioner wanted to see a
doctor.[66]

The BCADC booking sergeant whom the social worker summoned
when petitioner said he wanted to get something off his chest

--------------------------------------------------

[66] S.F. State Habeas Hearing, Volume 5 of 10, testimony of
Kim Robinson, at pp. 3-46.

testified in pertinent part that (1) the social worker told him

petitioner wanted to get something off his chest, (2) he would

not have known petitioner wished to speak with detective Carian

unless petitioner himself specifically identified Carian as the

person with whom petitioner had already spoken, (3) if petitioner

had merely requested to speak to a law enforcement officer

generically, he would have referred petitioner to the Bexar

County Sheriff's Department's Criminal Investigation Department,

(4) he is familiar with inmates who are going through drug

withdrawal, (5) petitioner did not appear to be showing symptoms

of drug withdrawal, (6) he routinely refers inmates going through

drug withdrawal or experiencing medical problems to the BCADC

medical staff or a social worker, (7) he would not have told an

inmate going through withdrawal to talk with an investigator, and

(8) "I want to get something off my chest" is a common expression

used by inmates who wish to make a confession.[67]

6. The Interviewing Detectives

Detective John Kellogg testified, in pertinent part that (1)

after interviewing Asel Abdygapparova, he obtained an arrest

warrant for petitioner, (2) when he saw petitioner shortly after

petitioner's arrest, petitioner did not appear to be having a

panic attack and did not appear to be in need of medical

_____

[67] S.F. State Habeas Hearing, Volume 4 of 10, testimony of
Rogelio M. Contreras, at pp. 238-52.

attention, (3) petitioner did not appear to be experiencing
convulsions or seizures or any involuntary muscle movement, (4)
petitioner did not mention medications, (5) he did not see
detective Carian laugh at, mock, or threaten petitioner with the
death penalty, (6) he did not see detective Carian accuse
petitioner of faking any symptoms of a medical problem, (7) he
did not witness petitioner invoke his right to counsel within the
first few minutes of the April 6, 2001 interview, (8) neither he
nor detective Carian ever refused any request by petitioner for
medical attention, (9) he was not present when petitioner invoked
his right to counsel (Kellogg left the interview around 3:30 a.m.
on April 6, 2001), (10) neither he nor detective Carian suggested
they had the authority to withhold medical treatment or
medication from petitioner, (11) petitioner never mentioned
Klonopin in his presence, (12) petitioner never indicated he was
going through withdrawal from any drug, (13) petitioner did not
appear to be shaking, sweating profusely, or exhibiting any other
sign or symptom of a need for medical attention, (14) he did not
recall detective Carian ever telling petitioner that the
information contained in Abdygapparova's statement was what the
petitioner should put into his own statement, (15) following a
trip to Austin on April 7, 2001, he and detective Carian met
again with petitioner at the BCADC, (16) when they met again on
the afternoon of April 7, 2001, petitioner did not appear

surprised to see them, (17) petitioner did not express a desire
to see a physician, (18) petitioner was not trembling, suicidal,
or any more anxious that other suspects, and (19) petitioner did
not appear to be in need of medical attention on April 7, 2001.[68]

Detective Andrew B. Carian testified in pertinent part that
(1) Abdygapparova led police to the location of Rosado's body,
(2) he obtained an arrest warrant for petitioner, (3) his first
contact with petitioner came on April 6 after petitioner's arrest
when he (Carian) read petitioner his rights, (4) Carian advised
petitioner that Abdygapparova had implicated petitioner in a
murder, (5) petitioner did not appear to be having a panic
attack, (6) petitioner had a very serious demeanor and showed no
sign he lacked comprehension, (7) petitioner was able to
communicate clearly and appeared to understand what Carian said,
(8) petitioner's arms and legs were not jerking involuntarily,
(9) petitioner did not appear to be having a seizure and was not
sweating profusely, (10) petitioner never mentioned that he
needed any medications or any medicine at all, (11) Carian did
not laugh at, mock, or accuse petitioner of faking any symptoms
of a medical problem, (12) Carian never suggested he had the
authority to withhold medications from petitioner, (13)
petitioner did not invoke his right to counsel or ask to

---

[68] S.F. State Habeas Hearing, Volume 5 of 10, testimony of
John Kellogg, at pp. 47-83.

47

terminate the interview at the outset or within five minutes of
the start of that interview, (14) petitioner did not repeatedly
request an attorney, (15) initially, petitioner denied knowing
either Minjarez or Abdygapparova and claimed to be unable to
identify a photo of Minjarez, (16) eventually, after more than
two hours of discussion during which petitioner made it clear he
did not wish to give a formal statement, petitioner did invoke
his right to counsel and petitioner's interview immediately
halted on that date, (17) at that time (around 5 a.m. on April
6), Carian turned petitioner over to a patrol officer for
transport to the Magistrate's office, (18) petitioner never
mentioned Klonopin to Carian, (19) petitioner exhibited no signs
on April 6 that petitioner needed medicine or medical attention,
(20) while in Austin on April 7, Carian received a page from
detective Whitson indicating petitioner wanted to talk with
Carian, (21) Carian and detective Kellogg went to see petitioner
at the BCADC, (22) petitioner did not appear surprised to see
them, (23) Carian again gave petitioner his *Miranda* warnings,
informed petitioner that Carian had received a message that
petitioner wanted to talk, and asked "What's up?", (24)
petitioner did not ask for a doctor, (25) at that point,
petitioner started discussing his case, specifically, blaming
Minjarez for Rosado's death, (26) Carian asked petitioner if he
would agree to be transported to the Homicide Office to give a

48

statement and petitioner consented, (27) once they all arrived at the Homicide Office, petitioner gave a written statement outlining petitioner's role in the offense, (28) Carian did not suggest to petitioner what information petitioner should include in petitioner's statement, (29) petitioner did not appear to be having a panic attack, (30) throughout that interview on April 7, petitioner did not mention any need for medication and did not request to see a physician, (31) Carian did not laugh at or accuse petitioner of faking any symptoms of any medical condition, (32) Carian did not threaten petitioner with the death penalty if petitioner failed to cooperate, (33) Carian did not withhold any medication or threaten to withhold any medication from petitioner, (34) petitioner never mentioned Klonopin to Carian, (35) petitioner was not sweating profusely, shaking, having a seizure, or exhibiting involuntary twitching of his arms or legs, (36) Carian typed petitioner's statement on a computer and then petitioner spent at least three hours carefully editing the nine-page statement, (37) petitioner made several corrections to the initial draft of his statement and even made a few changes to the final draft, (38) two civilians witnessed petitioner's execution of his written statement, (39) petitioner never mentioned medicine prior to the execution of his statement, (40) at the time petitioner requested an attorney on April 6, everything stopped, (41) during both interviews, Carian was

49

unaware that petitioner had been under the care of a psychiatrist while on parole or that petitioner was taking prescribed medications, and (42) Carian had no reason to suspect that was the case.[69]

   7. Oral Argument

   On March 20, 2008, the state habeas trial court heard final oral argument in petitioner's state habeas corpus proceeding. During petitioner's argument, his state habeas counsel emphasized that resolution of petitioner's complaint about the admission of his allegedly involuntary confession turned on a credibility determination in which the court had to weigh the relative credibility of petitioner's account of his interview with that of detectives Carian and Kellogg.[70]

   8. Findings and Conclusions

   In an Order issued March 31, 2008, the state habeas trial judge issued her findings of fact and conclusions of law recommending denial of petitioner's state habeas corpus application.[71]  For unknown reasons, on July 8, 2008, the state habeas trial court issued a second, virtually identical, order setting forth its findings of fact, conclusions or law, and

---

   [69] S.F. State Habeas Hearing, Volume 5 of 10, testimony of Andrew B. Carian, at pp. 84-133.

   [70] S.F. State Habeas Hearing, verbatim transcript of oral argument held March 20, 2008, Volume 1 of 1, at pp. 3-16, 30-45.

   [71] State Habeas Transcript, Volume II, at pp. 365-436.

50

recommendation that petitioner's state habeas corpus application be denied.[72]

In pertinent part, the state habeas trial court found (1) petitioner's assertion that he supplemented his own Klonopin prescription with medicine he obtained from his uncle was not credible,[73] (2) petitioner's assertions in his affidavit and testimony regarding his interview on April 6, 2001 were not credible and the testimony of detectives Kellogg and Carian concerning the petitioner's interview on April 6, 2001 was credible,[74] (3) petitioner's assertions that he became hysterical, demanded Kim Robinson call a doctor right away, and that Sergeant Contreras told petitioner "you need to talk to an investigator, not a doctor" were not credible,[75] (4) the testimony of Caroline Mkubwa, Kim Robinson, and Rogelio Contreras was credible and established that petitioner's testimony concerning his condition while at the BCADC on April 7, 2001 was false,[76] (5) the testimony of John Kellogg and Andrew Carian

---

[72] State Habeas Transcript, Volume III, at pp. 30-101.

[73] State Habeas Transcript, Volume II, at p. 421; State Habeas Transcript, Volume III, at p. 86.

[74] State Habeas Transcript, Volume II, at p. 422; State Habeas Transcript, Volume III, at p. 87.

[75] State Habeas Transcript, Volume II, at pp. 422-23; State Habeas Transcript, Volume II, at pp. 87-88.

[76] State Habeas Transcript, Volume II, at p. 423; State Habeas Transcript, Volume III, at p. 88.

concerning petitioner's condition during his interview on April
7, 2001 was credible and established that petitioner's assertions
that his will was overborne and his written statement was
involuntary were false,[77] and (6) petitioner's assertions that he
was suffering from withdrawal symptoms on April 6-7, 2001 were
not credible.[78]

    Based on the foregoing factual findings, the state habeas
trial court concluded, in pertinent part, that (1) petitioner's
written statement to police was freely and voluntarily given,[79]
(2) police scrupulously honored petitioner's invocation of his
right to counsel and to terminate his interview and spoke with
petitioner again only because petitioner asked them to come back
and talk with him,[80] (3) the officers first reminded petitioner
of his rights before re-initiating contact with him,[81] and (4)

---

    [77] State Habeas Transcript, Volume II, at pp. 423-24; State
Habeas Transcript, Volume III, at p. 88.

    [78] State Habeas Transcript, Volume II, at p. 424; State
Habeas Transcript, Volume III, at p. 89.

    [79] State Habeas Transcript, Volume II, at p. 424; State
Habeas Transcript, Volume III, at p. 89.

    [80] State Habeas Transcript, Volume II, at p. 424; State
Habeas Transcript, Volume III, at p. 89.

    [81] State Habeas Transcript, Volume II, at p. 424; State
Habeas Transcript, Volume III, at p. 89.

petitioner's trial counsel were both constitutionally effective.[82]

9. <u>Texas Court of Criminal Appeals' Ruling</u>

In an unpublished, per curiam, order issued September 10, 2008, the Texas Court of Criminal Appeals adopted the findings and conclusions of law issued by the state trial judge with the exception of the trial court's findings and conclusions regarding petitioner's final claim, i.e., petitioner's complaint that his state appellate counsel failed to raise a point of error protesting the state trial court's failure to permit petitioner's trial counsel to introduce the contents of Abdygapparova's statement.[83]

M. <u>Procedural History in this Court</u>

On May 15, 2009, petitioner filed his petition for federal habeas corpus relief in this Court, urging six claims for relief. *Docket entry no. 11.*

_____

[82] State Habeas Transcript, Volume II, at pp. 424-25; State Habeas Transcript, Volume III, at p. 89.

