victims' families while making these statements, (2) because there had been no "victim impact" testimony from the victims' family members, such prosecutorial statements were improper comments on matters outside the record, and (3) even if the victims' family members had testified, and offered victim impact evidence, it would have been improper under Texas law for them to have opined as to the appropriate sentence for petitioner.[146]  The state habeas trial court (1) found there was no credible evidence establishing the prosecutor had gestured toward the victims' families when making these statements,[147] (2) concluded this complaint did not satisfy the deficient performance prong of *Strickland*,[148] and (3) concluded this complaint did not satisfy the prejudice prong of *Strickland* because it was only a passing remark, not a major part of the prosecutor's argument, and unlikely to have actually harmed petitioner.[149]

-------------------

[146] State Habeas Transcript, Volume I, at pp. 76-78.

[147] "No credible witnesses at applicant's habeas hearing remembered the prosecutor gesturing toward the victims' families." State Habeas Transcript, Volume II, at p. 428; State Habeas Transcript, Volume III, at p. 92.

[148] "Counsel's failure to object to the comment may also have simply been a trial strategy to avoid drawing even more attention to the remark.  Applicant has certainly not proven that it was not a trial strategy to forgo an objection to the comment." State Habeas Transcript, Volume II, at p. 428; State Habeas Transcript, Volume III, at p. 93.

[149] State Habeas Transcript, Volume II, at p. 429; State Habeas Transcript, Volume III, at pp. 93-94.

3. <u>Synthesis</u>

    a. <u>No Deficient Performance</u>

In his pleadings herein, petitioner aggressively challenges the state habeas trial court's *reasoning* supporting that court's conclusion that petitioner's complaint about his trial counsels' failure to object to the prosecutor's comment in question failed to satisfy the deficient performance prong of *Strickland*. Petitioner misunderstands the proper role of this Court sitting in federal habeas review of a state court's conclusions regarding either prong of the *Strickland* test.

Under the AEDPA, in order to obtain federal habeas relief on an ineffective assistance claim rejected on the merits by a state court, the petitioner must do more than convince the federal court the state court applied *Strickland* incorrectly - the petitioner must show the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner. *Bell v. Cone*, 535 U.S. at 699, 122 S.Ct. at 1852.

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles,* 556 U.S., at ___, 129 S.Ct. at 1420.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ___, 129 S.Ct. at 1420.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).

When § 2254(d) applies, the question is not whether
counsel's actions were reasonable.  The question is
whether there is any reasonable argument that counsel
satisfied *Strickland*'s deferential standard.

*Harrington v. Richter*, ___ U.S. ___, ___, 131 S.Ct. 770, 788, 178
L.Ed.2d 624 (2011)

Furthermore, a federal habeas court reviewing a state

court's rejection on the merits of a claim for relief pursuant to

the AEDPA must focus exclusively on the propriety of the ultimate

decision reached by the state court and not evaluate the quality,

or lack thereof, of the state court's written opinion supporting

its decision. *See Maldonado v. Thaler*, 625 F.3d 229, 239 (5th

Cir. 2010)(federal habeas review of a state court's adjudication

involves review only of a state court's decision, not the written

opinion explaining the decision), *cert. filed March 14, 2011 (N0.

10-9511)*; *St. Aubin v. Quarterman*, 470 F.3d 1096, 1100 (5th Cir.

2006)(holding Section 2254(d) permits a federal habeas court to

review only a state court's decision and not the written opinion

explaining that decision), *cert. denied*, 550 U.S. 921 (2007);

*Amador v. Quarterman*, 458 F.3d 397, 410 (5th Cir. 2006)(holding

the same), *cert. denied*, 550 U.S. 920 (2007); *Pondexter v.

Dretke*, 346 F.3d 142, 148 (5th Cir. 2003)(holding the

precise question before a federal habeas court in reviewing a

state court's rejection on the merits of an ineffective

assistance claim is whether the state court's ultimate conclusion

was objectively reasonable), *cert. denied*, 541 U.S. 1045 (2004);

119

*Anderson v. Johnson*, 338 F.3d 382, 390 (5th Cir. 2003)(holding a federal habeas court reviews only a state court's decision and not the opinion explaining that decision); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002)(*en banc*)(holding a federal court is authorized by §2254(d) to review only a state court's decision and not the written opinion explaining that decision), *cert. denied*, 537 U.S. 1104 (2003).

Petitioner also attacks the subjective rationales offered by petitioner's trial counsel during their testimony at petitioner's state habeas corpus hearing for their failure to object to the prosecutor's comment in question. However, the first prong of *Strickland* analysis focuses on the *objective* reasonableness of counsels' *conduct*, not their subjective state of mind. *Premo v. Moore*, ___ U.S. ___, ___, 131 S.Ct. 733, 739, 178 L.Ed.2d 649 (2011); *Harrington v. Richter*, ___ U.S. ___, ___, 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011); *Strickland v. Washington*, 466 U.S. at 688-89, 104 S.Ct. at 2064-65. Thus, the critical issue in the first prong of *Strickland* analysis is the objective reasonableness of trial counsels' conduct under the then-existing circumstances.

As explained above, petitioner's trial counsel paraded a large number of petitioner's family members before the jury and had each of them make an emotional appeal for mercy, i.e., a specific request that the jury spare petitioner's life. The

prosecution did not object to any of those emotional appeals even though it arguably could have done so under applicable Texas law. *See Sattiewhite v. State*, 786 S.W.2d 271, 290-91 (Tex. Crim. App. 1989)(holding trial court correctly excluded testimony of capital defendant's proffered mental health expert regarding the appropriate punishment which should be imposed on the defendant), *cert denied*, 498 U.S. 881 (1990).  Petitioner's trial counsel also repeatedly referenced those same emotional appeals for mercy by petitioner's family during closing argument at the punishment phase of petitioner's capital murder trial.  Again, the prosecution did not object.

Petitioner's suggestion in his state habeas application that the prosecution could have called the victims' families to testify at the punishment phase of petitioner's trial about their own opinions as to the appropriate punishment for petitioner is legally specious. *See Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003)("The wishes of the victim's family members as to the defendant's fate fall beyond the parameters of victim-impact evidence and are not admissible."), *cert. denied*, 542 U.S. 905 (2004).  "[W]e strongly discourage the State from soliciting or making any reference to the wishes of the victim's family or friends about the punishment to which the defendant should be sentenced." *Id.*  Thus, the prosecution's comment on the wishes of

the victims' families was properly subject to objection under Texas law.

Nonetheless, there clearly existed an objectively reasonable rationale for petitioner's trial counsel not to have leapt to their feet to object to the prosecutor's passing reference to the victims' families' wishes.  Under the circumstances of petitioner's trial, such an objection could rationally have been construed by the jury as undermining the integrity and legitimacy of petitioner's own family members' emotional appeals for mercy. Simply put, if petitioner's trial counsel had objected to the prosecutor's passing reference to the victims' families' wishes regarding punishment as an improper appeal to prejudice and sympathy, the jury could easily have construed such an objection as rendering petitioner's trial counsel highly hypocritical given the naked appeals for mercy riddled throughout the petitioner's punishment-phase evidence presentation and closing argument.

Nothing in the first prong of the *Strickland* standard requires trial counsel to object to each and every objectionable remark made by a prosecutor if there are objectively reasonable reasons to refrain from doing so.  Given the petitioner's family members' strong emotional appeals for mercy made directly to the jury (without objection by the prosecution), this Court concludes objectively reasonable justifications existed for the decision by petitioner's trial counsel not to object to the prosecutor's

122

passing reference to the wishes of the victims' families, even
though that reference was clearly objectionable under applicable
state law.  Had petitioner's trial counsel made the objection
petitioner now argues said counsel should have been made
(regardless of how the state trial court ruled on such an
objection), petitioner's trial counsel would have undoubtedly
left the jury wondering why it was appropriate for the
petitioner's family to make emotional appeals for mercy but
inappropriate for the victims' families to express their desire
for what they undoubtedly perceived to be a just sentence.