[83] The Texas Court of Criminal Appeals' per curiam order of September 10, 2008 reads as follows:
> This Court has reviewed the record with respect to the allegations made by applicant. We agree with the trial judge's recommendation and adopt the trial judge's findings and conclusions with the following exception: Findings of Fact and Conclusions of Law on Applicant's Ground for Review (1). Based upon the trial judge's findings and conclusions and our own review of the record, relief is denied.

On October 14, 2009, respondent filed his answer. *Docket entry no. 25.*

On December 3, 2009, petitioner filed his reply to respondent's answer. *Docket entry no. 28.*

## II. <u>AEDPA Standard of Review</u>

Because petitioner filed his federal habeas corpus action after the effective date of the AEDPA, this Court's review of petitioner's claims for federal habeas corpus relief is governed by the AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141, 125 S.Ct. 1432, 1438, 161 l.Ed.2d 334 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section

2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U.S. at 141, 125 S.Ct. at 1438; *Mitchell v. Esparza*, 540 U.S. 12, 15-16, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003)("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does not, *per se*, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza*, 540 U.S. at 16, 124 S.Ct. at 10.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of

the petitioner's case. *Brown v. Payton*, 544 U.S. at 141, 125
S.Ct. at 1439; *Wiggins v. Smith*, 539 U.S. 510, 520, 123 S.Ct.
2527, 2534-35, 156 L.Ed.2d 471 (2003). A federal court making
the "unreasonable application" inquiry should ask whether the
state court's application of clearly established federal law was
"objectively unreasonable." *McDaniel v. Brown*, ___ U.S. ___, ___,
130 S.Ct. 665, 673, 175 L.Ed.2d 582 (2010)("A federal habeas
court can only set aside a state-court decision as 'an
unreasonable application of...clearly established Federal law,' §
2254(d)(1), if the state court's application of that law is
'objectively unreasonable.'"); *Wiggins v. Smith*, 539 U.S. at 520-
21, 123 S.Ct. at 2535. The focus of this inquiry is on whether
the state court's application of clearly established federal law
was objectively unreasonable; an "unreasonable" application is
different from a merely "incorrect" one. *Schriro v. Landrigan*,
550 U.S. 465, 473, 127 S.Ct. 1933, 1939, 167 L.Ed.2d 836
(2007)("The question under the AEDPA is not whether a federal
court believes the state court's determination was incorrect but
whether that determination was unreasonable - a substantially
higher threshold."); *Wiggins v. Smith*, 539 U.S. at 520, 123 S.Ct.
at 2535; *Price v. Vincent*, 538 U.S. 634, 641, 123 S.Ct. 1848,
1853, 155 L.Ed.2d 877 (2003)("it is the habeas applicant's burden
to show that the state court applied that case to the facts of
his case in an objectively unreasonable manner").

56

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004)("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003).

The AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. Section 2254(d)(2) of Title 28, United States Code, provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, ___ U.S. ___, 130 S.Ct. 841, 849, 175 L.Ed.2d 738 (2010)("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410, 120 S.Ct. at 1522 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the

factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood v. Allen*, ___ U.S. at ___, 130 S.Ct. at 849; *Rice v. Collins*, 546 U.S. 333, 341-42, 126 S.Ct. 969, 976, 163 L.Ed.2d 824 (2006).

In addition, Section 2254(e)(1) provides a petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan*, 550 U.S. at 473-74, 127 S.Ct. at 1939-40 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U.S. 333, 338-39, 126 S.Ct. 969, 974, 163 L.Ed.2d 824 (2006)("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke*, 545 U.S. 231, 240, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005)("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1).  It remains unclear at this juncture whether Section 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under Section 2254(d)(2). *See Wood*

*v. Allen*, ___ U.S. at ___, 130 S.Ct. at 849 (choosing not to resolve the issue of Section 2254(e)(1)'s possible application to all challenges to a state court's factual findings); *Rice v. Collins*, 546 U.S. at 339, 126 S.Ct. at 974 (likewise refusing to resolve the Circuit split regarding the application of Section 2254(e)(1)).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El v. Dretke*, 545 U.S. at 240, 125 S.Ct. at 2325 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003)("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review.  Deference does not by definition preclude relief.").

Finally, in this Circuit, a federal habeas court reviewing a state court's rejection on the merits of a claim for relief pursuant to the AEDPA must focus exclusively on the propriety of the ultimate decision reached by the state court and not evaluate the quality, or lack thereof, of the state court's written opinion supporting its decision. *See St. Aubin v. Quarterman*, 470 F.3d 1096, 1100 (5th Cir. 2006)(holding Section 2254(d) permits a federal habeas court to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*,

550 U.S. 921 (2007); *Amador v. Quarterman*, 458 F.3d 397, 410 (5th Cir. 2006)(holding the same), *cert. denied*, 550 U.S. 920 (2007); *Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003)(holding the precise question before a federal habeas court in reviewing a state court's rejection on the merits of an ineffective assistance claim is whether the state court's ultimate conclusion was objectively reasonable), *cert. denied*, 541 U.S. 1045 (2004); *Anderson v. Johnson*, 338 F.3d 382, 390 (5th Cir. 2003)(holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002)(*en banc*)(holding a federal court is authorized by §2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 537 U.S. 1104 (2003).

### III. <u>Involuntary Confession & Involuntary Waiver Claims</u>

A. <u>The Claims</u>

In his first two claims for federal habeas corpus relief, the petitioner argues (1) his due process rights were violated by virtue of the admission of his allegedly involuntary written statement and (2) his written statement was inadmissible, in part, because his waiver of his rights to counsel and not to incriminate himself was involuntary.[84]

---

[84] Petitioner's Petition for Writ of Habeas Corpus, filed May 15, 2009, docket entry no. 11 (henceforth "Petition"), at pp.

B. <u>State Court Disposition</u>

Petitioner complained in his third point of error on direct
appeal that the trial court erred when it failed to suppress his
oral and written statements and allowed the prosecution to elicit
testimony regarding same.[85]  In its unpublished opinion affirming
petitioner's conviction and death sentence, the Texas Court of
Criminal Appeals concluded as follows:

> In his third point of error, Hernandez argues that
> the trial court erred in failing to suppress his oral
> and written statements, that the trial court erred in
> allowing the State to elicit testimony regarding
> Hernandez's written statement, and that Article 38.22
> was violated when the trial court failed to make
> findings of fact regarding the voluntariness of his
> statement.  Hernandez fails to apply the law to the
> facts in this case with respect to all three of his
> allegations.  He simply makes bare assertions.  We will
> not address this point of error because it is
> multifarious and inadequately briefed.  Hernandez's
> third point of error is overruled.[86]

Petitioner re-urged his complaints about the admission of
his allegedly involuntary statement and his allegedly involuntary
waiver of his Fifth and Sixth Amendment rights as his third,
fourth, and fifth claims for state habeas corpus relief.[87]  The

---

4-5; Petitioner's Brief in Support of Petition for Writ of Habeas
Corpus, filed May 15, 2009, docket entry no. 12 (henceforth
Petitioner's Brief"), at pp. 2-21.

[85] *Appellant's Brief*, filed December 19, 2003, at pp. 23-25.

[86] *Hernandez v. State*, AP-74,451 (Tex. Crim. App. March 23,
2005), at p. 8.

[87] State Habeas Transcript, Volume I, at pp. 38-57.

state habeas trial court held that, insofar as petitioner sought
to re-litigate the voluntariness of his confession through the
introduction of evidence that was available at the time of
petitioner's pretrial motion to suppress hearing, petitioner
waived those complaints.[88]  As was explained at length above, the
state habeas trial court held a lengthy evidentiary hearing on
petitioner's involuntariness claims, heard testimony from a
plethora of witnesses, found petitioner's accounts of his alleged
Klonopin withdrawal and allegedly "involuntary" confession to be
wholly incredible, and rejected petitioner's involuntariness
claims on the merits.[89]  The Texas Court of Criminal Appeals
adopted this aspect of the state habeas trial court's findings
and conclusions and rejected relief on the merits. *Ex parte Ramon
Hernandez*, WR-69,724-01, 2008 WL 4151799 (Tex. Crim. App.
September 10, 2008).

---

[88] As the state habeas trial court noted, ordinarily, under
Texas law a claim raised and rejected on direct appeal is not
cognizable in a state habeas corpus proceeding. *Ex parte Reynoso*,
257 S.W.3d 715, 723 (Tex. Crim. App. 2008); *Ex parte Torres*, 943
S.W.2d 469, 475 (Tex. Crim. App. 1997).  Nonetheless, because
petitioner also re-urged his involuntariness claims in
conjunction with a complaint about the performance of
petitioner's trial counsel during the pretrial hearing on
defendant's motion to suppress, the state habeas trial court
effectively permitted petitioner to re-litigate the merits of
petitioner's motion to suppress based upon evidence that was
never presented during petitioner's pretrial motion-to-suppress
hearing. State Habeas Transcript, Volume II, at pp. 397-98; State
Habeas Transcript, Volume III, at pp. 62-63.

[89] State Habeas Transcript, Volume II, at pp. 405-24; State
Habeas Transcript, Volume III, at pp. 70-89.

C. Clearly Established Federal Law

"Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. at 167, 107 S.Ct. At 522. "In order for a defendant to establish that his confession was involuntary, he must demonstrate that it resulted from coercive police conduct and it is essential that there be a link between the coercive conduct of the police and the confession of the defendant." *Hopkins v. Cockrell*, 325 F.3d 579, 584 (5th Cir.), *cert. denied*, 540 U.S. 968 (2003).

The voluntariness of a consent or an admission on the one hand, and a knowing and intelligent waiver on the other, are discrete inquiries. *Edwards v. Arizona*, 451 U.S. 477, 484, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). When an accused has invoked his right to counsel during custodial interrogation, as did petitioner on April 6, 2001, a valid waiver of *Miranda* rights cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his right; rather, an accused, such as

63

petitioner, having expressed a desire to deal with police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. *Edwards v. Arizona*, 451 U.S. at 484-85, 101 S.Ct. at 1884-85.  "[W]aivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Edwards v. Arizona*, 451 U.S. at 482, 101 S.Ct. at 1884.

D. Synthesis

Under the AEDPA's deferential standard of review, this Court's role is limited to determining whether a state court's decision on a matter of federal constitutional law (i.e., whether the defendant's federal constitutional rights were violated) was either (1) contrary to, or involved an unreasonable application of, clearly established federal law or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. at 141, 125 S.Ct. at 1438; *Williams v. Taylor*, 529 U.S. at 404-05, 120 S.Ct. at 1519; 28 U.S.C. § 2254(d).

64

The initial problem with analyzing petitioner's first and second claims herein is that petitioner's pleadings herein are ambiguous with regard to precisely which state court ruling petitioner is challenging herein.