Criminal trial counsel who approach oral argument as a
debate to be won by out-maneuvering opposing counsel and
objecting to every arguably improper statement made by opposing
counsel ignore at their client's peril the possible negative
impact of such a strategy on the jury's sensibilities.  Having
made a highly emotional appeal for mercy through petitioner's
family members' naked appeals for the jury to spare petitioner's
life, petitioner's trial counsel could have reasonably considered
the objection petitioner now urges as more potentially
disadvantageous to their efforts to obtain a life sentence for
petitioner than simply ignoring the prosecutor's passing comment.
Whether petitioner's trial counsel actually considered that
possibility subjectively is irrelevant to this Court's analysis
of the first prong of *Strickland* under the AEDPA.

So long as *objectively* reasonable justifications existed for
the *conduct* of petitioner's trial counsel, the state habeas
court's conclusion that this ineffective assistance claim fails
to satisfy the deficient performance prong of *Strickland* is
itself an objectively reasonable application of the *Strickland*
test. *See Strickland v. Washington*, 466 U.S. at 689, 104 S.Ct. at
2065:

> Judicial scrutiny of counsel's performance must be
> highly deferential. It is all too tempting for a
> defendant to second-guess counsel's assistance after
> conviction or adverse sentence, and it is all too easy
> for a court, examining counsel's defense after it has
> proved unsuccessful, to conclude that a particular act
> or omission of counsel was unreasonable. *Cf. Engle v.
> Isaac*, 456 U.S. 107, 133-134, 102 S.Ct. 1558, 1574-
> 1575, 71 L.Ed.2d 783 (1982). A fair assessment of
> attorney performance requires that every effort be made
> to eliminate the distorting effects of hindsight, to
> reconstruct the circumstances of counsel's challenged
> conduct, and to evaluate the conduct from counsel's
> perspective at the time. Because of the difficulties
> inherent in making the evaluation, a court must indulge
> a strong presumption that counsel's conduct falls
> within the wide range of reasonable professional
> assistance; that is, the defendant must overcome the
> presumption that, under the circumstances, the
> challenged action "might be considered sound trial
> strategy."

When viewed in proper context (i.e., after petitioner's
trial counsel introduced considerable testimony from petitioner's
family members consisting of emotional appeals for mercy), this
Court finds it was objectively reasonable for petitioner's trial
counsel to have refrained from objecting to the prosecutor's

passing reference to the wishes of the victims' families

regarding petitioner's sentence.

### b. <u>No Prejudice</u>

> With respect to prejudice, a challenger must
> demonstrate "a reasonable probability that, but for
> counsel's unprofessional errors, the result of the
> proceeding would have been different.  A reasonable
> probability is a probability sufficient to undermine
> confidence in the outcome." *Strickland v. Washington,*
> 466 U.S. at 694, 104 S.Ct. at 2068.  It is not enough
> "to show that the errors had some conceivable effect on
> the outcome of the proceeding." *Id.,* 466 U.S. at 693,
> 104 S.Ct. at 2067.  Counsel's errors must be "so
> serious as to deprive the defendant of a fair trial, a
> trial whose result is reliable." *Id.,* 466 U.S. at 687,
> 104 S.Ct. at 2064.

*Harrington v. Richter,* ___ U.S. ___, ___, 131 S.Ct. 770, 787-88,
178 L.Ed.2d 624 (2011).

The evidence before the jury at the punishment phase of

petitioner's capital murder trial established beyond any

reasonable doubt that (1) petitioner participated in the

abduction and robbery of Rosado, (2) petitioner stood guard while

Minjarez sexually assaulted Rosado, (3) petitioner was present at

the motel with Minjarez when Rosado was killed, (4) petitioner

directed Abdygapparova to purchase the shovel used to bury

Rosado's body, (5) petitioner had previously been convicted

pursuant to a guilty plea of burglary with intent to commit

sexual assault in connection with an incident in which petitioner

lured his victim's husband away from home, locked his victim's

husband in petitioner's apartment, and then went back to sexually

assault the victim, (6) petitioner participated in numerous

burglaries, at least one of which resulted in petitioner serving a prison sentence and another of which involved petitioner leading police on a dangerous, high speed, chase, (7) deposited his semen inside the rectum of a twelve year old girl only hours before her lifeless body was found beside that of her equally battered thirteen-year-old cousin "dumped" in the high brush in an isolated location only days before Christmas, (8) the girls' bodies and Rosado's body revealed all three had been bound, severely beaten about the head and face, violently sexually assaulted, and asphyxiated in a manner suggesting they had been unable to offer much resistance as they were strangled to death, (9) petitioner had come very close to escaping from the BCADC only weeks before the start of his trial, and (10) *petitioner had never expressed any sincere remorse or contrition for his role in any of the three abductions, rapes, or murders.*

The trial record was not without some admittedly strong mitigating evidence, particularly the testimony showing the petitioner had experienced a clearly traumatic event when his father was shot and died in petitioner's arms when petitioner was but a teenager.  Yet there was also evidence showing petitioner had engaged in several burglaries and other delinquent conduct (including heavy drug use) prior to his father's tragic death and that petitioner had fathered several children out of wedlock with a variety of different women, beginning when petitioner was in

126

his middle teenage years.  In addition, petitioner's family members had made repeated emotional pleas to the jury for mercy on petitioner's behalf.

If petitioner's trial counsel had timely objected to the prosecutor's passing comment about the wishes of the victims' families, the most petitioner could reasonably have hoped for would have been an instruction directing the jury to disregard same.  It is highly unlikely the Texas courts would have held the prosecutor's improper comment required a mistrial.  *See Simpson v. State*, 119 S.W.3d at 271-73 (holding trial court properly denied motion for mistrial after a prosecution witness (who was also a family member of the victim) testified the victim's family unanimously wanted the defendant to receive the death penalty, in part, because the trial court had sustained an objection thereto and instructed the jury to disregard same).

> We also think that the jury would not place much weight on the erroneously elicited comment.  Jurors understand that the victim's family members will be emotional and therefore less objective about what punishment should be given.  It was probably no great surprise that the victim's family was in favor of the death penalty.

*Simpson v. State*, 119 S.W.3d at 274.

Under these circumstances, particularly considering the petitioner's emotional appeals to the jury for mercy made through his family members as contrasted with the petitioner's own failure to demonstrate any sincere remorse or contrition before his capital sentencing jury for any of the particularly brutal

murders in which he participated, this Court independently concludes there is no reasonable probability that, but for the failure of petitioner's trial counsel to object to the prosecutor's passing comment about the wishes of the victims' families, the outcome of the punishment phase of petitioner's capital murder trial would have been any different.

4. <u>Conclusions</u>

Petitioner's complaint about his trial counsels' failure to object to the prosecutor's passing comment about the wishes of the victims' families does not satisfy either prong of *Strickland*.

The Texas Court of Criminal Appeals' rejection on the merits in the course of petitioner's state habeas corpus proceeding of petitioner's ineffective assistance claim premised on the failure of petitioner's trial counsel to object to the prosecutor's comments in question was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.  Petitioner's fifth claim herein does not warrant federal habeas corpus relief.