1. Original Denial of Motion to Suppress was Reasonable

Insofar as petitioner argues the state trial court erred when it failed to suppress petitioner's written statement, the proper focus of AEDPA analysis is on the evidence and arguments before the state trial court when it made the ruling in question, i.e., at the March 20, 2002 hearing on petitioner's motion to suppress.[90]  Insofar as petitioner's third, fourth, and fifth claims herein challenge the state trial court's overruling of petitioner's motion to suppress in March, 2002, this Court must determine whether that ruling was objectively reasonable given then-clearly-established federal law and the evidence then-before the state trial court.  The evidence and arguments presented many years later during the petitioner's state habeas corpus proceeding cannot logically or legally render unreasonable a determination that was objectively reasonable at the time it was

---

[90] On direct appeal, the Texas Court of Criminal Appeals rejected petitioner's third point of error for reasons wholly separate and distinct from the lack of merit in that point of error.  Thus, until the state habeas court ruled on petitioner's involuntariness claims many years later, the only state court to have addressed the merits of petitioner's claims that (1) his confession was involuntary and (2) his waiver of his Fifth and Sixth Amendment rights was involuntary was the state trial court.

originally made.  Simply put, insofar as petitioner challenges the state trial court's original ruling denying his motion to suppress, this Court's analysis of whether petitioner's written confession was voluntary and whether petitioner's waiver of his Fifth and Sixth Amendment rights on April 7, 2001 was voluntary focuses on the evidence presented to the state trial court when it denied petitioner's motion to suppress, not on the evidence presented years later in connection with petitioner's analytically distinct complaints about the performance of his trial counsel during the hearing on his motion to suppress.

The evidence and arguments presented during petitioner's state habeas corpus proceeding may have been relevant to petitioner's complaints about the performance of his trial counsel during the original motion to suppress hearing but the petitioner's testimony (and the rest of the ex post facto testimony regarding the circumstances surrounding petitioner's April 7, 2001 confession) presented during the petitioner's state habeas corpus hearing in October, 2007 are not determinative of whether the state trial court's original ruling on petitioner's motion to suppress was objectively reasonable in light of clearly established federal law and the evidence then before that court. Petitioner's state habeas counsel did an excellent job confusing the state habeas court to the point that it undertook a wholly

unnecessary re-trial of the issues originally resolved during petitioner's motion to suppress hearing.[91]

As was explained in detail in Section I.G. above,[92] during the petitioner's motion to suppress hearing on March 20, 2002, detective Carian testified *without contradiction* that (1) the petitioner invoked his right to counsel on April 6, 2001, at which time Carian's interview with petitioner promptly terminated, (2) petitioner initiated the contact between them on April 7, 2001, (3) he gave petitioner a second set of *Miranda* warnings at the outset of their meeting on April 7, 2001, (4) petitioner thereafter began talking about Rosado's murder and agreed to accompany detectives Carian and Kellogg to the police homicide office to give a statement, (5) he made no threats or promises to induce petitioner's statement, (6) petitioner indicated he understood his rights and wished to tell his side of

---

[91] Petitioner's state habeas corpus application lumped together petitioner's complaints that (1) his written statement was involuntary, (2) his waiver of his Fifth Amendment right not to incriminate himself was violated, (3) his Sixth Amendment right to the assistance of counsel during a custodial interrogation was violated, and (4) his trial counsel rendered ineffective assistance in connection with petitioner's motion to suppress hearing. State Habeas Transcript, Volume I, at pp. 38-57. At oral argument before the state habeas court, petitioner's state habeas counsel argued the voluntariness of petitioner's written confession turned on the state habeas court's resolution of the diametrically opposing versions of petitioner's April 7, 2001 interrogation given by petitioner, on the one hand, and Detective Carian, on the other. S.F. State Habeas Oral Argument, Volume 1 of 1, March 20, 2008, at pp. 4, 36.

[92] *See notes 24-27, supra, and accompany text.*

the story, (7) he furnished petitioner with drinks and snacks during their April 7, 2001 interview, (8) petitioner had bathroom breaks during their interview, and (9) he was unaware petitioner was then taking any prescribed medications for depression or any other mental illness.[93]   BCADC social worker Kim Robinson testified during the same hearing *without contradiction* that, when the petitioner informed her on April 7, 2001 that "he wanted to get something off his chest," she immediately referred him to the booking sergeant.[94]

In light of the foregoing uncontradicted testimony, this Court concludes the state trial court's original overruling of petitioner's motion to suppress was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based upon an unreasonable determination of the facts in light of the evidence presented in the petitioner's motion-to-suppress hearing.   On the contrary, the state trial court's rejection of petitioner's original motion to suppress appears to be fully consistent with the principles set forth in *Colorado v. Connelly, supra,* and *Edwards v. Arizona, supra.*

---

[93] S.F. Trial, Volume 2, testimony of Andrew B. Carian, at pp. 26-59.

[94] S.F. Trial, Volume 2, testimony of Kim Robinson, at pp. 4-17.

The state trial court reasonably concluded the uncontradicted testimony of detective Carian at the pretrial hearing on petitioner's motion to suppress established there was no coercion directed against petitioner on April 7, 2001 to induce petitioner to give his written statement. Thus, under the legal standard set forth in *Connelly*, petitioner's written statement was voluntary. According to detective Carian's uncontradicted account, petitioner spent many hours on April 7, 2001 furnishing police with a highly detailed account of the events surrounding Rosado's abduction, robbery, sexual assault, and murder. Again, based on Carian's uncontradicted testimony at the hearing on petitioner's motion to suppress, petitioner edited his statement with great care. Kim Robinson's uncontradicted testimony established how petitioner re-initiated conversations with the police on April 7, 2001. Detective Carian's uncontradicted testimony during the pretrial hearing on petitioner's motion to suppress established the petitioner voluntarily, intelligently, and knowingly waived his Fifth and Sixth Amendment rights. *See Moran v. Burbine*, 475 U.S. 412, 422-23, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986)("Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is

69

complete and the waiver is valid as a matter of law."); *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979)("in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.").[95]

## 2. State Habeas Court's Rulings were Reasonable

Insofar as petitioner's first and second claims herein challenge the state habeas court's rejections on the merits of petitioner's involuntariness claims, this Court must focus on the evidence presented during petitioner's state habeas corpus proceeding in October, 2007, summarized above in Section I.L.[96]

This Court concludes (1) the state habeas court's credibility findings, i.e., those findings explicitly or implicitly rejecting the factual accuracy of petitioner's testimony and, instead, finding credible the testimony of numerous BCADC employees, detectives Carian and Kellogg, and petitioner's own trial counsel, are eminently reasonable in light of the evidence presented before the state habeas trial court in

---

[95] Although not controlling for purposes of this Court's retrospective AEDPA analysis, the Supreme Court's recent opinion in *Berghuis v. Thompkins*, ___ U.S. ___, ___, 130 S.Ct. 2250, 2262, 176 L.Ed.2d 1098 (2010), does not appear to require a different result. "As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Id.*

[96] *See* notes 56-69, *supra, and accompanying text.*

October, 2007 and (2) the state habeas court's rejections on the merits of petitioner's complaints about the alleged involuntariness of his written statement and his waiver of his Fifth and Sixth Amendment rights were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.

Having independently review the entire record from petitioner's state habeas corpus proceeding, including the more than one thousand pages of medical records admitted as exhibits during petitioner's state habeas corpus hearing in October, 2007, this Court finds wholly reasonable the state habeas corpus court's factual findings which rejected as incredible petitioner's highly dubious account of the extreme withdrawal symptoms petitioner claimed to have experienced during the April 6-7, 2001 time frame.  As the state habeas court correctly noted, petitioner's own treating physician, Dr. Robert Stowe, testified without contradiction during petitioner's state habeas corpus hearing that petitioner's vital signs taken on April 7, 2001 at approximately 11:58 a.m. were all in or near the normal range and did not indicate petitioner was then suffering the effects of

71

Klonopin withdrawal.[97]  Dr. Stowe also testified, in pertinent part that (1) petitioner never indicated to Dr. Stowe that petitioner was taking *more* than the prescribed dosage of Klonopin, (2) petitioner on one occasions indicated to Dr. Stowe that he (petitioner) was only taking Klonopin on an "as needed" basis, (3) he believed the dosage of Prozac he prescribed for petitioner was sufficient to handle petitioner's anxiety symptoms, (3) he slowly tapered petitioner off Klonopin and discontinued petitioner's Klonopin prescription completely in February, 2001, (4) anyone experiencing Klonopin withdrawal from four milligrams daily to none, as petitioner testified he was experiencing on April 6-7, 2001, could be expected to exhibit anxiety, convulsions, tremors, increased blood pressure, increased heart rate, sweating, agitation, and increased motor restlessness, (5) petitioner never resisted Dr. Stowe's efforts to reduce petitioner's Klonopin dosage, (6) if petitioner had gone "cold turkey" off Klonopin in the manner petitioner testified, it would be unlikely petitioner would not experience at least some withdrawal symptoms, and (7) *petitioner's vital signs on April 7, 2001 were not indicative of a person then experiencing Klonopin withdrawal.*[98]

---

[97] S.F. State Habeas Hearing, Volume 4 of 10, testimony of Dr. Robert H. Stowe, at pp. 35-38.

[98] *Id.*, at pp. 12-20, 24-42.

Furthermore, as was explained at length in Section I.L. above, with the exception of petitioner, none of the persons who testified during the petitioner's state habeas corpus hearing who personally observed petitioner during the April 6-7, 2001 time frame claimed to have witnessed petitioner displaying any of the significant physiological indications of Klonopin withdrawal described by either Dr. Stowe or Dr. Lundberg-Love during their testimony which petitioner claimed to then-be experiencing.[99]

The one fact petitioner and both his trial counsel agreed upon during their testimony before the state habeas court was that petitioner never informed his trial counsel that he had undergone Klonopin withdrawal on April 6-7, 2001.[100]  In fact, petitioner's experienced trial counsel testified they would have considered any evidence suggesting petitioner was withdrawing from Klonopin on April 6-7, 2001 as directly relevant to the

_____

[99] Petitioner claimed that, during his interviews with detective Carian on April 6 and April 7, 2001, petitioner experienced trembling and shaking, a panicky sensation, feelings of impending doom, difficulty breathing, involuntary jerking of his limbs, sweating profusely, feelings of disorientation and confusion, the sensation of blood rushing through his head, nervousness, his knees shaking, tension, hyperventilation, his heart racing, feeling "unbalanced," exhaustion, and the effects of prolonged insomnia. S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 30, 61, 67-69, 181-87, 214-15.

[100] S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 28, 32-37, 270-72, 275, 278, 292-94, 296; Volume 4 of 10, testimony of Michael Ugarte, at pp. 54-56, 61-71, 73-77, 79-80, 82, 86, 103-04, 116-17, 119-21, 137-38; testimony of Patrick Hancock, at pp. 143-45, 157-65, 168, 175, 177-78.

issue of the voluntariness of petitioner's written statement
(which they vigorously contested) and, had they received such
information, it would have changed their strategy at the motion
to suppress hearing.[101]  Like the state habeas court, this Court
finds it wholly implausible that an experienced, college-
educated, career criminal such as petitioner would have withheld
from his own trial counsel any mention of the allegedly severe
withdrawal symptoms petitioner testified in October, 2007 he had
experienced in April, 2001.  Given the testimony of petitioner's
experienced trial counsel and petitioner's obvious familiarity
with the criminal justice system, the state habeas court
reasonably found petitioner was well aware of his right to
testify during the pretrial hearing on petitioner's motion to
suppress in March, 2002, by which time petitioner admitted he had
been receiving Klonopin from BCADC medical staff for months.[102]

Finally, petitioner admitted during his testimony at his
state habeas corpus hearing that, on the afternoon of April 7,

_____

[101] S.F. State Habeas Hearing, Volume 4 of 10, testimony of
Michael Ugarte, at pp. 51, 54-56, 61-71, 73-77, 103-04, 116-17,
119-21; Testimony of Patrick Hancock, at pp. 143-45, 157, 160-63,
165, 169, 175, 177-78.