## V. Ineffective Assistance by Appellate Counsel

### A. The Claim

In his sixth and final claim for relief herein, petitioner argues his appellate counsel should have raised a point of error on direct appeal complaining about the state trial court's failure to admit Abdygapparova's written statement or hearsay testimony by detective Carian regarding its contents during the guilt-innocence phase of petitioner's capital murder trial.[150]

### B. State Court Disposition

#### 1. Trial Court Proceedings

To understand the full context of this ineffective assistance claim, it is necessary to return to the lengthy guilt-innocence phase trial testimony of detective Carian.  After detective Carian testified on direct examination about the circumstances surrounding the petitioner's execution of his written statement of April 7, 2001 and Carian then read the petitioner's written statement before the jury, he testified about witnessing blood samples being drawn from both petitioner and Minjarez.[151]  On cross-examination, petitioner's trial counsel emphasized that the factual assertions contained in petitioner's written statement coincided with the physical evidence detective

---

[150] Brief in Support of Petition, at pp. 36-43.

[151] S.F. Trial, Volume 23, testimony of Andrew Carian, at pp. 28-68.

129

Carian and other law enforcement officers recovered in the course of their investigation into Rosado's murder.[152]  On redirect examination, detective Carian pointed out that, when he confronted petitioner with the contents of Abdygapparova's statement, petitioner had tried to shift blame for Rosado's murder toward Minjarez, and, at the time he interrogated petitioner, Carian was unaware that petitioner's DNA matched the rape kit of Priscilla Almares.[153]  On re-cross, detective Carian admitted he had disclosed to petitioner practically the entire contents of Abdygapparova's written statement.[154]

At that point, the attorneys requested a conference with the trial court outside the jury's presence.  Once the jury left the courtroom, counsel for both parties engaged in a discussion in which the prosecutor argued the questions asked by petitioner's counsel had created a false impression that petitioner had been forthright and factually accurate in his interviews with detective Carian and that the prosecution believed it should be permitted to introduce testimony from detective Carian regarding false oral statements made to the detective by petitioner.[155]

---

[152] S.F. Trial, Volume 23, testimony of Andrew Carian, at pp. 69-94.

[153] *Id.*, at pp. 94-105.

[154] *Id.*, at pp. 105-09.

[155] *Id.*, at pp. 110-15.

After a lunch recess, the discussions between counsel and the trial judge continued outside the jury's presence.  During those discussions (1) petitioner's trial counsel objected to the admission of any testimony regarding oral statements made by petitioner on April 6, 2001, (2) the prosecutors argued they should be permitted to inquire into statements made by petitioner on April 6, 2001 in which petitioner denied any involvement in Rosado's murder because the questioning of detective Carian by petitioner's trial counsel had created the "false impression" that petitioner had fully cooperated with law enforcement officials from the start of their investigation into Rosado's murder, and (3) the state trial judge ruled she would permit the prosecution to question detective Carian about oral statements petitioner made on April 6, 2001.[156]

Detective Carian then testified (1) during their interview on April 6, 2001, petitioner initially denied knowing anything about Rosado's murder, claimed he was home on the night of her murder, and even denied knowing either Minjarez or Abdygapparova, (2) petitioner continued his denials even after Carian confronted petitioner with Abdygapparova's statement and Minjarez's photograph, and (3) petitioner ultimately claimed Minjarez raped

---

[156] *Id.*, at pp. 116-27.

and killed Rosado but denied raping her himself.[157]   On re-cross

examination, the following exchanges occurred:

> Q. (BY MR. HANCOCK) Well, some of the stuff Asel
> told you exculpates him, doesn't it?  I mean some of
> the stuff Asel tells you says that he didn't commit the
> murder, correct?
> A.   A lot of what Asel says is --
> Q.   No. Answer just my question.  Okay.
> A.   Well, I can't answer the question as you put
> it because some of the information that I had that came
> from Asel was -- did not do what you are suggesting.
> Q.   Well, didn't Asel say that --
> MR. MCCLURE:   Objection.  Judge, that would be
> hearsay.
> THE COURT:      Sustained
> Q. (BY MR. HANCOCK) I guess the point is you
> didn't tell him everything Asel told you, did you?
> A.   Just about.  Yes.
> Q.   Okay.  Well, some of the information that
> Asel told you would have been contrary to what you said
> about him participating in a rape and a murder of a
> female, correct?
> A.   No.
> MR. MCCLURE:   That would call for hearsay, Your
> Honor.
> THE COURT:      You may respond.
> THE WITNESS:   No.  Because she wasn't there to be
> able to say one way or the other.
> Q. (BY MR. HANCOCK) You told us she gave a
> statement.  You told him that you got the information
> that you are given is based upon the information that
> you got from Asel.
> A.   Yes.  But during those particular times that
> you are referring to, she had been out collecting
> evidence.  So she wouldn't have been able to be present
> to have witnessed the information that you are
> referring to regarding what happened in the room.
> Q.   Okay.  Well, that's consistent in his, in
> Ramon Hernandez's statement, isn't it?  Isn't it?
> A.   The consistency would be her not being
> present.  Yes.
> Q.   Okay.  And she gave her statement a whole day

---

[157] S.F. Trial, Volume 23, testimony of Andrew Carian, at pp.
137-32.

before; is that correct?

    A.   Not a whole day, just a few hours before because of the switch at midnight.

    Q.   You never told this man, in giving him information about this case when you told him in your response on direct examination was that he had been arrested for capital murder and that you had information that he participated in a kidnapping [sic], rape, and murder of a female, you never got information from Asel that he participated in a rape or a murder, did you?

    A.   Yes.

    Q.   From Asel?

    A.   Yes.

    MR. MCCLURE:   And I would object to further inquiry on this line because he's trying to open his own door to hearsay, Judge.

    THE COURT:   Sustained.

    Q. (BY MR. HANCOCK) Detective, or Sergeant. I'm sorry. I want to ask you, and not hearsay, but I want to ask you, did you take a statement from Asel the day before, on the 5th?

    A.   No. Detective Kellogg did.

    Q.   Someone did, okay?

    A.   Yes.

    Q.   As part of your lead duties in this case, Asel's statement was taken on the 5th, correct?

    A.   If I can just check. Yes, April the 5th.

    Q.   And did you reveal to him the entire contents of her statement? You didn't do that, did you?

    MR. MCCLURE:   Judge, I believe that question has been asked and answered three times.

    MR. HANCOCK:   Judge, it's cross examination. Please allow me some latitude on that.

    THE COURT:   And you may respond.

    THE WITNESS:   I revealed from her statement just about all the factual information that I had.

    Q. (BY MR. HANCOCK) Okay. Nowhere in that statement does it say --

    MR. MCCLURE:   Judge, the question is going to ask for hearsay. May we approach the bench?

    THE COURT:   You may.[158]

---

[158] S.F. Trial, Volume 23, testimony of Andrew Carian, at pp. 135-38.

During the ensuing conference held outside the presence of
the jury and detective Carian, the following exchanges occurred:

      THE COURT:    Mr. Hancock, can you ask your
question?  You weren't allowed to finish the question,
so what was the question?

      MR. HANCOCK:   I think I've forgotten my question,
but what I -- so I'll ask it again. Judge.  I think
this is where I was going with it.

      This officer has clearly said that he had revealed
all the information in Asel's report to Ramon Hernandez
before he gives his statement.  And I think that I
should be allowed to ask him did -- so what you are
saying is that did Asel tell you that, that she gave
information in her statement that Ramon Hernandez did
the killing in this case.  And I will tell you, Judge,
and I don't think anybody here will contradict it,
that's not in her statement.