[102] S.F. State Habeas Hearing, Volume 3 of 10, testimony of
Ramon Hernandez, at pp. 32, 258-60, 270-71, 279-80.
Petitioner explained he specifically requested Klonopin
after his arrest and was able to obtain it from BCADC medical
personnel because "they will give you what you need in order to
keep -- keep us calm here." Id., at pp. 259-60.

2001 (after petitioner had received his prescribed dosage of Prozac), he furnished detective Carian with a highly detailed written statement which petitioner meticulously edited (over a total of approximately eight hours) and which petitioner claimed was factually accurate in all regards.[103]

The testimony presented during petitioner's state habeas corpus hearing fully supports the state habeas court's conclusions that petitioner's written statement was voluntary and the petitioner's waiver of his Fifth and Sixth Amendment rights was voluntary, intelligent, and knowing. *See Moran v. Burbine*, 475 U.S. at 422-23, 106 S.Ct. at 1141 ("Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.")

3. No Basis for Relief under *de novo* Review

Alternatively, in the event an appellate court one day concludes this Court should have conducted a *de novo* review of petitioner's complaints about the alleged involuntariness of his written confession and the alleged involuntariness of his waiver of his Fifth and Sixth Amendment rights, this Court concludes (1)

---

[103] S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 192, 202-03, 205, 221, 223, 225-26, 230 233-38, 241, 244, 258-59, 287-88.

petitioner's complaint about the alleged involuntariness of his
written statement lacks any arguable merit and (2) petitioner's
complaint about the alleged involuntariness of his waiver of his
Fifth and Sixth Amendment rights lacks any arguable merit.   In
light of the objective evidence showing petitioner's vital signs
were in or near the normal range on the morning of April 7,
2001[104] and petitioner's admission that he received his prescribed
dosage of Prozac that same morning,[105] there is no credible
evidence in the record establishing petitioner's highly detailed
written confession was involuntary or the result of an
involuntary waiver of his Fifth or Sixth Amendment rights.
Petitioner knew full well on April 7, 2001 how to terminate an
interview with police had he wished to do so when he met with
detectives Carian and Kellogg.   In point of fact, he had done
precisely that on April 6, 2001.   Under the facts as found by the
state habeas court, which after independent review this Court
finds eminently reasonably, petitioner's waiver of his Fifth and
Sixth Amendment rights was voluntary, intelligent, and knowing
and his confession uncoerced. *See Berghuis v. Thompkins*, ___ U.S.
___, ___, 130 S.Ct. 2250, 2264, 176 L.Ed.2d 1098 (2010)("a
suspect who has received and understood his *Miranda* warnings, and

_____

[104] S.F. State Habeas Hearing, Volume 4 of 10, testimony of
Dr. Robert H. Stowe, at pp. 35-38.

[105] S.F. State Habeas Hearing, Volume 3 of 10, testimony of
Ramon Hernandez, at pp. 241, 259.

had not invoked his *Miranda* rights, waives the right to remain
silent by making an uncoerced statement to the police.").

E. Conclusions

The state trial court's rejections on the merits in March,
2002 of petitioner's claims that his written confession was
involuntary and that his waiver of his Fifth and Sixth Amendment
rights was involuntary were neither contrary to, nor involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States, nor based
on an unreasonable determination of the facts in light of the
evidence presented in the petitioner's motion-to-suppress
hearing.

The state habeas court's rejections on the merits of
petitioner's state habeas claims that his written confession was
involuntary and that his waiver of his Fifth and Sixth Amendment
rights was involuntary were neither contrary to, nor involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States, nor based
on an unreasonable determination of the facts in light of the
evidence presented in the petitioner's state habeas corpus
proceeding.

Alternatively, this Court independently concludes
petitioner's first and second claims herein lack any arguable
merit because, like the state habeas court, this Court finds

petitioner's allegations that he was experiencing severe Klonopin
withdrawal on April 6-7, 2001 were completely refuted by the
evidence establishing (1) petitioner's vital signs on the morning
of April 7, 2001 were all in or near the normal range,[106] (2) the
petitioner is very experienced in the criminal justice system,
highly intelligent, and yet he utterly failed to inform his own
trial counsel about the alleged Klonopin withdrawal petitioner
claimed to have experienced on April 6-7, 2001,[107] (3) petitioner
was able, despite his alleged withdrawal symptoms, over the
course of many hours to furnish and carefully edit a highly
detailed written statement on April 7, 2001,[108] and (4) no one who
observed petitioner on April 6-7, 2001 witnessed petitioner
exhibiting any of the severe physiological symptoms petitioner
claimed to be experiencing at that time.[109]   Accordingly,

---

[106] S.F. State Habeas Hearing, Volume 4 of 10, testimony of
Dr. Robert H. Stowe, at pp. 35-38.

[107]

[108] S.F. State Habeas Hearing, Volume 3 of 10, testimony of
Ramon Hernandez, at pp. 221, 223, 225-26, 230, 233-34, 237-38,
251, 287-88.

[109] As was explained in detail in Section I.L. above, none of
the BCADC employees nor any of the San Antonio Police detectives
who testified during petitioner's state habeas corpus hearing
(who encountered petitioner on April 6-7, 2001) observed anything
about petitioner's appearance or demeanor that suggested to them
petitioner was either suicidal, suffering from the effects of
drug withdrawal, or otherwise in need of immediate medical
attention.

petitioner's first two claims herein do not warrant federal

habeas corpus relief.

## IV. <u>Ineffective Assistance by Trial Counsel</u>

### A. <u>The Claims</u>

In his third, fourth, and fifth claims herein, petitioner

argues his trial counsel rendered ineffective assistance by

failing to (1) introduce all available evidence at the hearing on

petitioner's motion to suppress showing petitioner's written

statement was involuntary (specifically petitioner's testimony

and medical records and the testimony of petitioner's medical and

mental health experts presented during petitioner's state habeas

corpus proceeding), (2) exclude or prevent the admission of

evidence relating to the murders of Sarah Gonzales and Priscilla

Almares, and (3) object to the prosecution's closing argument at

the punishment phase of trial regarding the victims' families'

feelings about the appropriate punishment.[110]

### B. <u>The Constitutional Standard</u>

The constitutional standard for reviewing petitioner's

complaints about the performance of his trial counsel is well-

---

[110] Petition, at p. 5; Brief in Support of Petition, at pp.
2-36.  As was explained above, petitioner lumped his initial
complaint of ineffective assistance in with his involuntariness
complaints in a successful effort to lure the state habeas court
into re-litigating the propriety of the trial court's denial of
petitioner's motion-to-suppress based upon evidence that was
never presented to the state trial court during the original
hearing on petitioner's motion to suppress.

settled.  The Sixth Amendment entitles criminal defendants to
"the effective assistance of counsel," *i.e.*, legal representation
that does not (1) fall below an objective standard of
reasonableness in light of prevailing professional norms and the
circumstances of the defendant's case (*Wong v. Belmontes*, ___
U.S. ___, ___, 130 S.Ct 383, 384, 175 L.Ed.2d 328 (2009); *Bobby
v. Van Hook*, ___ U.S. ___, ___, 130 S.Ct. 13, 16, 175 L.Ed.2d 255
(2009)); and (2) give rise to a reasonable probability that, but
for counsel's unprofessional errors, the result of the proceeding
would have been different (*Porter v. McCollum*, ___ U.S. ___, ___,
130 S.Ct. 447, 452-53, 175 L.Ed.2d 398 (2009); *Wong v. Belmontes*,
___ U.S. at ___, 130 S.Ct. at 386).

The constitutional standard for determining whether a
criminal defendant has been denied the effective assistance of
*trial* counsel, as guaranteed by the Sixth Amendment, was
announced by the Supreme Court in *Strickland v. Washington*, 466
U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

> A convicted defendant's claim that counsel's assistance
> was so defective as to require reversal of a conviction
> or death sentence has two components.  First, the
> defendant must show that counsel's performance was
> deficient.  This requires showing that counsel made
> errors so serious that counsel was not functioning as
> the "counsel" guaranteed the defendant by the Sixth
> Amendment.  Second, the defendant must show that the
> deficient performance prejudiced the defense.  This
> requires showing that counsel's errors were so serious
> as to deprive the defendant of a fair trial, a trial
> whose result is reliable.

To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S. at 687-91, 104 S.Ct. at 2064-66. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, ___ U.S. at ___, 130 S.Ct. at 16; *Strickland v. Washington*, 466 U.S. at 688-

81

89, 104 S.Ct. at 2065.  It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068.  A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.*

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Belmontes*, ___ U.S. at ___, 130 S.Ct. at 386; *Wiggins v. Smith*, 539 U.S. at 534, 123 S.Ct. at 2542. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a capital murder trial would have been different. *Wong v. Belmontes*, ___ U.S. at ___, 130 S.Ct. at 390-91.

82

A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Rogers v. Quarterman*, 555 F.3d 483, 489 (5th Cir. 2009), *cert. denied*, ___ U.S. ___, 130 S.Ct. 365, 175 L.Ed.2d 62 (2009); *Blanton v. Quarterman*, 543 F.3d 230, 235 (5th Cir. 2008), *cert. denied*, ___ U.S. ___, 129 S.Ct. 2383, 173 L.Ed.2d 1301 (2009); *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000), *cert. denied*, 522 U.S. 1067 (2001).

Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone*, 535 U.S. at 698, 122 S.Ct. at 1852; *Strickland v. Washington*, 466 U.S. at 690, 104 S.Ct. at 2066; *Scheanette v. Quarterman*, 482 F.3d 815, 820 (5th Cir. 2007); *Sonnier v. Quarterman*, 476 F.3d 349, 356 (5th Cir. 2007), *cert. denied*, 552 U.S. 948 (2007); *Amador v. Quarterman*, 458 F.3d at 410; *Gonzales v. Quarterman*, 458 F.3d 384, 390 (5th Cir. 2006), *cert. denied*, 549 U.S. 1323 (2007).

C. Failure to Present Available Evidence at Pretrial Hearing on Motion to Suppress

1. The Claim

In his third claim herein, petitioner argues his trial counsel should have presented petitioner's testimony,

petitioner's medical records, and the testimony of medical and

mental health experts like Dr. Stowe and Dr. Lundberg-Love,

respectively, during petitioner's pretrial hearing on defendant's

motion to suppress petitioner's written statement.[111]

2. <u>State Court Disposition</u>

The state habeas trial court expressly found that (1) the

petitioner never told his trial counsel that "at the time of his

interrogation, he was going through withdrawal from a drug called

Klonopin or from any other drug,"[112] (2) the petitioner did not

tell his trial counsel that "during his interrogation by police

he was in need of medical attention or that he was being denied

medical attention by the police,"[113] (3) the petitioner did not

tell his trial counsel that during his interviews with Carian,

petitioner experienced panic attacks or began shaking

uncontrollably,[114] (4) the petitioner never told his trial counsel

that Carian ignored petitioner's repeated requests to terminate

the interview or for an attorney, laughed at petitioner, accused

petitioner of faking the episodes, threatened petitioner with the

---

[111] Brief in Support of Petition, at pp. 2-21.

[112] State Habeas Transcript, Volume II, at p. 419; State
Habeas Transcript, Volume III, at p. 84.

[113] State Habeas Transcript, Volume II, at pp. 419-20; State
Habeas Transcript, Volume III, at p. 84.