      So you see, I find myself in the same position
that Mr. McClure tried to find himself before lunch,
and that's leaving a false impression with this jury.
And that's why this line of questioning -- I objected
to it.  *Now we've opened the door to Asel's statement.*
And I guess I can refresh his memory with it.  But I
think what we told you back in chambers is that Santos,
when she comes back from running an errand, Santos says
she's gone.  So it leaves the impression that, with her
that he had done the killing.

      Now I find myself with this witness leaving the
impression to the jury that he tells this man, and when
he's giving him information about the case, that he
says, well, Asel said you killed her.  That is the
impression that is being left.  So now I need a cure to
it, much like they got a cure to their false impression
argument.

      MR. MCCLURE:   Well --

      THE COURT:    Mr. McClure.

      MR. MCCLURE:   First of all, the place that we now
find ourselves is at the request of the defense.  You
will recall the Court's ruling, that it didn't matter
whether or not I now went into the statements of
Friday, April 6th.  You ruled that you would allow the
defense to introduce the oral statements that the
Defendant made to Detective Kellogg on Saturday the
7th.  And that being the request of the defense, I then
went ahead in accordance with the Court's ruling and

the defense's request, to adduce the specific questions
and answers from Detective Carian.

Now the defense seeks to kick open their own door
to an accomplice's statement.  That is not appropriate.
That's far afield of the false impression that had been
left with the jury previously.  There is no false
impression being left, when the fact is that Asel's
statement says she doesn't know who did the killing;
she wasn't present.

Furthermore, Detective Carian has left no false
impression.  He has repeatedly said that he believes
that he told Ramon the factual evidence that he had.
He has answered Mr. Hancock's question at least twice;
that, no, based on Asel's statement, yes, he did have
information that Ramon Hernandez was involved in all
the constituent elements of the capital murder that
he's charged with, individually and under the law of
parties.

So there has been no false impression created.
And Mr. Hancock would have the Court now believe that
because he has kicked the door open, an accomplice's
statement comes in.  And furthermore, he predicates
that upon what Asel's statement says Santos said.  And
you know where we are going next.

THE COURT:      Yes.

MR. MCCLURE:    I'm going to ask for Santos'
statement to come in.  And that says that Ramon
Hernandez is the killer.

MR. HANCOCK:    Judge, I just want to say my
sentence, if I may.

THE COURT:      All right.

MR. HANCOCK:    Mr. McClure very specifically asked
this sergeant that, did you tell Ramon Hernandez that
you had information regarding his participation in the
kidnapping [sic], rape, and murder of a female last
Saturday.  And then he says that he got that
information from Asel.  He tells him that he got that
information from his girlfriend.

What the jury now believes is that the information
that he got says that Asel says that he kidnapped
[sic], raped and murdered a female.  And for them to be
able to talk about this statement in its general
purposes, hiding behind some hearsay objection and
bootstrapping what the contents of the statement is to
lead this jury to believe that that's what she said is
incorrect.  And I want to show you her statement, Your
Honor, because it's more than what Mr. McClure just
said.

135

Mr. Ugarte had underlined it.  It says Santos
opened the -- well, the one, two, third paragraph, Your
Honor.  It's underlined.
     THE COURT:     Okay.
     MR. MCCLURE:   Judge, the point is that it
doesn't matter what the words are in Asel's statement.
The question of Detective Carian was that he had
information that the Defendant participated.  And Mr.
Hancock wants to create the impression --
     MR. HANCOCK:   Wait a minute.
     MR. MCCLURE:    -- that he personally did each of
the constituent acts.  And that is not the impression
that has been left with this jury that has been
educated on the law of parties.
     MR. HANCOCK:   But, Judge, he said he told this
man everything that Asel said.  And so everything that
Asel said is that he didn't do the killing.  And Mr.
McClure is relying on that he gave him information that
he participated in a killing.
     THE COURT:     Okay.  The State's objection is
sustained.  Bring the jury back in.[159]

## 2. State Habeas Proceeding

Petitioner raised an ineffective assistance claim as his

twelfth and final ground for state habeas relief in which he

argued his trial counsel should have urged the trial court to

admit testimony by detective Carian about the contents of

Abdygapparova's written statement under the Texas Rule of

Optional Completeness, i.e., Rule 107, Tex.R.Evid.[160]  The state

habeas trial court made findings of fact, conclusions of law, and

recommended denial of this claim for relief on the merits.[161]  The

---

[159] S.F. Trial, Volume 23, at pp. 139-43.

[160] State Habeas Transcript, Volume I, at pp. 81-86.

[161] State Habeas Transcript, Volume II, at pp. 431-35; State
Habeas Transcript, Volume III, at pp. 95-100.

Texas Court of Criminal Appeals denied state habeas relief but specifically declined to adopt any of the state habeas trial court's findings or conclusions on this particular claim. *Ex parte Ramon Hernandez*, WR-69,724-01, 2008 WL 4151799 (Tex. Crim. App. September 10, 2008).

C. <u>Constitutional Standard</u>

The same two-pronged standard for evaluating ineffective assistance claims against trial counsel announced in *Strickland* applies to complaints about the performance of counsel on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 764, 145 L.Ed.2d 756 (2000)(holding a petitioner arguing ineffective assistance by his appellate counsel must establish both (1) his appellate counsel's performance was objectively unreasonable and (2) there is a reasonable probability that, but for appellate counsel's objectively unreasonable conduct, the petitioner would have prevailed on appeal); *Blanton v. Quarterman*, 543 F.3d 230, 240 (5th Cir. 2008)(the traditional *Strickland* standard applies to claims alleging ineffective assistance by appellate counsel), *cert. denied*, ___ U.S. ___, 129 S.Ct. 2383, 173 L.Ed.2d 1301 (2009); *Ries v. Quarterman*, 522 F.3d 517, 531 (5th Cir.) (*Strickland* analysis applies to claims of ineffective assistance by appellate counsel), *cert. denied*, ___ U.S. ___, 129 S.Ct. 485, 172 L.Ed.2d 351 (2008); *Henderson v. Quarterman*, 460 F.3d 654, 665 (5th Cir. 2006)(*Strickland* furnishes the proper standard for

137

review of a complaint of ineffective assistance by state
appellate counsel), *cert. denied*, 549 U.S. 1252 (2007); *Amador v.
Quarterman*, 458 F.3d at 410-11 (holding complaints of ineffective
assistance by state appellate counsel are governed by the
*Strickland* standard of review); *Moreno v. Dretke*, 450 F.3d 158,
168 (5th Cir. 2006)(applying the dual prongs of *Strickland*
analysis to complaints of ineffective assistance by appellate
counsel), *cert. denied*, 549 U.S. 1120 (2007); *Busby v. Dretke*,
359 F.3d 708, 714 (5th Cir.)(holding *Strickland* applies to a
prisoner's claim his appellate counsel was ineffective for
failing to raise a certain issue on appeal), *cert. denied*, 541
U.S. 1087 (2004).

Thus, the standard for evaluating the performance of counsel
on appeal requires inquiry into (1) whether appellate counsel's
performance was deficient, i.e., whether appellate counsel's
conduct was objectively unreasonable under then-current legal
standards, and (2) whether appellate counsel's allegedly
deficient performance "prejudiced" petitioner, i.e., whether
there is a reasonable probability that, but for appellate
counsel's deficient performance, the outcome of petitioner's
appeal would have been different. *Smith v. Robbins*, 528 U.S. at
285, 120 S.Ct. at 764; *Henderson v. Quarterman*, 460 F.3d at 665;
*Busby v. Dretke*, 359 F.3d at 714; *Schaetzle v. Cockrell*, 343 F.3d
at 444.