[114] State Habeas Transcript, Volume II, at p. 420; State
Habeas Transcript, Volume III, at pp. 84-85.

death penalty, or refused to arrange for the administration of
any medications unless petitioner agreed to give a statement,[115]
(5) the testimony of detectives Carian and Kellogg regarding
petitioner's April 6, 2001 interrogation was credible,[116] (6) the
testimony of Caroline Mkubwa, Kim Robinson, Rogelio Contreras,
John Kellogg, and Andrew Carian regarding petitioner's appearance
and conduct on April 7, 2001 was credible and petitioner's very
dissimilar accounts of same were incredible,[117] and (7) the
petitioner was not suffering from withdrawal symptoms on April 6-
7, 2001.[118]

The state habeas trial court expressly concluded that (1)
petitioner's written statement was freely and voluntarily given,
(2) petitioner's statement was the product of no police
misconduct but, rather, petitioner's choice to give the police
his own version of the facts surrounding Rosado's capital murder,
(3) the only reason police spoke with petitioner again on April
7, 2001 was petitioner's request that they do so, (4) petitioner
was reminded of his rights prior to this second interview, and

---

[115] State Habeas Transcript, Volume II, at p. 420; State
Habeas Transcript, Volume III, at p. 85.

[116] State Habeas Transcript, Volume II, at p. 422; State
Habeas Transcript, Volume III, at p. 87.

[117] State Habeas Transcript, Volume II, at pp. 423-24; State
Habeas Transcript, Volume III, at p. 88.

[118] State Habeas Transcript, Volume II, at p. 424; State
Habeas Transcript, Volume III, at p. 88.

(5) petitioner's complaints about his trial counsel's performance in connection with petitioner's pretrial motion to suppress hearing did not satisfy either prong of the *Strickland* test.[119]

The Texas Court of Criminal Appeals adopted these findings and conclusions when it rejected petitioner's ineffective assistance claims on the merits in the course of petitioner's state habeas corpus proceeding.

3. Synthesis

  a. No Deficient Performance

The fundamental problem with this assertion of ineffective assistance is that it is premised upon petitioner's contention that, throughout his interrogations on April 6-7, 2001, he was experiencing severe withdrawal symptoms from the prescription medication Klonopin, a contention which the state habeas court reasonably found to be incredible.[120]  The state habeas trial court reasonably concluded petitioner's testimony suggesting he was experiencing severe withdrawal symptoms during his police interviews on those dates was incredible.  Having independently reviewed the entirety of the voluminous record from petitioner's state habeas corpus proceeding, this Court concludes the state habeas court's credibility findings were eminently reasonable.

---

[119] State Habeas Transcript, Volume II, at pp. 424-25; State Habeas Transcript, Volume III, at p. 89.

[120] State Habeas Transcript, Volume II, at pp. 424-25; State Habeas Transcript, Volume III, at p. 89.

Dr. Stowe's testimony established that any person suffering the type of severe withdrawal symptoms petitioner described should have exhibited objectively verifiable indications of withdrawal, including elevated blood pressure and heart rate.  Yet petitioner's "normal" vital signs taken shortly before noon on April 7, 2001 belie any contention petitioner was then experiencing the type of severe withdrawal symptoms petitioner described in his testimony.  None of the eyewitnesses at the BCADC who observed petitioner on April 7, 2001 offered any indication they witnessed petitioner exhibiting any of the withdrawal symptoms Dr. Stowe or Dr. Lundberg-Love identified as typical of Klonopin withdrawal.  Dr. Stowe, who treated petitioner from August, 2000 through petitioner's arrest in April, 2001 could not corroborate petitioner's self-serving testimony suggesting petitioner had been over-medicating himself with Klonopin for many months with pills petitioner obtained from a third-party.  In fact, petitioner's testimony during the state habeas hearing regarding how much Klonopin he was taking during the time period Dr. Stowe was trying to wean petitioner off Klonopin was a veritable fount of internal inconsistency, ambiguity, and self-contradiction.[121]

---

[121] S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 38-41, 46-50, 52-54, 56-57, 61-62, 64-66, 76, 252-56, 259-60.

Furthermore, as was explained above, it was undisputed during petitioner's state habeas corpus hearing that petitioner never communicated to his trial counsel any information suggesting petitioner was experiencing drug withdrawal symptoms or otherwise in need of medical attention during petitioner's interviews on April 6-7, 2001.[122]  Petitioner's trial counsel testified without contradiction during the state habeas hearing that they stood ready, willing, and able to challenge as involuntary petitioner's written statement and would have welcomed any information suggesting petitioner was experiencing drug withdrawal during his police interrogations but petitioner simply failed to communicate any such information to them.[123] Under such circumstances, the state habeas court's factual determination that petitioner did not suffer withdrawal symptoms on April 6-7, 2001 was an eminently reasonable determination based upon the evidence before that court.  Petitioner's trial counsel cannot reasonably be faulted for professionally deficient performance when the petitioner admitted he failed to communicate

---

[122] S.F. State Habeas Hearing, Volume 3 of 10, testimony of Ramon Hernandez, at pp. 28, 32-37, 270-72, 275, 278, 292-94, 296; Volume 4 of 10, testimony of Michael Ugarte, at pp. 54-56, 61-71, 73-77, 79-80, 82, 86, 103-04, 116-17, 119-21, 137-38; testimony of Patrick Hancock, at pp. 143-45, 157-65, 168, 175, 177-78.

[123] S.F. State Habeas Hearing, Volume 4 of 10, testimony of Michael Ugarte, at pp. 54-56, 61-71, 73-77, 79-80, 82, 86, 103-04, 116-17, 119-21, 137-38; testimony of Patrick Hancock, at pp. 143-45, 157-65, 168, 175, 177-78.

88

to his trial counsel the very information petitioner now contends

his trial counsel should have presented to the state trial court

at the pretrial hearing on petitioner's motion to suppress.

Petitioner admitted during his testimony at the state habeas

hearing that he concealed from his trial counsel any and all

information suggesting petitioner was suffering drug withdrawal

symptoms on April 6-7, 2001.

Insofar as petitioner argues his trial counsel should have

somehow discerned from petitioner's medical records that

petitioner was experiencing Klonopin withdrawal on April 6-7,

2001, that argument fails for two, equally compelling, reasons.

First, the state habeas court reasonably found from the evidence

before it that petitioner did not, in fact, experience withdrawal

symptoms on April 6-7, 2001.  Petitioner's trial counsel cannot

reasonably be faulted for failing to discover a "fact" which did

not exist at the time of the pretrial hearing on petitioner's

motion to suppress.  Second, according to the uncontradicted

testimony of petitioner's own medical expert, Dr. Stowe,

petitioner's medical records showed that petitioner had been

successfully weaned off of Klonopin in February, 2001.[124]  Insofar

as petitioner points to the fact he began receiving Klonopin

shortly after he was arrested, petitioner himself admitted during

---

[124] S.F. State Habeas Hearing, Volume 4 of 10, testimony of
Dr. Robert H. Stowe, at pp. 16-17.

89

his testimony that he specifically requested Klonopin from the
BCADC psychiatric staff and believed he could obtain any
medication he wanted if he convinced the BCADC staff it would
keep him calm.[125]   Thus, there was nothing objectively
unreasonable with the failure of petitioner's trial counsel to
discover evidence showing petitioner experienced drug withdrawal
symptoms on April 6-7, 2001.   The state habeas court reasonably
determined that no credible evidence of same has ever existed.

Furthermore, this Court independently concludes there was
nothing objectively unreasonable with the failure of petitioner's
trial counsel to discover prior to trial petitioner's wholly
incredible assertion that he was suffering from severe Klonopin
withdrawal symptoms on April 6-7, 2001.

In light of the foregoing, this Court concludes the state
habeas court's conclusion that this assertion of ineffective
assistance failed to satisfy the deficient performance prong of
*Strickland* was neither contrary to, nor involved an unreasonable
application of, clearly established Federal law, as determined by
the Supreme Court of the United States, nor based on an
unreasonable determination of the facts in light of the evidence
presented in the petitioner's state habeas corpus proceeding.

---

[125] S.F. State Habeas Hearing, Volume 3 of 10, testimony of
Ramon Hernandez, at pp. 259-60.

b. <u>No Prejudice</u>

Petitioner was afforded a rare opportunity to completely re-litigate his originally unsuccessful motion to suppress in the context of his state habeas corpus proceeding.  The same state district trial judge who presided over petitioner's pretrial hearing on his motion to suppress and petitioner's capital murder trial also presided over petitioner's state habeas corpus proceeding.  As was explained in detail in Section I.L. above, during petitioner's state habeas corpus proceeding, state district judge Mary Roman heard petitioner's testimony, reviewed petitioner's voluminous medical records, heard testimony from petitioner's medical and mental health experts, and heard testimony from the State's witnesses, including detectives Carian and Kellogg and several BCADC personnel who encountered petitioner on April 7, 2001.  Judge Roman was uniquely qualified to make credibility determinations regarding the diametrically opposing descriptions of petitioner's demeanor on April 6-7, 2001 offered by the petitioner, on the one hand, and all of the State's witnesses, on the other.

Judge Roman reviewed all of the new evidence petitioner argued his trial counsel should have presented during the original hearing on petitioner's motion to suppress and concluded, despite petitioner's testimony alleging he was suffering from severe Klonopin withdrawal symptoms on April 6-7,

91

2001, petitioner's written confession and petitioner's waiver of
his Fifth and Sixth Amendment rights were voluntary.  For the
reasons set forth at length above in Section III.D. above, Judge
Roman reasonably determined petitioner's account of the
circumstances surrounding the creation, editing, and execution of
petitioner's written statement on April 7, 2001 were wholly
incredible.[126]  Likewise, Judge Roman's conclusions that
petitioner's written statement was voluntary, as was petitioner's
waiver of his Fifth and Sixth Amendment rights, are not subject
to debate among reasonable jurists.

This Court independently concludes there is not even a
remote possibility, much less a reasonable probability, that, but
for the failure of petitioner's trial counsel to present the
state trial court with any or all of the evidence petitioner

------------------------------------------------------------

[126] As was explained above, petitioner testified during his
state habeas corpus hearing that he endured months of severe
withdrawal symptoms associated with Dr. Stowe's reduction in
petitioner's Klonopin dosage immediately prior to his arrest on
April 6, 2001.  However, petitioner's own medical records reveal
that petitioner was a "no show" or cancelled appointments with
Dr. Stowe several times in the months immediately prior to
petitioner's arrest, specifically on January 16, January 30,
February 13, and April 4, 2001. *See, e.g., Defense Exhibit 3-A,
S.F. State Habeas Hearing, Volume 8 of 10,* at pp. 121-55; *Defense
Exhibit 3, S.F. State Habeas Hearing, Volume 7 of 10,* at pp. 31,
33, 38, 40; *State's Exhibit 1, S.F. State Habeas Hearing, Volume
6 of 10,* at pp. 39, 41, 65, 121.  For a person who described
himself as desperate during the Winter of 2000-01 to convince Dr.
Stowe to re-institute his Klonopin prescription and increase the
dosage, petitioner's rather casual conduct toward his medical
appointments with Dr. Stowe belies that of a person who was
suffering from severe Klonopin withdrawal during that same time
frame.

presented during his state habeas corpus proceeding, the outcome
of petitioner's trial (or the hearing on petitioner's pretrial
motion to suppress) would have been different.  There is no
rational basis for concluding Judge Roman's objectively
reasonable factual findings and legal conclusions issued in the
course of the petitioner's state habeas corpus proceeding (the
relevant portion of which the Texas Court of Criminal Appeals
expressly adopted) would have been any different had petitioner's
trial counsel presented that very same evidence during the
pretrial hearing on petitioner's motion to suppress his written
statement.  In fact, had petitioner's trial counsel offered all
of the evidence petitioner presented during his state habeas
corpus proceeding at the pretrial motion to suppress hearing, it
is highly likely Judge Ramon would have issued the same or
similar, objectively reasonable, factual findings and legal
conclusions rejecting as incredible petitioner's assertion that
he suffered severe Klonopin withdrawal symptoms on April 6-7,
2001.  Judge Roman heard all of petitioner's new evidence and
reasonably rejected petitioner's factual assertions as
incredible.  There was substantial, if not overwhelming, evidence
presented during petitioner's pretrial hearing on his motion to
suppress, as well as petitioner's state habeas corpus proceeding,
establishing petitioner's written statement executed April 7,
2001 was voluntarily given and that petitioner's waiver of his

Fifth and Sixth Amendment rights on April 7, 2001 was voluntary, intelligent, and knowing.