138

Appellate counsel who files a merits brief need not and
should not raise every non-frivolous claim but, rather, may
select from among them in order to maximize the likelihood of
success on appeal. *Smith v. Robbins*, 528 U.S. at 288, 120 S.Ct.
at 765; *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 3313,
77 L.Ed.2d 987 (1983); *Henderson v. Quarterman*, 460 F.3d at 665;
*Busby v. Dretke*, 359 F.3d at 714; *Schaetzle v. Cockrell*, 343 F.3d
at 445.

The process of winnowing out weaker arguments on appeal and
focusing on those more likely to prevail is the hallmark of
effective appellate advocacy. *Smith v. Murray*, 477 U.S. 527, 536,
106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986); *Jones v. Barnes*, 463
U.S. at 751-52, 103 S.Ct. at 3313.

Nonetheless, appellate counsel is obligated to research
relevant facts and law or to make an *informed* decision that
certain avenues will not prove fruitful. *See Busby v. Dretke*, 359
F.3d at 714 (a reasonable attorney has an obligation to research
relevant facts and law or make an informed decision that certain
avenues will not be fruitful); *United States v. Reinhart*, 357
F.3d 521, 525 (5th Cir. 2004)(holding the same); *Schaetzle v.
Cockrell*, 343 F.3d at 445 (failure to raise a discrete, purely
legal issue, where the precedent could not be more pellucid or
applicable, denies adequate representation).  Likewise, solid,
meritorious arguments based on directly controlling precedent

should be discovered and brought to the appellate court's
attention. *United States v. Reinhart*, 357 F.3d at 525; *Schaetzle
v. Cockrell*, 343 F.3d at 445.

Where, as in petitioner's case, appellate counsel presented,
briefed, and argued, albeit unsuccessfully, one or more non-
frivolous grounds for relief on appeal and did not seek to
withdraw from representation without filing an adequate *Anders*
brief, the defendant must satisfy *both* prongs of the *Strickland*
test in connection with his claims of ineffective assistance by
his appellate counsel. *See Roe v. Flores-Ortega*, 528 U.S. 470,
477 & 482, 120 S.Ct. 1029, 1034 & 1037, 145 L.Ed.2d 985
(2000)(holding the dual prongs of *Strickland* apply to complaints
of ineffective appellate counsel and recognizing, in cases
involving "attorney error," the defendant must show prejudice);
*Smith v. Robbins*, 528 U.S. at 287-89, 120 S.Ct. at 765-66
(holding petitioner who argued his appellate counsel rendered
ineffective assistance by failing to file a merits brief must
satisfy both prongs of *Strickland*); *Busby v. Dretke*, 359 F.3d at
714-17 (applying dual prongs of *Strickland* to a complaint about
appellate counsel's failure to present a point of error on
appeal).

D. <u>Synthesis</u>

    1. <u>No Deficient Performance</u>

    During the evidentiary hearing in petitioner's state habeas corpus proceeding, petitioner's state appellate counsel testified in pertinent part that he did not raise a point of error challenging the state trial court's refusal to admit, under the rule of optional completeness or Rule 107, Tex.R.Evid., detective Carian's testimony regarding the contents of Abdygapparova's written statement because (1) he did not believe such an argument had been properly preserved by trial counsel, i.e., no specific objection or argument urging such a legal position had been intelligently communicated to the trial court, and (2) he did not believe such a point of error could have proven successful because of the harmless error rule.[162]

    This Court has independently reviewed the petitioner's trial record, the record from petitioner's state direct appeal and state habeas corpus proceedings, and the legal authorities cited by petitioner in support of this claim of ineffective assistance. This Court has also independently reviewed applicable state case law and rules.  This Court concludes both of petitioner's state

---

    [162] S.F. State Habeas Hearing, Volume 4 of 10, testimony of Rocky Glass, at pp. 204-06, 208.  As attorney Glass correctly pointed out, petitioner's own trial counsel "opened the door" to the admission of petitioner's April 6, 2001 oral statements to detective Carian by interrogating detective Carian regarding petitioner's and detective Carian's oral conversations on April 6-7, 2001. *Id.*

appellate counsel's proffered justifications for not including a point of error premised on the Texas "Rule of Optional Completeness," i.e., Rule 107 of the Texas Rules of Evidence, urged herein by petitioner are objectively reasonable.

    a. <u>Point of Error Arguably Not Properly Preserved</u>

  Under Rule 103 of the Texas Rules of Evidence, error may not be predicated upon a ruling which admits or excludes evidence unless "a timely objection or motion to strike appears of record, stating the specific ground of objection, if specific ground was not apparent from the context." *Resendez v. State*, 306 S.W.3d 308, 312 (Tex. Crim. App. 2009); *Mays v. State*, 285 S.W.3d 884, 889 (Tex. Crim. App. 2009)(to preserve error regarding a trial court's exclusion of evidence, the complaining party must make an "offer of proof" which sets forth the substance of the proffered evidence).

> The purpose of requiring a specific objection in the trial court is twofold: (1) to inform the trial judge of the basis of the objection and give him the opportunity to rule on it; (2) to give opposing counsel the opportunity to respond to the complaint.  Although there are no technical considerations or forms of words required to preserve an error for appeal, a party must be specific enough so as to "let the trial judge know what he wants, why he thinks himself entitled to it, and do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it."  The parties, not the judge, are responsible for the correct application of evidentiary rules; in order to preserve a complaint for appeal, the complaining party must have done everything necessary to bring the relevant evidentiary rule and its precise and proper application to the trial court's attention.

*Resendez v. State*, 306 S.W.3d at 312-13 (*footnotes omitted*).

In addition, under Rule 33.1 of the Texas Rules of Appellate Procedure,[163] the Texas Court of Criminal Appeals usually requires great specificity in objections to preserve a point of error for review on direct appeal. *See, e.g., Freeman v. State*, ___ S.W.3d ___, ___, 2011 WL 891266 *11 (Tex. Crim. App. March 16, 2011)(holding request for instructed verdict did not preserve facial and "as applied" constitutional challenges to Texas capital murder statute's provision addressing murder of a peace officer "acting in the lawful discharge of an official duty"); *Estrada v. State*, 313 S.W.3d 274, 303 (Tex. Crim. App. 2010)(failure to timely object or move for mistrial forfeit defendant's right to complain about allegedly improper jury argument), *cert. denied*, ___ U.S. ___, 131 S.Ct. 905, 178 L.Ed.2d 760 (2011); *Mays v. State*, 318 S.W.3d 368, 388 (Tex. Crim. App. 2010)(holding neither motion for directed verdict based on insufficient evidence nor objection to lack of definition of "acting in the lawful discharge of an official duty" in jury charge preserved for appellate review complaint of

---

[163] Rule 33.1(a), Texas Rules of Appellate Procedure, provides that, as a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request or motion that stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context.

unconstitutional vagueness in Texas capital murder statute's provision), *cert denied*, ___ U.S. ____, 131 S.Ct. 1606, ___ L.Ed.2d ___ (2011); *Lovill v. State*, 319 S.W.3d 687, 691 (Tex. Crim. App. 2009)("The complaining party must have informed the trial judge what was wanted and why the party was entitled to it."); *Wright v. State*, 28 S.W.3d 526, 536 (Tex. Crim. App. 2000)(holding stated objections to the admission of testimony based on hearsay and Rule 107 grounds did not preserve a Sixth Amendment Confrontation Clause objection to the same evidence), *cert. denied*, 531 U.S. 1128 (2001)

This Court concludes nothing in the exchanges between petitioner's trial counsel and the state trial court detailed above reasonably alerted the state trial court that petitioner was suggesting detective Carian should be permitted to testify to the clearly hearsay within hearsay details of Abdygapparova's written statement based upon the Texas Rule of Optional Completeness found in Rule 107, Tex.R.Evid. Petitioner's trial counsel did not identify any evidence introduced by the prosecution relating to the *contents* of Abdygapparova's written statement. The rather vague references by petitioner's trial counsel to "opening the door" did not alert the state trial court that petitioner was relying upon the Rule of Optional Completeness as a legal basis for admitting detective Carian's testimony concerning the contents of Abdygapparova's written

statement.  "'Opening the door' or 'inviting' testimony that would otherwise pertain to an inadmissible subject matter does not mean that such testimony is necessarily 'invited' into evidence in *any* form, including hearsay." *Kipp v. State*, 876 S.W.2d 330, 337 (Tex. Crim. App. 1994).  Petitioner's state appellate counsel's conclusion that an "optional completeness" argument had not been properly preserved for state appellate review was, therefore, an objectively reasonable deduction from the relevant portions of the state trial record.