The state habeas court's conclusion that petitioner's complaints about his trial counsel's failure to present all of the new evidence (which petitioner presented during his state habeas corpus proceeding) during the pretrial hearing on petitioner's motion to suppress failed to satisfy the prejudice prong of *Strickland* was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.  On the contrary, the state habeas court's conclusion in that regard was an eminently reasonable application of the well-settled *Strickland* standard.

    4. Conclusion

The Texas Court of Criminal Appeals' rejection on the merits, in the course of petitioner's state habeas corpus proceeding, of petitioner's ineffective assistance complaint about the performance of petitioner's trial counsel in connection with the pretrial hearing on petitioner's motion to suppress his written statement was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based

94

on an unreasonable determination of the facts in light of the
evidence presented in the petitioner's state habeas corpus
proceeding.   Petitioner's third claim herein does not warrant
federal habeas corpus relief.

D. Failure to Exclude Evidence of Sarah Gonzales' and Priscilla
   Almares' Murders

   1. The Claim

     In his fourth claim herein, petitioner argues his trial
counsel should have argued the fourth paragraph of petitioner's
indictment was unconstitutionally vague as applied to petitioner
because under Texas law the murder of Priscilla Almares in
December, 1994 was simply too attenuated, both temporally and in
terms of its modus operandi, to have been committed as part of
"the same scheme or course of conduct" as the murder of Rosado.[127]
Put more simply, petitioner argues his trial counsel, who did
move to quash the fourth paragraph of the petitioner's
indictment, should have presented different factual and legal
arguments to support their motion to quash the indictment, to
wit, that the fourth paragraph of the indictment should have been
quashed because the murders of Rosado and Almares were too far
apart in time and too dissimilar in their manner of commission to
have been committed "pursuant to the same scheme and course of
conduct."   Petitioner argues further that, had his trial counsel

_____

   [127] Brief in Support of Petition, at pp. 21-31.

properly raised such an "as-applied void-for-vagueness" challenge

to the fourth paragraph of petitioner's indictment, the state

trial court would have been compelled to quash that paragraph and

the prosecution would thereafter have been unable to introduce

any evidence at petitioner's trial relating to Sarah Gonzales or

Priscilla Almares' murders because those murders would have been

extraneous bad acts, inadmissible under applicable Texas law.[128]

2. State Court Disposition

In his application for state habeas corpus relief,

petitioner included a similar ineffective assistance claim as his

second ground for state habeas corpus relief.[129]   The state habeas

_____

[128] *Id.*

[129] State Habeas Transcript, Volume I, at pp. 13-38.
Because petitioner's fourth claim herein is so factually
convoluted and, in this Court's judgment, based upon a rather
myopic view of the many obvious similarities between the murders
of Gonzales and Almares and the murder of Rosado, it is necessary
to examine what petitioner actually argued before the state
habeas court in support of petitioner's second claim for state
habeas relief:
> The only evidence even connecting Applicant to the
> murders of Almares and Gonzales was the DNA from the
> semen sample taken from Almareas' rectal swab.
> Otherwise the evidence does not show to what extent, if
> any, Applicant actually participated in the murders
> themselves, either as a party or as a principal actor.
> The killings were separated in time by more than six
> years.  It is true they show certain generic
> similarities, common to most abduction/robbery/rape/
> murder cases.  But these similarities are hardly
> sufficient to establish a "regular mode or pattern of
> behavior."  For example, all the victims died of
> asphyxiation.  But while Almares and Gonzales were
> strangled in some undetermined manner, the medical
> examiner could not say whether Rosado's asphyxiation

trial court rejected this claim on the merits and, in so doing,

made the following findings and conclusions:

> * * * Also, contrary to applicant's claim, the evidence
> was sufficient to establish, as alleged in the
> indictment, that all three murders occurred pursuant to
> the same scheme or course of conduct.
>     Dr. DiMaio testified to a number of similarities
> found in all three of these cases. According to Dr.
> DiMaio, in all three of these cases, there were
> relatively young females who were abducted, sexually
> assaulted, and killed by asphyxiation. He testified
> that all three victims had hemorrhages to the eyes. He

---

> was the result of strangulation. The medical examiner
> also testified that all the victims had been bound,
> beaten, and forcibly raped. While the medical examiner
> could detect that something like bleach had apparently
> been used to try to clean Rosado's body, all he could
> say about the bodies of Almares and Gonzales was that
> they were "unusually clean" when found, *not* that any
> concerted effort had been made to destroy evidence.
> Moreover, the beating inflicted on Rosado was much more
> severe than those that Almares and Gonzales endured.
> The medical examiner could not say how any of the rapes
> were perpetrated, or how many rapists were involved.
> And while Almares and Gonzales were unceremoniously
> "dumped" by the side of the road after they were
> killed, Rosado was meticulously buried. Rosado, at
> thirty-seven years old, was much older than Almares and
> Gonzales, who were only 12 and 13 years old,
> respectively.
>     None of this evidence suffices to establish a
> "regular mode or pattern of behavior." There is
> nothing distinctive that the separate occurrences have
> in common to suggest a "mode" or "pattern" of any sort,
> much less a "regular" mode or pattern. Unlike in
> *Corwin*, there were only two occurrences involved in
> this case, rather than multiple and periodic
> rape/murders spread over the course of a number of
> years. Thus, the generic similarities shown by the
> State in this case do not establish a *regular* mode or
> pattern of behavior, even if it can be said that some
> *rough* "mode" or "pattern" is shown.

State Habeas Transcript, Volume I, at pp. 17-18 (*record citations omitted*).

observed that, with Rosado, bleach was used to clean
the body, and the other two bodies were also clean for
this type of crime.  He testified that there were also
bruises about the head to all three victims, as if they
had been struck about the head.  He explained that all
three victims had been beaten enough to cause
unconsciousness.  And he explained that, in all three
cases, there was no evidence of resistance to asphyxia,
suggesting that they were all helpless at the time of
strangulation.

Additionally, the evidence in this case also
demonstrates that all three victims were abducted or
last seen alive within the same area of San Antonio,
and the photographs of the victims admitted into
evidence in this case demonstrate that all three
victims shared certain similarities in appearance: they
were all Hispanic appearing females, they were all
between 5' 2 1/2" and 5' 5" tall, they all had dark
brown to black hair color, and their hair appears to
have been about the same length at the time of their
deaths.[130]

* * *

Applicant alleges that trial counsel should have
moved to quash paragraph D of his indictment.  To
support his argument, however, he points to evidence
adduced at trial as well as to arguments that the
prosecutor made to the jury.  The Court of criminal
Appeals has held that the sufficiency of an indictment
may not be supported or defeated by evidence. See *State
v. Rosenbaum*, 910 S.W.2d 934, 948 (Tex. Crim. App.
1994)(dissenting op. Adopted on reh'g)(sufficiency of
indictment at pretrial motion to quash indictment
cannot be supported or defeated by evidence).  The
purpose of a motion to quash is to address the
sufficiency of the pleading itself, not to force the
State to try its case in front of the court before it
actually tries its case in front of the jury. *Woods v.
State*, 153 S.W.3d 413, 415 (Tex. Crim. App.
2005)(explaining that the purpose of a pretriqal motion
or a motion to quash "is to address preliminary

---

[130] State Habeas Transcript, Volume II, at pp. 390-92 (*record
citations omitted*); State Habeas Transcript, Volume III, at pp.
55-57 (*record citations omitted*).

matters, not the merits of the case itself.
Preliminary matters are those issues that can be
determined before there is a trial on the general issue
of the case."). A challenge to the sufficiency of an
indictment is limited to the face of the indictment
itself, and may not be supported by evidence, even if
there is any, that would prove the State cannot sustain
its burden. See *Carpenter v. State*, 477 S.W. 2d 22, 23
(Tex. Crim. App. 1972)(explaining that a court may not
look beyond the face of the murder indictment to see if
there is sufficient evidence to support it.).

The record of this case indicates that trial
counsel for Applicant actually did pursue the quashal
[sic] of the indictment pending against him on the
grounds that, "the indictment...doesn't state any type
of..act or omission committed by Mr. Hernandez that
constitutes a similar scheme and or course of conduct
as alleged in the indictment," and that, "the
indictment does not set out sufficient facts to give
defendant notice of what they are claiming to be a
common scheme and course of conduct." Counsel is not
required, however, to pursue futile motions. *Mooney v.
State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991). In
this case the motion to quash that applicant alleges
his counsel should have pursued would have been futile.
It would not have entitled him to relief, so his
counsel could not be ineffective for failing to pursue
it.[131]

The Texas Court of Criminal Appeals adopted this portion of the

state habeas trial court's findings and conclusions when it

denied petitioner's state habeas corpus application on the

merits. *Ex parte Hernandez*, WR-69,724-01, 2008 WL 4151799 (Tex.

Crim. App. September 10, 2008).

---

[131] State Habeas Transcript, Volume II, at pp. 394-96; State
Habeas Transcript, Volume III, at pp. 59-61.

3. <u>Synthesis</u>

    a. <u>No Deficient Performance</u>

The fundamental problem with this ineffective assistance claim is that petitioner's pretrial "as applied void-for-vagueness" challenge to the fourth paragraph of his indictment, which forms the lynch pin for petitioner's fourth claim herein, is precluded by applicable state law.  More specifically, the state habeas court concluded *as a matter of state law* that the types of legal and factual arguments petitioner urged in his first and second claims for state habeas relief were are *not* cognizable *under Texas law* in a pretrial motion to quash an indictment.[132]  Thus, the Texas Court of Criminal Appeals implicitly rejected the construction of Texas law urged by petitioner in his first and second claims for state habeas relief and re-urged by petitioner in his fourth claim for federal habeas relief herein.

The state habeas court's conclusions regarding the scope and application of state law (including its determination that the types of arguments urged by petitioner were not cognizable under applicable state law in a pretrial motion to quash a Texas indictment) are binding on this federal habeas court.  Insofar as petitioner suggests in his pleadings in this Court that the Texas

---

    [132] State Habeas Transcript, Volume II, at pp. 394-96; State Habeas Transcript, Volume III, at pp. 59-61.