> ### b. No Reversible Error Under Texas Law

Rule 44.2 of the Texas Rules of Appellate Procedure provides in pertinent part as follows:

> (a) *Constitutional Error*. If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.
> (b) *Other Errors*. Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.

"In that harmless error context, a reviewing court must determine whether the error had a substantial influence on the proceeding itself or whether it had a substantial and injurious effect or influence on the jury's verdict." *Gonzalez v. State*, 117 S.W.3d 831, 840 (Tex. Crim. App. 2003).  "Under Rule of Appellate

Procedure 44.2(b), we disregard all non-constitutional errors that do not affect the appellant's substantial rights. A substantial right is affected 'when the error has a substantial and injurious effect or influence in determining the jury's verdict.'" *Rich v. State*, 160 S.W.3d 575, 577 (Tex. Crim. App. 2005).

Petitioner's state appellate counsel's conclusion that a point of error premised upon the Texas Rule of Optional Completeness would not withstand scrutiny under the Texas harmless error rule was likewise objectively reasonable. Far from exonerating petitioner, as petitioner's trial counsel implicitly suggested during his questioning of detective Carian, Abdygapparova's written statement indicated petitioner (1) was an active participant in Rosado's abduction and robbery, driving Abdygapparova's vehicle while Minjarez grabbed Rosado and dragged her into the vehicle, (2) drove Rosado and the others to a motel, where Minjarez repeatedly raped Rosado, (3) directed Abdygapparova to go purchase the shovel used to bury Rosado's body at a time when Rosado was still alive, (4) refused Abdygapparova's request that he accompany her to buy the shovel, (5) was present at the motel when Rosado was killed, (6) carried Rosado's lifeless body from the motel room to Abdygapparova's vehicle, (7) helped Minjarez bury Rosado's body, (8) helped Minjarez burn various items taken from Rosado's purse, (9)

146

directed Abdygapparova to throw Rosado's clothing out the window

of her vehicle as petitioner drove around town, and (10) directed

Abdygapparova to sell her vehicle.[164]

Petitioner's own written statement corroborated

Abdygapparova's narrative and added additional details such the

facts he (1) sped away from the scene of Rosado's abduction, (2)

drove them to his own residence where he directed Minjarez to

cover Rosado's head, (4) directed Abdygapparova to obtain tape

from inside his home to secure Rosado's hands, head covering, and

mouth, (5) stood watch at the motel while Minjarez and

Abdygapparova forced Rosado to reveal her PIN, (6) directed

Abdygapparova not to leave fingerprints at the motel, (7) helped

Minjarez secure Rosado's hands behind her back after Minjarez had

sexually assaulted Rosado multiple times, (8) walked outside and

looked around while Minjarez fatally forced Rosado's face down on

to a pillow with his hands on the back of her neck, (9) watched

Minjarez wash Rosado's body externally and internally, (10)

directed Abdygapparova to drive all of them with Rosado's body to

his residence, (11) stood watch while Minjarez buried Rosado's

body, (12) disposed of Rosado's jewelry and clothing by tossing

them from Abdygapparova's vehicle as they drove, (13) burned

---

[164] Statement of Asel Abdygapparova, State Habeas Transcript,
Volume I, at pp. 299-303.
    A substantial portion of Abdygapparova's written statement
is quoted verbatim in note 9, *supra*.

147

several items taken from Rosado's purse at petitioner's residence, (14) helped Abdygapparova clean her vehicle's interior, and (15) went with Abdygapparova to Austin to sell her vehicle.[165]

During his cross-examination of detective Carian, petitioner's trial counsel attempted to suggest that Abdygapparova's written statement somehow established petitioner had neither personally sexually assaulted nor personally murdered Rosado. Detective Carian resisted these efforts, arguing that Abdygapparova claimed she was present at the motel at the time she suggested Rosado was murdered.[166] This Court finds Abdygapparova's written statement actually established that (1) she was not present for at least two substantial periods of time during which petitioner and Minjarez were at the motel with Rosado and (2) she was not present during the time frame in which she claimed Rosado was murdered. In petitioner's own written statement, he recites that, at one point, he declined Minjarez's invitation to sexually assault Rosado *because* Abdygapparova was present. When read together, at a minimum, the written statements of petitioner and Abdygapparova establish the petitioner clearly facilitated Minjarez's multiple sexual assaults upon Rosado and Minjarez's murder of Rosado.

---

[165] State's Exhibit 5, S.F. Trial, Volume 29.

[166] *See note 158, supra, and accompanying text.*

148

Furthermore, while Abdygapparova's statement does include a recitation of a hearsay exchange between her and Minjarez regarding the death of Rosado, it is impossible to tell from that cryptic exchange, when Abdygapparova returned from purchasing the shovel later used to bury Rosado's body and asked Minjarez "Did you kill her?" whether she was asking Minjarez if he had personally killed Rosado or if Minjarez and petitioner had together killed Rosado.[167]

Petitioner's jury was properly instructed at the guilt-innocence phase of trial on the Texas law of parties.[168]  Under the Texas law of parties, i.e., the provisions of the Texas Penal Code that address the criminal liability of accomplices and co-conspirators, a criminal defendant may be held responsible for criminal acts of another person as follows:

> (a) A person is criminally responsible for an offense committed by the conduct of another if:
> (1) acting with the kind of culpability required for the offense, he causes or aids an innocent or nonresponsible person to engage in conduct prohibited by the definition of the offense;
> (2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; or
> (3) having a legal duty to prevent commission of the offense and acting with intent to promote or assist its

---

[167] See note 9, supra, for the complete text of that exchange, which also appears at State Habeas Transcript, Volume I, at p. 301.

[168] Trial Transcript, at pp. 245-46.

commission, he fails to make a reasonable effort to prevent commission of the offense.

(b) If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

*Section 7.02, Texas Penal Code Annotated (Vernon 2003).*

Given the foregoing, this Court concludes petitioner's state appellate counsel's conclusion that an "optional completeness" point of error regarding the contents of Abdygapparova's written statement would have had difficulty surmounting the Texas harmless error rule was an objectively reasonable conclusion. Petitioner's state appellate counsel could have reasonably concluded that a successful challenge to the state trial court's exclusion of detective Carian's testimony concerning the contents of Adbygapparova's written statement would have raised harmless error, at best.  Petitioner's state appellate counsel could have reasonably concluded the Texas Court of Criminal Appeals would likely determine the non-admission of Abdygapparova's statement (or Carian's recitation of the contents of same) did not have a substantial or injurious effect on the jury's verdict at the guilt-innocence phase of petitioner's trial.