Court of Criminal Appeals erroneously construed applicable *Texas law* in rejecting on the merits petitioner's argument that the murders of Rosado, on the one hand, and those of Gonzales and Almares, on the other, were too attenuated in time and dissimilar in modus operandi to have been committed "pursuant to the same scheme and course of conduct" as alleged in the fourth paragraph of petitioner's indictment, that argument fails for two, equally compelling, reasons. First, the Texas Court of Criminal Appeals' construction of applicable state law during petitioner's state habeas corpus proceeding binds this Court's federal habeas review of same. *See Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S.Ct. 602, 604, 163 L.Ed.2d 407 (2005)("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009)(a state court's interpretation of state law binds a federal court sitting in habeas corpus), *cert. denied*, ___ U.S. ___, 131 S.Ct. 1050, 178 L.Ed.2d 870 (2010); *Amador v. Quarterman*, 458 F.3d at 412 (holding a federal habeas court must defer to a state court's interpretation of state law); *Fuhrman v. Dretke*, 442 F.3d 893, 901 (5th Cir. 2006)(holding the same); *Young v. Dretke*, 356 F.3d 616, 628 (5th Cir. 2004)("In our role as a federal habeas court, we cannot review the correctness of the state habeas court's interpretation of state law."); *Johnson*

*v. Cain*, 215 F.3d 489, 494 (5th Cir. 2000)(holding a federal habeas court may not review a state court's interpretation of its own law); *Gibbs v. Johnson*, 154 F.3d 253, 259 (5th Cir. 1998)(holding the same), *cert. denied*, 526 U.S. 1089 (1999). Second, errors in the construction or application of state law do not furnish an independent ground for federal habeas relief. See *Estelle v. McGuire*, 502 U.S. at 67-68, 112 S.Ct. at 480 (holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers*, 497 U.S. at 780, 110 S.Ct. at 3102 (recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris*, 465 U.S. at 41, 104 S.Ct. at 874 (holding a federal court may not issue the writ on the basis of a perceived error of state law).

Thus, petitioner's fourth claim herein boils down to an argument that petitioner's trial counsel should have done what was legally impossible under Texas law, i.e., present a set of legal and factual arguments in the context of petitioner's pretrial motion to quash his indictment that were not cognizable under Texas law in such a pretrial motion. Whatever else it might command, the first prong of *Strickland* analysis does not compel trial counsel to perform that which is legally

impossible.[133]   The state habeas court's conclusion (which this
Court is not free to second-guess) that the type of pretrial
motion to quash urged by petitioner in his fourth claim for
relief herein would have been futile as a matter of state law
fully supports the state habeas court's conclusion that
petitioner's trial counsel did not fail to furnish objectively
reasonable legal assistance to petitioner.   Petitioner's trial

---

[133] Petitioner does not identify any legal authority
establishing that it was impossible as a matter of state law for
him to *ever* present a Texas appellate court with his contention
that the murders of Rosado and Gonzales and Almares were not
committed "pursuant to the same scheme and course of conduct."
Nor could such an argument seriously have been urged.   The
principal state appellate opinion urged by petitioner in support
of his fourth claim herein is *Corwin v. State*, 870 S.W.2d 23
(Tex. Crim. App. 1993), *cert. denied*, 513 U.S. 826 (1994).   In
*Corwin*, the Texas Court of Criminal Appeals reviewed on direct
appeal following a capital murder conviction the same type of
legal and factual arguments petitioner urges his trial counsel
should have raised in petitioner's pretrial motion to quash
petitioner's indictment, i.e., complaints about the vagueness of
the serial killer provision of the Texas capital murder statute
"as applied" to a series of murders and attempted murders that
took place over a number of years, i.e., from 1975 through 1988.
The Texas Court of Criminal Appeals held the Texas serial killer
statute and Corwin's indictment furnished sufficient notice to
avoid an "as applied unconstitutional vagueness" challenge. *See
Corwin v. State*, 870 S.W.2d at 27-29 & n.6 (examining the
evidence presented during the punishment phase of Corwin's
capital murder trial relevant to the pattern of his behavior over
the years).   Subsequently, the Fifth Circuit held the serial
killer provision of the Texas capital statute (currently found in
Texas Penal Code Annotated §19.03(a)(7)(B)(Vernon Supp. 2010),
was not unconstitutionally vague on its face. *Corwin v. Johnson*,
150 F.3d 467, 475-76 (5th Cir.), *cert. denied*, 525 U.S. 1049
(1998).   Thus, petitioner was not completely deprived of an
opportunity to present his "applied unconstitutional vagueness"
challenge to the Texas appellate courts.   He was only precluded
by state law from obtaining a *pretrial* ruling on those arguments
in the context of his motion to quash his indictment.

counsel did attempt to challenge the fourth paragraph of petitioner's indictment.  That they failed to raise a host of factual and legal arguments that were not cognizable in such a motion did not cause their performance to fall below an objective level of reasonableness.

Moreover, petitioner's trial counsel did challenge the fourth paragraph of petitioner's indictment in a pretrial motion to quash in which said counsel argued as follows:

> The indictment does not "charge the commission of the offense in ordinary and concise language in such a manner as to enable a person of common understanding to know what is meant and with what degree of certainty that will give the Defendant notice of the particular offense with which he is charged..." in violation of TEX. CODE Crim. ANN. Art. 21.11 and the Fifth, Sixth and Fourteenth Amendments to the united States Constitution and article I, §§ 10 and 19 of the Texas Constitution.[134]

Petitioner raised the state trial court's failure to grant this same motion to quash as his second point of error on direct appeal.  On direct appeal, the Texas Court of Criminal Appeals rejected same on the merits.[135]  Thus, petitioner's trial counsel did everything necessary to preserve for state appellate review a challenge to the validity of petitioner's indictment.  Said counsel cannot be faulted for their failure to raise an "as applied vagueness" *evidentiary* challenge to petitioner's

---

[134] Trial Transcript, at p. 54.

[135] *Hernandez v. State*, AP-74,451 (Tex. Crim. App. March 23, 2005), at pp. 7-8.

indictment in a pretrial context when Texas law did not permit them to raise such an evidence-based challenge in that manner. *See Paredes v. Quarterman*, 574 F.3d at 291 n.13 (failure to raise a meritless argument cannot form the basis for a successful ineffective assistance claim because the result of the proceeding would not have been different had the attorney raised the issue); *Wood v. Quarterman*, 508 F.3d 408, 413 (5th Cir. 2007)(failure to raise futile or meritless objections is not ineffective lawyering), *cert. denied*, 552 U.S. 1314 (2008); *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002)(holding there was nothing deficient in counsel's failure to object to the admission of psychiatric testimony that was admissible under then-existing precedent), *cert. denied*, 538 U.S. 926 (2003).

Thus, insofar as petitioner complains that his trial counsel failed to exclude the evidence of his "extraneous" bad acts, specifically petitioner's involvement in the murders of Almares and Gonzales, after first quashing the fourth paragraph of the indictment, that complaint is premised on the erroneous presumption that it was possible for petitioner's trial counsel to have obtained a pretrial ruling on what was essentially an evidence-based challenge to the validity of paragraph four of petitioner's indictment. "[T]he Sixth Amendment does not require that counsel do what is impossible or unethical." *United States v. Cronic*, 466 U.S. 648, 656 n.19, 104 S.Ct. 2039, 2045 n.19, 80

L.Ed.2d 657 (1984).  Nor is counsel required to assert every

potential argument or claim available. *See Knowles v. Mirzayance*,

___ U.S. ___, ___, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251

(2009)("this Court has never required defense counsel to pursue

every claim or defense regardless of its merit, viability, or

realistic chance for success.").

>    b. No Prejudice

>    (1) Impossible to Get a Pretrial Ruling

The state habeas court construed Texas law as not permitting

precisely the type of evidence-based challenge to the sufficiency

of petitioner's indictment that petitioner argues his trial

counsel should have presented in a pretrial context.  Without a

ruling declaring Gonzales and Almares' murders to be "extraneous

bad acts," there was no legal basis for petitioner's complaint

that his trial counsel failed to "exclude" evidence of same at

trial.  This precludes a finding of "prejudice" under the

*Strickland* standard. *Paredes v. Quarterman*, 574 F.3d at 291;

*United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999).

Moreover, in light of the state habeas court's eminently

reasonable factual findings about the many similarities between

the murders of Rosado, on the one hand, and Gonzales and Almares,

on the other, there is no reasonable probability that, but for

the failure of petitioner's trial counsel to urge an invalid-

under-state-law, evidence-based, challenge to the sufficiency of

paragraph four of petitioner's indictment, the outcome of either phase of petitioner's capital murder trial would have been any different. Even if petitioner's trial counsel had presented the state trial court with the exact same evidence and arguments petitioner presented to the state habeas court in support of his first ground for state habeas relief, there is no reasonable probability the outcome of petitioner's trial would have been any different. *See Knowles v. Mirzayance*, ___ U.S. at ___, 129 S.Ct. at 1422 (holding no prejudice could be shown by defendant complaining about his counsel's failure to urge an insanity defense after the same jury had ruled in favor of the prosecution after hearing the same evidence petitioner claimed should have been re-urged in support of his insanity defense).

(2) <u>No Underlying Due Process Violation</u>

Furthermore, even if this Court were to delve into the underlying merits of petitioner's evidence-based constitutional challenge to his indictment, petitioner cannot satisfy the prejudice prong of *Strickland*. Petitioner argued that, under the Texas Court of Criminal Appeals' holding in *Corwin*, the evidence introduced at trial showing petitioner's involvement in both Almares' and Rosado's murders was inadequate to show both murders were committed "pursuant to the same scheme or course of conduct" because those murders were too distant in time and involved too many dissimilarities.

However, the temporal separation between petitioner's participation in the murders of Hispanic women was hardly conclusive of anything. The evidence considered by the Texas Court of Criminal Appeals in *Corwin* in rejecting a similar, evidence-based, challenge to an indictment included a showing that Corwin had abducted, raped, strangled, and stabbed (some fatally and some non-fatally) several victims with the first such crime occurring in 1975 and more such crimes occurring in 1987 and 1988. The long separation (twelve years) between Corwin's first two crimes was explained by Corwin's lengthy prison stay following his conviction for that offense. In petitioner's case, the period of apparent criminal inactivity between petitioner's participation in the murders of Almares and Rosado (between December, 1994 and March, 2001) can be explained by two factors made very clear from this Court's independent review of the record in this case. First, petitioner was incarcerated for a portion of the time frame between the murders, obtaining release in August, 1995. Second, not long after his release on parole, petitioner began taking a prescription medication which he reported had a negative impact on his sex drive.[136] The evidence

---

[136] More specifically, petitioner began taking Paxil in June, 1996 and continued taking that medication for many months thereafter but soon began reporting the drug had a negative impact on his sex drive. S.F. State Habeas Hearing, Volume 7 of 10, at p. 68; Volume 8 of 10, at pp. 277, 288, 338, 345, 349, 351-55, 364; Volume 9 of 10, at pp. 667, 669, 671, 678, 681, 686, 743-44, 762. Petitioner's physicians switched petitioner back

introduced during the petitioner's capital murder trial portrayed petitioner as not merely a serial killer but also a serial rapist.[137]   Petitioner's chemically-reduced sex drive may well account for his lack of fatal sexual assaults upon women for a substantial portion of the time between the murders of Almares and Rosado.