The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy. *Smith v. Murray*, 477 U.S. at 536,

106 S.Ct. at 2667; *Jones v. Barnes*, 463 U.S. at 751-52, 103 S.Ct. at 3313.  That is precisely what petitioner's state appellate counsel did when he chose not to pursue the point of error premised on the "Rule of Optional Completeness" now urged by petitioner herein. *See Broxton v. Cockrell*, 278 F.3d 456, 458 (5th Cir.)(holding failure to raise a meritless point of error did not cause performance of appellate counsel to fall below an objective level of reasonableness), *cert. denied*, 537 U.S. 951 (2002).

 2. No Prejudice

 This Court independently concludes that the "Rule of Optional Completeness" point of error urged by petitioner as the underlying basis for his sixth and final claim herein would not have been of dubious utility; it would have been doomed to failure under applicable Texas law and the facts of petitioner's case.

 The Texas Rule of Optional Completeness is contained in Rule 107, Texas Rules of Evidence, and states as follows:

> When part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, as when a letter is read, all letters on the same subject between the same parties may be given.  When a detailed act, declaration, conversation, writing or recorded statement is given in evidence, any other act, declaration, writing or recorded statement which is necessary to make it fully understood or to explain the same may also be given in evidence.  "Writing or recorded statement" includes depositions.

*Wright v. State*, 28 S.W.3d 526, 536 n.10 (Tex. Crim. App. 2000), *cert. denied*, 531 U.S. 1128 (2001).

The plain language of this rule provides that, when part of a conversation is placed in evidence by one party, the other party can put the remainder of the conversation (or writing) into evidence to explain the prior comments or otherwise make them fully understood. *Wright v. State*, 28 S.W.3d at 536.  The fundamental problem with petitioner's complaint about the state trial court's exclusion of Carian's testimony regarding the contents of Abdygapparova's written statement is that the prosecution made no effort whatsoever to introduce any of the contents of Abdygapparova's written statement.  This Court's independent review of the entire record from petitioner's trial reveals not even a single instance in which the prosecution questioned detective Carian or any other witness about the contents of Abdygapparova's written statement.  On the contrary, all such questions were directed to detective Carian by petitioner's own trial counsel.  Thus, under the plain language of Rule 107, the Texas Rule of Optional Completeness had no application to detective Carian's testimony regarding the contents of Abdygapparova's written statement. *See Washington v. State*, 856 S.W.2d 184, 186 (Tex. Crim. App. 1993)(the Rule of Optional Completeness is not implicated until such time as a party attempts to have a portion of an act, declaration, conversation, writing or recorded statement "given in evidence,"

at which time the adverse party is entitled to introduce into evidence the remaining parts of the act, declaration, conversation, writing or recorded statement necessary to a full understanding of the evidence).

Furthermore, as was explained above, contrary to the suggestions implicit in the questions petitioner's trial counsel asked detective Carian, Abdygapparova's written statement does not purport to establish that the petitioner did not kill Rosado. On the contrary, she merely stated that she asked Minjarez if "you killed her" and Minjarez responded "Yes.  She's dead."[169]  It is impossible to tell from the cryptic exchange recited in Abdygapparova's statement whether she was referring to only Minjarez or to both Minjarez and petitioner when she asked "did

---

[169] In her written statement, Abdygapparova made the following statements:

> After I bought the shovel I went back to the motel room.  I parked the car and knocked.  Santos opened the door.  He wouldn't let me in, but walked me back to the car.  He was telling me not to go in there.  I asked him why, what did they do in there.  He said she is gone.  I said what do you mean, you killed her?  He said "yes, she is gone."  He told me to wait outside. I was waiting by the car.  Santos came back out and called me to the room.  I went into the room and saw her laying down on the floor.  She didn't have a towel on her head anymore and she had no clothes on.  That is when I saw her body.  She was dead.  She wasn't moving, and she didn't have the towel on her head or the tape on her wrists.  Her eyes were closed, and there was some blood on the right side of her face.  I couldn't tell where it was coming from.  They told me they have to bury her.

State Habeas Transcript, Volume I, at p. 301.

you kill her?"  In any event, Abdygapparova claimed she was not present when Rosado was killed.  Thus, she could not offer any personal knowledge regarding who actually killed Rosado.  Any effort to get Carian to testify regarding what Abdygapparova's written statement said about statements Minjarez made would have involved solicitation of hearsay within hearsay that was clearly outside the scope of Rule 107, *Tex.R.Evid.*

Under Texas law, an erroneous ruling excluding evidence may rise to the level of a constitutional violation if it effectively prevents the defendant from presenting his defensive theory. *Walters v. State*, 247 S.W.3d 204, 221 (Tex. Crim. App. 2007). The state trial court's ruling excluding hearsay testimony from detective Carian concerning the specific hearsay within hearsay contents of Abdygapparova's written statement did not prevent petitioner from presenting any defensive theory.

Under the harmless error standard of review applicable in Texas, quoted above in full from Rule 44.2, *Tex.R.App.P.*, the key question is whether non-constitutional errors such as the exclusion of detective Carian's testimony regarding the contents of Abdygapparova's written statement's contents affected petitioner's substantial rights, i.e., did the error have a substantial and injurious effect or influence in determining the jury's verdict. *Rich v. State*, 160 S.W.3d 575, 577 (Tex. Crim. App. 2005).  For the reasons set forth at length above, this

Court independently concludes petitioner's substantial rights were not detrimentally impacted by virtue of the state trial court's exclusion of detective Carian's testimony regarding the contents of Abdygapparova's written statement. Simply put, Abdygapparova's written statement did not exonerate petitioner or even claim to be based on any personal knowledge regarding who actually murdered Rosado.

This Court independently concludes there is no reasonable probability that, but for the failure of petitioner's state appellate counsel to raise the "optional completeness" point of error petitioner urges herein, the outcome of petitioner's direct appeal would have been any different. The failure of petitioner's state appellate counsel to raise what would have been a meritless point of error did not "prejudice" petitioner within the meaning of *Strickland*. *See Medellin v. Dretke*, 371 F.3d 270, 279 (5th Cir. 2004)(failure to raise a meritless claim on direct appeal did not amount to ineffective assistance), *cert. dism'd*, 544 U.S. 660 (2005); *Garcia v. Quarterman*, 454 F.3d 441, 450 (5th Cir. 2006)(when there was no prejudice from a trial error, by extension there is no prejudice from an appellate error predicated on the same issue).

155

E. Conclusions

Petitioner's complaint about the performance of his state appellate counsel fails to satisfy either prong of *Strickland* analysis.

The Texas Court of Criminal Appeals' rejection on the merits in the course of petitioner's state habeas corpus proceeding of petitioner's complaint about the failure of his state appellate counsel to raise a point of error premised on the Texas Rule of Optional Completeness was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in the petitioner's state habeas corpus proceeding.  Petitioner's sixth claim herein does not warrant federal habeas corpus relief.

## VI. Certificate of Appealability

A.   The Necessity for Obtaining a CoA

The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA"). *See Hill v. Johnson*, 114 F.3d 78, 80 (5th Cir. 1997)(recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson*, 114 F.3d

156

43, 45 (5th Cir. 1997)(holding the standard for obtaining a CoA is the same as for a CPC).  The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson*, 151 F.3d 256, 259 n.2 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999); *Hallmark v. Johnson*, 118 F.3d 1073, 1076 (5th Cir. 1997), *cert. denied sub nom. Monroe v. Johnson*, 523 U.S. 1041 (1998). Effective December 1, 2009, Rule 11(a) of the Rules Governing Section 2254 Cases in United States District Courts requires this Court to issue or deny a CoA when it enters an order adverse to a federal habeas corpus petitioner.