Petitioner's efforts to distinguish the circumstances of Rosado's murder from those of Gonzales and Almares are likewise unconvincing.   Petitioner points to the difference in the ages between Rosado (37) and his two prior victims (ages 12 and 13). Yet Abdygapparova stated to police that Rosado appeared to her to be "young."[138]   As noted by the medical examiner and the state

_____

and forth between Paxil and Prozac several times in the following years. *Id.*  More specifically, in December, 1997, petitioner was switched from Paxil to Prozac. S.F. State Habeas Hearing, Volume 8 of 10, at p. 338.  In July, 1999, petitioner requested and obtained a change from Prozac back to Paxil. *Id.*, at pp. 345, 364.  In June, 2000, however, petitioner asked to return to Prozac, citing his diminished sex drive. *Id.*, at pp. 206, 351. Petitioner reported shortly thereafter that his sex drive had returned. *Id.*, at p. 204.

[137]In addition to the uncontradicted DNA evidence linking petitioner's to Almares' sexual assault and murder, two witnesses testified that, with the assistance of Minjarez, in January, 1991, petitioner lured a neighbor to petitioner's apartment, locked the neighbor inside, and then returned to the neighbor's apartment and raped the neighbor's wife. S.F. Trial, Volume 27, testimony of Danny G. Zapata, at pp. 22-27; testimony of Anna Diaz, at pp. 105-07.  Petitioner later pleaded guilty to a charge of burglary with intent to commit sexual assault arising out of that incident. State's Exhibit 267, S.F. Trial, Volume 30.

[138] Statement of Asel Abdygapparova, Defendant's Exhibit 1, S.F. State Habeas Hearing, Volume 7 of 10, at p. 2 ("She looked

habeas trial court, all three victims shared a myriad of physical characteristics, including their ethnic heritage, hair color, hair length, and height.  The autopsy results in all three cases were eerily similar.

All three victims had been bound, beaten about the head and face, sexually assaulted in a violent manner, and asphyxiated in a peculiar way that left bruises on the back of the neck, indications all three victims had offered little or no resistance when they were being asphyxiated, and made it impossible to determine the precise method of strangulation.[139]  All three bodies showed extensive bruising but Rosado, whom both Abdygapparova and petitioner indicated in their statements had fought violently with Minjarez, showed more extensive bruising.[140]  Given the immaturity of Gonzales and Almares at the time of their rapes and murders, it is hardly surprising they offered less resistance than an adult woman like Rosado.  Besides the precise manner of their deaths, the circumstances of the crimes in general showed more than coincidental similarities.  All three victims had been abducted or last seen in public in the same part

young.  I didn't see her face, but just the way she looked made me feel she was young.").

[139] S.F. Trial, Volume 21, testimony of Steven A. Erickson, at pp. 131, 137-38, 144, 149-51, 153-54, 156-58, 160; Volume 24, testimony of Vincent DiMaio, at pp. 136, 151-77.

[140] S.F. Trial, Volume 24, testimony of Vincent DiMaio, at pp. 157-59, 160-63, 165-66.

of San Antonio.  All three victims were bound, beaten about the head and face, and violently sexually assaulted.  All were asphyxiated in a manner that made it impossible to ascertain the precise method of strangulation, none appeared to have offered much resistance while they were being asphyxiated, and then their bodies were disposed of in fairly isolated locations.[141]  Rosado's body had been cleaned with an alkaline-based bleach and the two girls' bodies appeared "unusually clean" in the medical examiner's words.  While there were admittedly differences in some of the details of the two crimes, nothing in the serial killer provision of the Texas capital murder statute appears to require that multiple murders be identical in every respect for them to qualify as having been committed "pursuant to the same scheme or course of conduct."

The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. *Gonzales v. Carhart*, 550 U.S. 124, 148-49, 127 S.Ct. 1610, 1628, 167 L.Ed.2d 480 (2007).  The serial

---

[141] Insofar as petitioner argued before the state court that the girls' bodies had been "dumped" off the side of a road while Rosado had been "meticulously" buried, that argument is specious. Rosado was unceremoniously buried in a shallow grave and was uncovered by a police officer who moved a few inches of top soil with his hands. S.F. Trial, Volume 22, testimony of Doug Ryan, at pp. 79-82.

killer provision of the Texas capital murder statute (currently found in Texas Penal Code Annotated §19.03(a)(7)(B)(Vernon Supp. 2010)), is not unconstitutionally vague on its face. *Corwin v. Johnson*, 150 F.3d 467, 475-76 (5th Cir.), *cert. denied*, 525 U.S. 1049 (1998). It provides persons of ordinary intelligence a reasonable opportunity to know what is prohibited. *Id*.

To succeed in his as-applied void-for-vagueness challenge, petitioner must show the Texas serial killer statute is vague *in his case* and that he could not have known that participating in the murders of both Almares and Rosado would subject him to prosecution under the Texas capital murder statute. *United States v. Clark*, 582 F.3d 607, 614 (5th Cir. 2009), *cert. denied*, ___ U.S. ___, 130 S.Ct. 1306, 175 L.Ed.2d 1091 (2010). As the state habeas trial court explained, the medical examiners who performed their autopsies testified (and the other evidence at trial established) Rosado, Gonzales, and Almares were all (1) abducted from (or at least last seen in) public locations in the same part of San Antonio, (2) bound, (3) beaten about the head and face, (4) violently sexually assaulted, and (5) asphyxiated in a manner that (a) left bruising on their necks and indications they offered little or no resistance while they were asphyxiated and (b) made it impossible to ascertain whether they had been strangled manually or with an irregular ligature like a twisted piece of cloth. Under such circumstances, this Court

112

independently concludes that petitioner's constitutional due process rights were not violated by virtue of his indictment and prosecution under the Texas serial killer provision of the Texas capital murder statute.  Petitioner had reasonable notice that his conduct could subject him to prosecution as a serial killer. *See United States v. Clark*, 582 F.3d at 614 (rejecting "as applied" void-for-vagueness challenge to a criminal charge of illegally importing an alien for "immoral purposes" where evidence showed the defendant had transported a woman from Africa into virtual sex slavery in the United States).

4. Conclusions

Petitioner's complaints about the performance of his trial counsel in connection with petitioner's pretrial motion to quash paragraph four of the indictment and said counsels' alleged failure to "exclude" evidence of Gonzales' and Almareas' murders from the guilt-innocence phase of trial fail to satisfy either prong of *Strickland* analysis.  It was impossible under applicable Texas law for petitioner's trial counsel to have raised the evidentiary arguments in the context of a pretrial motion to quash petitioner's indictment that petitioner now argues his trial counsel should have raised in that context.

The Texas Court of Criminal Appeals' rejection on the merits, in the course of petitioner's state habeas corpus proceeding, of petitioner's ineffective assistance complaints

about the performance of petitioner's trial counsel in connection

with petitioner's pretrial motion to quash petitioner's

indictment and the exclusion of evidence of Gonzales' and

Almares' murder during the guilt-innocence phase of petitioner's

capital murder trial was neither contrary to, nor involved an

unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States, nor based

on an unreasonable determination of the facts in light of the

evidence presented in the petitioner's state habeas corpus

proceeding.  Petitioner's fourth claim herein does not warrant

federal habeas corpus relief.

F. <u>Failure to Object to Improper Prosecutorial Argument</u>

    1. <u>The Claim</u>

    In his fifth claim herein, petitioner argues his trial

counsel should have objected to that portion of the prosecution's

closing argument at the punishment phase of petitioner's capital

murder trial in which the prosecutor suggested the jury should

consider how the victims' families wished the jury to answer the

capital sentencing special issues.[142]

    2. <u>State Court Disposition</u>

    During the punishment phase of petitioner's trial,

petitioner's trial counsel presented numerous members of

petitioner's family and a friend of petitioner, all of whom made

---

    [142] Brief in Support of Petition, at pp. 31-36.

emotional appeals to the jury to spare petitioner's life.[143]   The

prosecution made no objection to these emotional appeals for

mercy and engaged in only limited cross-examination of most of

---

[143] Petitioner's aunt expressly asked the jury to spare petitioner's life and blamed petitioner's problems on the violent death of petitioner's father. S.F. Trial, Volume 28, testimony of Andrea Torres, at p. 116.

Petitioner's self-described "good friend" pleaded with the jury to spare petitioner's life, arguing petitioner was not a threat to society. S.F. Trial, Volume 28, testimony of Joe Vargas, at pp. 123-24.

Petitioner's sister-in-law pleaded with the jury, concluding "He's a good person" and "He's not the monster that he is set out to be." S.F. Trial, Volume 28, testimony of Elizabeth Hernandez, at p. 129.

One of petitioner's younger brothers directly asked the jury to spare petitioner's life, testifying petitioner was a "real caring, real loving" person who had cried when re-living their father's death. S.F. Trial, Volume 28, testimony of Mario Hernandez, at p. 137.

Petitioner's younger sister also asked the jury to spare petitioner's life and testified petitioner had been depressed ever since their father died in the petitioner's arms but petitioner had gone back to school and was attending college. S.F. Trial, Volume 28, testimony of Melissa Arnold, at pp. 144-45.

Petitioner's mother made an even more emotional plea for petitioner's life, telling his capital sentencing jury that Petitioner was a "very loving, caring," person, "I know in my heart he did not kill anyone," and "He's not that type of person." S.F. Trial, Volume 28, testimony of Gloria Hernandez, at p. 157.

Petitioner's cousin also asked petitioner's jury to spare petitioner's life, pointing out petitioner had earned a GED, enrolled in college, and shown affection toward petitioner's children, even after petitioner divorced his children's mother. S.F. Trial, Volume 28, testimony of Richard Torres Jimenez, Jr., at pp. 167-68.

Petitioner's other brother testified in his Marine Corps uniform about the tragic impact their father's murder had on their family, and petitioner in particular, and asked the jury to spare petitioner's life. S.F. Trial, Volume 28, testimony of Danny Hernandez, at pp. 176-78.

these witnesses.  During closing argument at the punishment phase
of petitioner's trial, petitioner's trial counsel repeatedly
emphasized the testimony of petitioner's family members and the
fact they had all asked the jury to spare petitioner's life.[144]
In response, the prosecution made the following remark which
petitioner argues was an inappropriate and objectionable "appeal
to sympathy or prejudice":

> * * * And I respectfully suggest to you, and I want to
> commend all these folks for how well they behaved
> throughout this trial.  And don't you know that if they
> could, they would stand up here and cry and tell you
> what they believe the proper answer to those questions
> is, are?[145]

Petitioner raised an abridged version of this same
ineffective assistance claim as his tenth claim for state habeas
corpus relief, arguing (1) the prosecutor had gestured toward the

---

[144] "I don't think there is any doubt among anybody the
feelings that his family is conveying, that he's important to
them.  They have asked, each and every one of them, of you to
spare his life." S.F. Trial, Volume 28, at p. 205.
    "So, to summarize on that bit, ladies and gentlemen, please
if you get to issue number three, please consider as mitigation
the situation, very tragic situation that happened in 1986 and
the guilt that I think has been expressed by his family as to
what this young man carried on his shoulders and still carries on
his shoulders today." *Id.*, at p. 206.
    "Ramon Hernandez is what you found him guilty of.  We do not
take exception to that.  I think his family knows that.  I think
it's difficult for them to say.  I think Melissa said there is a
dark side of him that we didn't know about.  But like I said,
they found some redeeming qualities in him.  But they all asked
you to spare his life, ladies and gentlemen." *Id.*, at p. 217.

[145] S.F. Trial, Volume 28, at pp. 226-27.