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller-El v. Johnson*, 537 U.S. 322, 335-36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. §2253(c)(2).  Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002)(holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain*, 227 F.3d 228, 230 n.2 (5th Cir. 2000)(holding the same); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997)(holding the scope of appellate review of denial of a habeas petition limited

157

to the issues on which CoA has been granted).   In other words, a

CoA is granted or denied on an issue-by-issue basis, thereby

limiting appellate review to those issues on which CoA is granted

alone. *Crutcher v. Cockrell*, 301 F.3d at 658 n.10; *Lackey v.*

*Johnson*, 116 F.3d at 151; *Hill v. Johnson*, 114 F.3d at 80; *Muniz*

*v. Johnson*, 114 F.3d at 45; *Murphy v. Johnson*, 110 F.3d 10, 11

n.1 (5th Cir. 1997); 28 U.S.C. §2253(c)(3).

B.   The Standard for Obtaining a CoA

A CoA will not be granted unless the petitioner makes a

substantial showing of the denial of a constitutional right.

*Tennard v. Dretke*, 542 U.S. 274, 282, 124 S.Ct. 2562, 2569, 159

L.Ed.2d 384 (2004); *Miller-El v. Johnson*, 537 U.S. at 336, 123

S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. 473, 483, 120 S.Ct.

1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle*, 463 U.S.

880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983).

To make such a showing, the petitioner need *not* show he will

prevail on the merits but, rather, must demonstrate that

reasonable jurists could debate whether (or, for that matter,

agree) the petition should have been resolved in a different

manner or that the issues presented are adequate to deserve

encouragement to proceed further. *Tennard v. Dretke*, 542 U.S. at

282, 124 S.Ct. at 2569; *Miller-El v. Johnson*, 537 U.S. at 336,

123 S.Ct. at 1039; *Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct.

at 1604; *Barefoot v. Estelle*, 463 U.S. at 893 n.4, 103 S.Ct. at

3394 n.4.  This Court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.*

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim.  If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong.  "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U.S. at 338, 123 S.Ct. at 1040 (*quoting Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604). *Accord Tennard v. Dretke*, 542 U.S. at 282, 124 S.Ct. at 2569.  In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its

procedural ruling. *See Slack v. McDaniel*, 529 U.S. at 484, 120 S.Ct. at 1604 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Avila v. Quarterman*, 560 F.3d 299, 304 (5th Cir.), *cert. denied*, ___ U.S. ___, 130 S.Ct. 536, 175 L.Ed.2d 350 (2009); *Moore v. Quarterman*, 534 F.3d 454, 460 (5th Cir. 2008); *Foster v. Quarterman*, 466 F.3d at 364; *Dickson v. Quarterman*, 462 F.3d 470, 476 (5th Cir. 2006); *Pippin v. Dretke*, 434 F.3d at 787; *Bridgers v. Dretke*, 431 F.3d 853, 861 (5th Cir. 2005), *cert. denied*, 548 U.S. 909 (2006).

Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See Miller-El v. Cockrell* 537 U.S. at 337, 123 S.Ct. at 1040 ("It follows that issuance of a COA must not be *pro forma* or a matter of course."); *Sonnier v. Quarterman*, 476 F.3d at 364-69 (denying CoA on a wide variety of challenges to the Texas capital sentencing scheme).

160

C.   Synthesis

The state habeas court's factual findings regarding the voluntariness of petitioner's written confession and petitioner's waiver of his Fifth and Sixth Amendment rights are eminently reasonable in light of that same court's objectively reasonable credibility findings.  Reasonable jurists could not dispute the objectively reasonable decision by the state habeas court to credit the testimony of all of the individuals at the BCADC and the two investigating detectives regarding petitioner's demeanor on April 6-7, 2001.  The undisputed facts that petitioner's vital signs were within or near the normal range on the morning of April 7, 2001 and the petitioner never told either of his experienced trial counsel about his alleged Klonopin withdrawal symptoms furnished the state habeas court with compelled reasons to reject as incredible petitioner's account of the events of April 6-7, 2001.

Petitioner was given an opportunity to present the state habeas court with all of the additional evidence concerning petitioner's motion to suppress that petitioner argued should have been presented during petitioner's pretrial motion to suppress hearing and still petitioner's complaints about the alleged involuntariness of his written confession and waiver of his Fifth and Sixth Amendment rights failed to persuade the same state trial judge who presided over his original motion-to-

suppress hearing.  Petitioner's argument regarding his trial counsel's failure to exclude evidence of petitioner's involvement in the murder of Priscilla Almares was premised upon a misunderstanding of applicable procedural law, which simply does not permit the type of evidence-based pretrial challenge to a state indictment petitioner argued should have been made on his behalf.  Given the highly emotional appeal for mercy orchestrated by petitioner's trial counsel, through the naked appeals for mercy made by petitioner's friends and family, the prosecution's passing reference to the desires of the victims' families did not prejudice petitioner within the meaning of *Strickland*. Petitioner's state appellate counsel had multiple, reasonable, reasons to believe that asserting a point of error regarding Abdygapparova's written statement premised on the Rule of Optional Completeness would likely be unable to overcome the Texas harmless error rule.

This Court has independently reviewed the entirety of petitioner's trial, direct appeal, and state habeas record and independently concludes petitioner's remaining claims for relief all fail to satisfy either prong of the *Strickland* test.  Even if it were possible to quibble over this Court's analysis of the deficient performance prong of *Strickland* with regard to some of petitioner's ineffective assistance claims herein, there is no basis for disagreement among reasonable jurists with this Court's

162

conclusions regarding the lack of prejudice supporting any of
petitioner's ineffective assistance claims.  Simply put,
reasonable jurists could not disagree with this Court's
conclusion that all of petitioner's ineffective assistance claims
herein fail to satisfy the prejudice prong of *Strickland*.  There
was overwhelming evidence supporting the jury's verdict at both
phases of petitioner's capital murder trial.  Furthermore, under
the highly deferential standard applicable to state court
rejections on the merits of ineffective assistance claims under
the AEDPA, petitioner is not entitled to a CoA on any of his
ineffective assistance claims herein:

> The *Strickland* standard is a general one, so the range
> of reasonable applications is substantial. *Knowles v.*
> *Mirzayance*, 556 U.S., at ___, 129 S.Ct. at 1420.
> Federal habeas courts must guard against the danger of
> equating unreasonableness under *Strickland* with
> unreasonableness under § 2254(d).  When § 2254(d)
> applies, the question is not whether counsel's actions
> were reasonable.  The question is whether there is any
> reasonable argument that counsel satisfied *Strickland*'s
> deferential standard.

*Harrington v. Richter*, ___ U.S. at ___, 131 S.Ct. at 788.

Petitioner is not entitled to a CoA on any legal issue,
procedural or substantive, in this cause.

Accordingly, it is hereby **ORDERED** that:

1.  All relief requested in petitioner's Petition, as
supplemented by petitioner's Brief in Support of Petition, *docket*
*entry nos. 11 and 12*, filed May 15, 2009, as further supplemented

163

by Petitioner's Reply to Respondent's Answer, *docket entry no. 28*, filed December 3, 2009, is **DENIED**.

    2.  Petitioner is **DENIED** a Certificate of Appealability.

    3.  Any other pending motions are **DISMISSED** as moot.

    4.  The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.

    **SIGNED** and **ENTERED** this ___*12*___ day of ~~April~~ *May* 2011, at San Antonio, Texas.

 

_____
        **ORLANDO L. GARCIA**
    **United States District Judge**

164